No. 24-60370

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

PRISCILLA STERLING, individually and on behalf of all others similarly situated; RAINE BECKER, individually and on behalf of all others similarly situated; SHAWN MILLER, individually and on behalf of all others similarly situated; JOHN BENNETT,

*PLAINTIFFS – APPELLANTS*

v.

THE CITY OF JACKSON, MISSISSIPPI; CHOKWE A. LUMUMBA; TONY YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH; TRILOGY ENGINEERING SERVICES, L.L.C.,

*DEFENDANTS - APPELLEES.*

---

On Appeal From The United States District Court,
For the Southern District of Mississippi, Northern Division
USDC No. 3:22-cv-00531-KHJ-MTP

---

## BRIEF OF APPELLANTS PRISCILLA STERLING, RAINE BECKER, SHAWN MILLER, AND JOHN BENNETT

---

Stuart C. Talley (CA 180374)
Jack R. Davis (CA 350365)
Kershaw Talley Barlow PC
401 Watt Ave., Ste. 1
Sacramento, California 95864
Telephone: 916-779-7000
Facsimile: 916-244-4829
stuart@ktblegal.com
jack@ktblegal.com
*Attorneys for Plaintiffs-Appellants*

Mark P. Chalos (TN 19328)
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
222 2nd Ave. South, Suite 1640
Nashville, Tennessee 37201
Telephone: (615) 313-9000
mchalos@lchb.com
*Attorney for Plaintiffs-Appellants*

(Additional counsel listed at signature)

# Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Appellees: | Counsel for Appellees: |
| --- | --- |
| City of Jackson, Mississippi | Adam Stone of Jones Walker, L.L.P.; Jackson, MS |
| City of Jackson, Mississippi | Kaytie Pickett of Jones Walker, L.L.P.; Jackson, MS |
| City of Jackson, Mississippi | Abbey Reeves of Jones Walker, L.L.P.; Jackson, MS |
| City of Jackson, Mississippi | Clarence Webster of Jones Walker, L.L.P.; Jackson, MS |
| City of Jackson, Mississippi | Dakota Stephens of Jones Walker, L.L.P.; Jackson, MS |
| City of Jackson, Mississippi | John Hawkins of Hawkins Law, P.C.; Jackson, MS |
| City of Jackson, Mississippi | Sheridan Carr of Office of the City Attorney; Jackson, MS |
| City of Jackson, Mississippi | Terris Harris of Maples Harris; Jackson, MS |
| City of Jackson, Mississippi | Drew Martin; Jackson, MS |
| Chokwe Lumumba | John Hawkins of Hawkins Law, P.C.; Jackson, MS |
| Robert Miller | Terris Harris of Maples Harris; Jackson, MS |
| Kishia Powell | Terris Harris of Maples Harris; Jackson, MS |
| Jerriot Smash | Terris Harris of Maples Harris; Jackson, MS |

| | |
|---|---|
| Trilogy Engineering Services, L.L.C. | Dennis Childress of Fletcher & Sippel, L.L.C.; Jackson, MS |
| Trilogy Engineering Services, L.L.C. | Jeremy Daniels of Daniels, Rodriguez, Berkeley, Daniels & Cruz, P.A.; Coral Gables, FL |
| Trilogy Engineering Services, L.L.C. | Davide Macelloni of Daniels, Rodriguez, Berkeley, Daniels & Cruz, P.A.; Coral Gables, FL |
| Tony Yarber | Terris Harris of Maples Harris; Jackson, MS |

| Appellants: | Counsel for Appellants: |
|---|---|
| Raine Becker | Tiseme Zegeye of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; San Francisco, CA |
| Raine Becker | Robert Gibbs of Gibbs Travis, P.L.L.C.; Jackson, MS |
| Raine Becker | Mark Chalos of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; Nashville, TN |
| Raine Becker | Larry Moffett; Oxford, MS |
| Raine Becker | Stuart Talley of Kershaw Talley Barlow, P.C.; Sacramento, CA |
| Raine Becker | Jack Davis of Kershaw Talley Barlow, P.C.; Sacramento, CA |
| John Bennett | Tiseme Zegeye of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; San Francisco, CA |
| John Bennett | Robert Gibbs of Gibbs Travis, P.L.L.C.; Jackson, MS |
| John Bennett | Mark Chalos of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; Nashville, TN |
| John Bennett | Larry Moffett; Oxford, MS |
| John Bennett | Stuart Talley of Kershaw Talley Barlow, P.C.; Sacramento, CA |

| | |
|---|---|
| John Bennett | Jack Davis of Kershaw Talley Barlow, P.C.; Sacramento, CA |
| Shawn Miller | Tiseme Zegeye of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; San Francisco, CA |
| Shawn Miller | John Hawkins of Hawkins Law, P.C.; Jackson, MS |
| Shawn Miller | Robert Gibbs of Gibbs Travis, P.L.L.C.; Jackson, MS |
| Shawn Miller | Mark Chalos of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; Nashville, TN |
| Shawn Miller | Larry Moffett; Oxford, MS |
| Shawn Miller | Stuart Talley of Kershaw Talley Barlow, P.C.; Sacramento, CA |
| Shawn Miller | Jack Davis of Kershaw Talley Barlow, P.C.; Sacramento, CA |
| Priscilla Sterling | Tiseme Zegeye of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; San Francisco, CA |
| Priscilla Sterling | Robert Gibbs of Gibbs Travis, P.L.L.C.; Jackson, MS |
| Priscilla Sterling | Mark Chalos of Lieff, Cabraser, Heimann & Bernstein, L.L.P.; Nashville, TN |
| Priscilla Sterling | Larry Moffett; Oxford, MS |
| Priscilla Sterling | Stuart Talley of Kershaw Talley Barlow, P.C.; Sacramento, CA |
| Priscilla Sterling | Jack Davis of Kershaw Talley Barlow, P.C.; Sacramento, CA |

/s/Stuart Talley
Attorney of record for Plaintiffs-Appellants

## Statement Regarding Oral Argument

Plaintiffs-Appellants request oral argument pursuant to Fed. R. App. P. 34(a)(1). This case warrants oral argument because it presents important legal issues concerning fundamental constitutional rights. The allegations in this case concern issues which impact many members of the public in Jackson, Mississippi. The factual allegations in this case are complex and oral argument will likely aid the Court by allowing the Parties to address or clarify questions about the facts and legal issues involved in this appeal.

# Table of Contents

Page

Jurisdictional Statement ........................................................14

Statement of Issues................................................................15

Statement of the Case............................................................17

I.    Factual Background ......................................................17

II.   Procedural History .......................................................22

Summary of Argument .........................................................25

Argument................................................................................30

I.    Introduction..................................................................30

II.   The District Court Erred in Dismissing Plaintiffs' Bodily Integrity Claim ..32

    A. Standard of Review ................................................34

    B. The District Court Applied the Wrong Standard for Analyzing Bodily Integrity Claims Caused by Deliberate Indifference................................34

    C. The Alleged Conduct of City Officials Shocks the Conscience .............37

      1. This Case Comports with Bodily Integrity Precedent ........................38

      2. The District Court Did Not Distinguish *Guertin* ................................41

      3. The District Court Failed to Analyze the City's Safe Drinking Water Act Violations............................................................43

III.  The District Court Erred in Granting Qualified Immunity to Defendant City Officials on Plaintiffs' Bodily Integrity Claim.............................................45

    A. Plaintiffs have sufficiently alleged violations of their constitutional right to bodily integrity .......................................................45

**Table of Contents, Cont.**

B. Defendant City Official's contamination and cover up of the lead water crisis is a violation of Plaintiffs' "clearly established" right to bodily integrity ..................................................................................................46

IV. The Court Should Adopt the State-Created Danger Theory .........................51

    A. Standard of Review ...................................................................................52

    B. Ten Circuits Recognize the State-Created Danger Claim........................52

    C. This Court's Prior Consideration of the State-Created Danger Theory...56

    D. Our Nation's History and Traditions Support the Conclusion that the Constitution Prohibits State-Created Dangers.........................................59

    E. Proposed Elements of the State-Created Danger Theory.........................62

    F. Plaintiffs Plead Facts Sufficient for Liability Under the State-Created Danger Theory ..........................................................................................65

        1. Affirmative act to create the risk of harm ...........................................65

        2. The Plaintiffs are members of a specifically defined group ...............68

        3. Defendant's conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm..........................................................69

        4. The risk was obvious or known...........................................................70

        5. Defendants acted recklessly in conscious disregard of the risk ..........71

        6. The conduct, when viewed in total, is conscience shocking...............74

V. Conclusion ..................................................................................................81

Certificate of Service ...........................................................................................83

Certificate of Compliance .....................................................................................84

## Table of Authorities

Page(s)

**Cases**

*Aldridge v. Mississippi Dep't of Corr.*,
990 F.3d 868 (5th Cir. 2021)........................................................ 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................. 34,71

*Bowers v. DeVito*,
686 F.2d 616 (7th Cir. 1982)....................................................... 53

*Breen v. Texas A&M Univ.*,
485 F.3d 325 (5th Cir. 2007)....................................................... 58

*Brown v. Nationsbank Corp.*,
188 F.3d 579 (5th Cir. 1999)..................................................... 80,81

*Carroll v. Ellington*,
800 F.3d 154 (5th Cir. 2015)....................................................... 46

*Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*,
85 F.4th 760 (5th Cir. 2023).................................................... 34,52

*Collins v. City of Harker Heights, Tex.*,
503 U.S. 115 (1992)............................................................*passim*

*Conroe Creosoting Co. v. Montgomery Cnty., Tex.*,
249 F.3d 337 (5th Cir. 2001)................................................. 78,79,80

*Cope v. Cogdill*,
3 F.4th 198 (5th Cir. 2021)......................................................... 49

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998)............................................................*passim*

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*,
497 U.S. 261 (1990)......................................................... 49,50,64

# Table of Authorities, Cont.

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
　　489 U.S. 189 (1989)............................................................*passim*

*Dobbs v. Jackson Women's Health Org.*,
　　597 U.S. 215 (2022)............................................................ 59

*Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*,
　　675 F.3d 849 (5th Cir. 2012)............................................ 58

*Est. of B.I.C. v. Gillen*,
　　710 F.3d 1168 (10th Cir. 2013)...................................... 55,63

*Fields v. Abbott*,
　　652 F.3d 886 (8th Cir. 2011)............................................ 55

*Fisher v. Moore*,
　　73 F.4th 367 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024)............... 59

*Greene v. Plano, I.S.D.*,
　　227 F. Supp. 2d 615 (E.D. Tex. 2002), *aff'd sub nom.*...................... 74,77,78

*Greene v. Plano Indep. Sch. Dist.*,
　　103 F. App'x 542 (5th Cir. 2004)...................................... 74,77,78

*Guertin v. State*,
　　912 F.3d 907 (6th Cir. 2019)............................................*passim*

*Harlow v. Fitzgerald*,
　　457 U.S. 800 (1982).......................................................... 46

*Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*,
　　380 F.3d 872 (5th Cir. 2004).......................................... 71,72

*Hope v. Pelzer*,
　　536 U.S. 730 (2002)............................................................*passim*

*Hurtado v. People of State of California*,
　　110 U.S. 516 (1884)........................................................ 59

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*,
    892 F.3d 719 (5th Cir. 2018)................................................................ 31,74

*Irish v. Fowler*,
    979 F.3d 65 (1st Cir. 2020) ................................................................ 54,55

*Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*,
    954 F.3d 925 (6th Cir. 2020)................................................................ 55,56

*Johnson v. Dallas Indep. Sch. Dist.*,
    38 F.3d 198 (5th Cir. 1994).................................................................... 57

*J.W. by & through Williams v. City of Jackson, Mississippi*,
    663 F. Supp. 3d 624 (S.D. Miss. 2023) ................................................ 33,58

*Kennedy v. City of Ridgefield*,
    439 F.3d 1055 (9th Cir. 2006)................................................................ 52,70

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2004)................................................................ 48,49

*Kneipp v. Tedder*,
    95 F.3d 1199 (3d Cir. 1996) ................................................................... 55

*Leffall v. Dallas Indep. Sch. Dist.*,
    28 F.3d 521 (5th Cir. 1994 ..................................................................... 57

*L.W. v. Grubbs*,
    974 F.2d 119 (9th Cir. 1992)................................................................ 69,70

*Malinski v. New York*,
    324 U.S. 401 (1945).............................................................................. 53

*M. D. by Stukenberg v. Abbott*,
    907 F.3d 237 (5th Cir. 2018)................................................................ 65,71

# Table of Authorities, Cont.

*Meador v. Apple, Inc.*,
    911 F.3d 260 (5th Cir. 2018)................................................... 34,52

*McClendon v. City of Columbia*
    305 F.3d 314 ...................................................................... 47

*Missouri v. McNeely*,
    569 U.S. 141 (2013)............................................................ *passim*

*Monell v. Dep't of Soc. Servs. of City of New York*,
    436 U.S. 658 (1978)........................................................... 62,66

*Morris v. Dearborne*,
    181 F.3d 657 (5th Cir. 1999)................................................ 62

*Morrow v. Meachum*,
    917 F.3d 870 (5th Cir. 2019)................................................ 58

*Mullenix v. Luna*,
    577 U.S. 7 (2015).............................................................. 46

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*,
    577 F.3d 415 (2d Cir. 2009)................................................ 55

*Piotrowski v. City of Houston*,
    237 F.3d 567 (5th Cir. 2001)................................................ 58

*Riggins v. Nevada*,
    504 U.S. 127 (1992)........................................................... 49,50

*Rochin v. California*,
    342 U.S. 165 (1952)........................................................... *passim*

*Salas v. Carpenter*,
    980 F.2d 299 (5th Cir. 1992)............................................... 56,57,58

*Scanlan v. Texas A&M Univ.*,
    343 F.3d 533 (5th Cir. 2003)............................................... 57

**Table of Authorities, Cont.**

*Schloendorff v. Society of New York Hospital*,
    211 N.Y. 125 (1914)......................................................................... 60

*Sell v. United States*,
    539 U.S. 166 (2003)......................................................................... 50

*Taylor v. Riojas*,
    141 S. Ct. 52 (2020)......................................................................... 48

*Union Pac. R. Co. v. Botsford*,
    141 U.S. 250 (1891)......................................................................... 60

*Villarreal v. City of Laredo, Texas,*
    44 F.4th 363 (5th Cir. 2022), *reh'g en banc granted, opinion vacated*,
    52 F.4th 265 (5th Cir. 2022)............................................................ 48

*Wallace v. Cnty. of Comal*,
    400 F.3d 284 (5th Cir. 2005)..................................................... 45,46

*Washington v. Harper*,
    494 U.S. 210 (1990)................................................................ *passim*

*White v. Rochford*,
    592 F.2d 381 (7th Cir. 1979)..................................................... 53,64

*Winston v. Lee*,
    470 U.S. 753 (1985)................................................................ *passim*

*Wood v. Ostrander*,
    879 F.2d 583 (9th Cir. 1989)........................................................... 64

## Statutes

40 C.F.R. §141.85(d)(2) ........................................................................51

28 U.S.C. § 1291 ...................................................................................14

28 U.S.C. § 1331 ...................................................................................14

28 U.S.C. § 1367 ................................................................................ 14,29

42 U.S.C § 300f *et seq.* ........................................................................ 18

42 U.S.C. § 1983 .......................................................................... *passim*

Federal Rule of Civil Procedure 12 .................................................... 34

Federal Rule of Civil Procedure 32 .................................................... 84

Federal Rule of Civil Procedure 34 ...................................................... 5

Jackson Code of Ord. §§ 122-268, 122-270 ...................................... 66

Miss. Code. § 41-26-13 ....................................................................... 51

## **Miscellaneous**

Cong. Globe, 42nd Cong., 1st Sess. 377 (1871). .............................. 61

David Pruessner, *The Forgotten Foundation of State-Created Danger Claims*,
    20 Rev. Litig. 357, 374 (2001) ...................................................... 62

Ku Klux Klan Act of 1871. 17 Stat. 13 ............................................. 61

RECKLESSNESS, Black's Law Dictionary (12th ed. 2024) ................ 71

U.S. CONST. AMEND. III ........................................................................ 60

U.S. CONST. AMEND. IV ........................................................................ 60

U.S. CONST. AMEND. XIV § 1 .............................................................. 61

## Jurisdictional Statement

The District Court had federal question subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs-Appellants ("Plaintiffs") asserted claims for violation of rights guaranteed by the United States Constitution and the law of the United States, including 42 U.S.C. § 1983. The District Court had supplemental subject matter jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal constitutional claims as to be part of the same case and controversy.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment of the District Court in this case which disposed of all Plaintiffs' claims. The Notice of Appeal was timely filed on July 19, 2024, which was less than thirty days after the District Court entered its Final Judgment on June 20, 2024.

**Statement of Issues**

I.      Whether the District Court employed the correct standard for a claim under 42 U.S.C. § 1983 for violation of the right to bodily integrity guaranteed by the Fourteenth Amendment when the District Court stated that such a claim requires "something more" than deliberate indifference.

II.     Whether the District Court correctly held that the facts plead by Plaintiffs-Appellants cannot give rise to liability for the City of Jackson and City Officials under 42 U.S.C. § 1983 for violation of the right to bodily integrity because those facts do not shock the conscience even when assumed to be true and construed in the light most favorable to Plaintiffs-Appellants.

III.    Whether the District Court correctly granted qualified immunity to City Officials in determining that the right to bodily integrity guaranteed by the Fourteenth Amendment is not "clearly established" for this case.

VI.     Whether the Fifth Circuit Court of Appeals should recognize a theory of liability under 42 U.S.C. § 1983 for violation of rights guaranteed by the Fourteenth Amendment for injuries caused by a state-created danger.

V.      Whether the facts plead by Plaintiffs-Appellants would give rise to liability under 42 U.S.C. § 1983 for violation of rights guaranteed by the Fourteenth Amendment for injuries caused by a state-created danger.

**Statement of the Case**

## I.    **Factual Background**

Plaintiffs-Appellants ("Plaintiffs"), residents of the City of Jackson, have been poisoned by lead containments released into Jackson's public water supply because of Defendant-Appellee City of Jackson's ("City") actions. The City deceived Plaintiffs into unknowingly putting toxic chemicals into their bodies. ROA.1449. For years, the City knowingly contaminated otherwise clean water with lead and then pumped that water to its residents' taps. It then encouraged residents to drink the contaminated water. ROA.1481–86. Perhaps to avoid public criticism and negative media reports—especially in light of the influx of media attention on the Flint water crisis, which began in April 2014—the City opted to cover up and downplay the severity of the Jackson water crisis and publicly deny the harm it was causing to its residents. By encouraging Plaintiffs to continue consuming the City's contaminated water, it knowingly subjected Plaintiffs' bodies to toxic contaminants.

City Officials knew and it is common knowledge that lead has devastating health effects on humans, especially on children's development. ROA.1498–99. Increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors, and arrests. ROA.1498–99. Lead is also harmful to adults as it can cause cardiovascular effects, increased blood pressure,

17

hypertension, decreased kidney function, and reproductive problems in both men and women. ROA.1499. Although the U.S. Centers for Disease Control and Prevention (CDC) states there is no safe amount of lead for a human to consume,[1] the Safe Drinking Water Act, 42 U.S.C § 300f *et seq.*, sets the maximum permissible concentration of lead in public drinking water at 15 parts per billion ("ppb"). ROA.1463.

In 2011, the Mississippi State Department of Health ("MSDH") identified Jackson to be at "high-risk for lead poisoning," and triennial testing from 2010 through 2013 showed that the concentration of lead in Jackson's drinking water was increasing at an alarming rate. ROA.1463, 1468–69. By late 2013 or early 2014, City officials knew it was contaminating otherwise clean water as a result of lead leaching from its pipes and fixtures into the City's drinking water, as well as the cause, the risks, and the cost to repair the system. ROA.1469, 1473–74.

Rather than take the needed steps to stop lead from leaching further into the water, the City ignored warnings, even actively switching a section of the City's water source from a safe groundwater system to the corrosive surface water system that was already causing lead to leach from its pipes into residents' drinking water. ROA.1476–77. Following these decisions, in June 2015, MSDH's triennial testing showed that lead levels in Jackson had jumped again, exceeding the 15 ppb

---

[1] https://www.cdc.gov/lead-prevention/about/index.html

regulatory limit at 28 ppb. ROA.1478–80.  Again, any amount of lead in drinking water is dangerous to humans; especially children. Yet the City did not notify residents whose lead levels exceeded the regulatory limit, nor did it notify the public until *at least seven months later*. ROA.1480. Because lead in drinking water cannot be seen or tasted, Plaintiffs could not know that the City was providing lead contaminated water to their homes.

To make matters worse, the City of Jackson and its policy-making officials affirmatively mislead the public into thinking the water was safe to drink when in fact, it was not. ROA.1481–86. For example, Defendant City official Former Public Works Director Kishia Powell stated to the Jackson Free Press that, "This is not a situation where you have to stop drinking the water." ROA.1481, 1482 ("A major difference between Flint, Mich. and Jackson, Miss., Powell said, is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does."), *id.* ("We are nowhere near the levels seen in Flint."). At the same conference, Powell stated, the June 2015 finding of lead above the Lead and Copper Rule's action level "does not mean that the City has violated the Safe Drinking Water Act, and our water is safe." ROA.1481–82. With these false misrepresentations, Defendant Powell encouraged the public to continue drinking the water and downplayed the severity and extent of the contamination, blaming plumbing at individual homes rather than pipes in the

City's system. ROA.1484. ("[T]he problem with the lead was happening at specific homes with lead pipes, and that the water leaving the treatment plant was not contaminated.") Additionally, Defendant Powell actively covered up the crisis by immediately firing one of her employees for alerting the public that in fact, the City's pipes contained bands of lead every 20 feet. ROA.1492.

Like Powell, Defendant Former Mayor Tony Yarber also misled the public and chose to deny and feign ignorance of the crisis in Jackson. ROA.1483 ("I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint."). Throughout 2018, City officials made false and misleading statements to avoid public outrage and delay spending on necessary infrastructure. Defendant Former Public Works Director Robert Miller falsely stated, "there's been no detecting of lead or copper in the water supply." ROA.1485–86. Even when Jackson had just been cited for failing to comport with the MSDH compliance plan, he falsely assured residents that the "water is still safe to drink." ROA.1486. In fact, the only recommendations that the City made to residents who were concerned about ingesting lead through their water actually exacerbated the lead problem. From January to March 2016, Jackson issued boil water notices, but boiling water causes lead concentrations to *increase* because it causes the water to evaporate, leading to a higher concentration of lead in each glass. ROA.1491–92.

These statements caused Plaintiffs to consume lead-contaminated water for years. Plaintiffs regularly watched, read, and listened to local news, where they closely followed City advisories. ROA.1516, 1518, 1521–23. Plaintiffs relied on the City's public misrepresentations that the Public Water System ("PWS") was safe for consumption, and given the City's complete control over the PWS, that reliance was reasonable. ROA.1455, 1516, 1518, 1521–23. Had Plaintiffs known that the City's municipal water contained lead, they would have immediately stopped consuming the water and switched to bottled water. ROA. 1516, 1518, 1521–23.

Throughout 2018 to 2021, the City remained in violation of both the MSDH Compliance Plan and the SDWA. ROA.1512. On March 27, 2020, the EPA issued an Administrative Order which cited multiple SDWA violations and noted that the water system "present[s] an imminent and substantial endangerment to the persons served by the system;" a fact already known to city officials for years. ROA.1508

The City's conscience-shocking conduct and deliberate indifference, including misrepresentations, caused Plaintiffs to consume lead-contaminated water, resulting in violations of Plaintiffs' rights to bodily integrity and to be free from state created dangers protected by the Due Process rights protected by the Fourteenth Amendment to the United States Constitution. ROA.1450, 1455–59.

## II.  Procedural History

Plaintiffs filed their complaint on September 16, 2022. (ECF No. 1.)

Following dismissal of Siemens Corporation and Siemens Industry (ECF Nos. 26, 35), Plaintiffs filed an Amended Complaint on June 15, 2023 (ECF No. 57), which brought the following five claims:

> (1) 42 U.S.C. § 1983 bodily integrity against the City, Lumumba, Yarber, Powell, Miller, and Smash.
>
> (2) 42 U.S.C. § 1983 state-created danger against the City, Lumumba, Yarber, Powell, Miller, and Smash.
>
> (3) Professional negligence against Trilogy.
>
> (4) Negligence against Trilogy.
>
> (5) Negligence against the City, Lumumba, Yarber, Powell, Miller, and Smash, and Doe defendants.

The City and Defendants Lumumba, Yarber, Powell, Miller, and Smash filed motions for judgment on the pleadings (ECF Nos. 66, 70, 72, 74, 75), and the individual Defendants filed motions for qualified immunity (ECF Nos. 68, 72, 74, 75).

On February 5, 2024, the District Court ruled on the motions. (ECF No. 97.) The District Court separated Plaintiffs' allegations into failures to act versus actions. The District Court held that the failures to act were not conscience-shocking because there is no fundamental right to clean water and because of the presumption that discretionary government decision making is rational.

ROA.1427–28. Regarding actions taken, the District Court held that the decisions to switch to surface water, adopt Trilogy's soda ash plan, and issue boil-water notices were not conscience-shocking for the same reasons. ROA.1430–31. Noting that the false and misleading statements might give rise to a constitutional claim, the District Court dismissed the bodily integrity claim without prejudice to provide further opportunity for the parties to brief the standard for misleading public statements and whether that standard is met, and to address the issue of reliance. ROA.1432. The District Court dismissed the state-created danger claim because that theory of liability had not yet been recognized in this Circuit. ROA.1434–35. The District Court also granted qualified immunity to the individual Defendants and noted that Plaintiffs conceded the negligence claim against the individual Defendants. ROA.1437.

Plaintiffs filed their Second Amended Complaint on February 20, 2020, which added allegations asserting that Plaintiffs' relied on Defendants' false and misleading public statements with respect to their decision to consume the water being delivered to their homes (ECF No. 101), and the City and individual Defendants renewed their motions to dismiss (ECF Nos. 104, 106). On June 11, 2024, the District Court again held that Plaintiffs' allegations do not shock the conscience and dismissed the bodily integrity claims with prejudice, holding that "something more" than deliberate indifference is required. ROA.1938–41. The

District Court dismissed Plaintiffs' state law claims without prejudice. ROA.1944. On June 20, 2024, the District Court entered final judgment. (ECF No. 120.)

Plaintiffs appeal from the District Court's two orders dismissing Plaintiffs' bodily integrity claims against the City and City Officials and state-created danger claims. (ECF Nos. 97, 118.) Plaintiffs maintain that the federal claims were improperly dismissed at the pleading stage and therefore further contend that dismissal of Plaintiffs supplemental state-law claims was improper.

## Summary of Argument

There are several basic truths that are not in dispute in this case. Humans need to consume water to survive. Lead is an extremely dangerous toxin and human consumption in *any amount* causes injury. The residents of Jackson were essentially required by law to purchase their water from the City. Because of the City's actions and deliberate inactions, the City's pipes contaminated the municipal water with dangerous levels of lead. City officials knew they were contaminating the water and knew that consumption of the water could cause injury to residents, especially children. However, instead of warning residents to stop drinking the water or complying with federal regulations, City officials provided false and misleading information to residents that caused the residents to consume the lead contaminated water for years.

This is not a case where plaintiffs were poisoned by some naturally occurring substance in the environment and are claiming that the City failed to protect them from this harm. This is a case where the City introduced a poison into the water supply, pumped that water into residents' homes, and then coerced them to drink it by lying about its safety.

There are several errors in the District Court's rulings on Plaintiffs-Appellants' ("Plaintiffs") bodily integrity claim which merit reversal. First, the District Court employed too high of a standard for liability for Plaintiffs' bodily

integrity claim when the District Court held that Plaintiffs were required to plead "something more" than deliberate indifference in order to meet the overall shocks-the-conscience standard. While the total course of conduct must still shock the conscience, deliberately indifferent conduct can meet that standard under *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

More fundamentally, the District Court erred in its conclusion that the allegations in this case do not shock the conscience. The scale of the harm and the certainty with which it would result are substantially higher here than in *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992), upon which the District Court relied, as well as bodily integrity precedent such as *Washington v. Harper*, 494 U.S. 210 (1990). This is not a case involving "environmental contamination." The water was clean and free of lead at its source. It was only after the City switched the water source and brought the corrosive water into its dilapidated pipes that lead was added to the water *by* the City. This case also contains allegations of false and misleading statements that directly coerced Plaintiffs to consume the water the City had contaminated. The District Court failed to distinguish this case from a case involving the Flint Water Crisis where the Sixth Circuit found almost identical conduct sufficiently conscience-shocking at the pleading stage. *Guertin v. State*, 912 F.3d 907 (6th Cir. 2019). Finally, the District Court did not consider the impact of the City's violations of the Safe Drinking Water Act.

The District Court also erred in deciding many of these points at the pleading stage, before discovery even commenced. The District Court pointed to the notion of government discretion to explain its conclusion that the conduct here does not shock the conscience as a matter of law. However, the Complaint contains plausible allegations that the City acted in reckless disregard of substantial dangers for private gain and without justification. Plaintiffs should have been allowed to conduct discovery on this issue before the Court drew inferences in favor of the Defendants.

The District Court also erred when it granted qualified immunity to the individual Defendants. Review of the "clearly established" prong is not confined to this Circuit's precedent and the bodily integrity violation was clearly established in light of *Guertin*, the state and federal administrative warnings, and the obviousness of the violation.

As for Plaintiffs' state created danger claim, the Fifth Circuit has heretofore declined to definitively adopt or reject this theory of liability under 42 U.S.C. § 1983. However, the instant case provides an ideal opportunity to address this issue. Plaintiffs assert that the Court should adopt the state-created danger theory since it has long roots in the history and tradition of our Nation. For the elements of the claim, the Court should follow the Tenth Circuit which has articulated them as follows:

(1) the charged actors created the danger or increased plaintiff's vulnerability to the danger in some way;

(2) plaintiff was a member of a limited and specifically definable group;

(3) defendant's conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;

(4) the risk was obvious or known;

(5) defendants acted recklessly in conscious disregard of that risk; and

(6) such conduct, when viewed in total, is conscience shocking.

The facts pled by Plaintiffs, taken as true and construed in the light most favorable to them, meet the elements set forth above. The City of Jackson took affirmative steps to create the danger by: (1) creating a Public Water System ("PWS") and requiring Plaintiffs' homes to receive water from that system unless they had a private well; (2) switching a clean, well water system to an acidic surface water system thereby forcing residents who were drinking clean water to instead receive the City's contaminated water; (3) pursuing a soda ash method of corrosion control recommended by Trilogy to cut costs despite knowing it would likely not work; and (4) knowingly making false and misleading public statements that the City knew would induce Plaintiffs to consume the contaminated water. These acts are enumerated in addition to Plaintiffs' allegations that City officials knew of rising corrosion and lead levels yet chose not to take corrective action. Plaintiffs were members of a specifically-defined limited group, and Defendants' conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm since it was substantially likely that Plaintiffs would drink and use the water

28

coming from their taps. The false and misleading statements by City officials deterred Plaintiffs from seeking alternate water sources. This conduct was undertaken in conscious disregard of the known risks and, viewed in total, shocks the conscience.

For these reasons, reversal of the District Court's dismissal of the § 1983 claims against the City and City Officials is warranted. If this Court were to reinstate either Plaintiffs' state created danger or bodily integrity federal claims, the District Court would no longer be able to decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(c)(3). Therefore, Plaintiffs also appeal the District Court's decision not to retain supplemental jurisdiction over Plaintiffs' state-law claims since the District Court erred in dismissing Plaintiffs' federal claims.

**Argument**

## I.     Introduction

The City of Jackson and its officials took clean water from the environment, contaminated the water with lead, and then pumped that water into Plaintiffs-Appellants' ("Plaintiffs") homes with full knowledge that the water was contaminated and would cause injury. This is a clear example of a state-created danger and a violation of Plaintiffs' right to bodily integrity. The City ignored rising lead levels and made decisions, the motivations for which are still unknown without discovery, to switch to more acidic water sources and implement corrosion control methods which they knew would fail and lead to further contamination. City officials then coerced Plaintiffs to consume the dangerous water by publicly stating that the water was safe to drink when it was not and by deciding not to inform Plaintiffs about the results of the testing it performed or that the Environmental Protection Agency ("EPA") had issued an Emergency Administrative Order for City. All of these actions were done in direct violation of the Federal Safe Drinking Water Act ("SDWA").

At root, this appeal is about whether these pleadings are shocking to the conscience. In holding that they were not, the District Court placed undue weight on certain general truisms, such as there being "no constitutional right to clean water." However, Plaintiffs' claims are not based on the City's failure to provide a

"clean environment." Instead, the claims are based on the City's reckless contamination of otherwise clean water through its pipes—water that Plaintiffs were statutorily obligated to purchase (unless they had a private well—which none of the Plaintiffs had) and were coerced into drinking as a result of public statements made by City officials. The complaint, read in a light most favorable to Plaintiffs, plausibly alleges conduct that could shock the conscience. At minimum, the District Court should have permitted discovery before concluding otherwise. *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 730 (5th Cir. 2018)

Plaintiffs have pled a proper case under established bodily integrity precedent. The harmful intrusion of lead into Plaintiffs' bodies was proximately caused by City officials' actions. The harm in this case is more serious and permanent than the harms in foundational bodily integrity cases such as *Rochin v. California*, 342 U.S. 165 (1952), *Missouri v. McNeely*, 569 U.S. 141 (2013), and *Winston v. Lee*, 470 U.S. 753 (1985), and it affected exponentially more people. The District Court applied too high a standard for deliberate indifference for this claim, did not distinguish the Sixth Circuit's Flint Water Crisis case, did not consider the SDWA violations, and did not construe the allegations in the light most favorable to Plaintiffs. Plaintiffs' claims should proceed.

Plaintiffs also adequately plead a state-created danger claim under 42 U.S.C. § 1983 which should be adopted as a viable theory of recovery. The Court should recognize this claim because there is a long history and tradition showing that the Constitution was intended to protect citizens against risks of physical harms caused by government action, including the text and legislative history of § 1983. The Court should join almost all of its sister Circuits in recognizing this theory, and Plaintiffs assert that the Court should follow the Tenth Circuit for an appropriate formulation of the elements of the claim.

## II.    The District Court Erred in Dismissing Plaintiffs' Bodily Integrity Claim

The City of Jackson's aging pipe system caused lead to contaminate the City's water supply. The City then pumped this water into Plaintiffs' homes knowing it was contaminated. It then misled its citizens about the safety of the water which resulted in them ingesting contaminated water that could result in serious harm, especially in children. These allegations establish a plausible description of conduct that shocks the conscience. This undisclosed invasion of its citizen's bodies comports with the standard for bodily integrity claims developed by the Supreme Court and this Court. Despite these allegations, the District Court held that Plaintiffs' allegations do not shock the conscience because they essentially amount to negligence and are within the allowance for discretionary government decision making. The District Court based this ruling on the following

rationale: (1) there is no fundamental constitutional right to clean water; (2) "something more" than pure deliberate indifference is required for a bodily integrity claim; and (3) courts should be reluctant to expand the concept of substantive due process to this "novel" claim. ROA.1938–39.

These principles led the District Court to an incorrect holding because: (1) Plaintiffs have never based their claims on a right to clean water and, instead, assert that they have a Constitutional right to be free from government conduct that actually poisoned their water and caused them through deception to drink it; (2) the vague "something more" standard utilized by the District Court misinterprets numerous cases holding that pure deliberate indifference is sufficient to shock the conscience; and (3) this claim is not novel nor a departure from bodily integrity precedent. Indeed, one glaring omission is the District Court failure to distinguish this case from Flint/*Guertin* where bodily integrity claims moved forward, even though the District Court alluded to that case several times in its ruling. In fact, Judge Reeves came to the opposite conclusion of the District Court finding Plaintiffs, minor children, had sufficiently alleged a violation of their right to bodily integrity for the same conduct by the same defendants as alleged here. *J.W. by & through Williams v. City of Jackson, Mississippi*, 663 F. Supp. 3d 624, 644 (S.D. Miss. 2023) ("once the government has opted to provide water, it cannot poison the water's recipients and then mislead them about the presence of that

poison."). The District Court did not read the allegations in the light most favorable to Plaintiffs and incorrectly held, before the opportunity for discovery, that the alleged facts do not shock the conscience.

## A.     Standard of Review

Review of a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) or 12(c) is de novo. *Aldridge v. Mississippi Dep't of Corr.*, 990 F.3d 868, 873 (5th Cir. 2021). The reviewing court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiffs. *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018). A complaint should survive a motion to dismiss if it pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Constitutional issues are matters of law reviewed de novo. *Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*, 85 F.4th 760, 767 (5th Cir. 2023).

## B.     The District Court Applied the Wrong Standard for Analyzing Bodily Integrity Claims Caused by Deliberate Indifference

Plaintiffs allege that the City of Jackson, by and through its official policymakers, was deliberately and conscience-shockingly indifferent to the risk that Plaintiffs would ingest lead contaminated water being pumped by the City into their homes. The City contaminated what was otherwise clean water and then assured residents it was safe to drink. This is all that is required for a bodily

integrity claim. However, in dismissing the SAC, the District Court held that

"'something more' than pure deliberate indifference to their foreseeable plight" is

required for a bodily integrity claim. ROA.1938. This standard misreads *Guertin*,

from where the quote came, as well as broader bodily integrity precedent, and

improperly imposes something vaguely akin to an intent-to-injure requirement.

In *Guertin*, the Sixth Circuit explained that "deliberate indifference claims

require 'something more': A something that we have variously described as callous

disregard for the risk of injury, or action in an arbitrary manner that shocks the

conscience or that indicates an intent to injure." 912 F.3d 907, 924 (6th Cir. 2019).

The District Court incorrectly interpreted this to mean "a bodily-integrity claim

requires 'something more' *than* deliberate indifference to a foreseeable risk of

harm." ROA.1938 (emphasis added). However, closer examination in context

reveals that the "something more" being referenced was the shocks-the-conscience

element. The full quote from *Guertin* reads:

> "After [*County of Sacramento v.*] *Lewis*, the key variable is
> whether actual deliberation is practical, not whether the claimant
> was in state custody. This is because custodial settings are not the
> only situations in which officials may have a reasonable
> opportunity to deliberate. But more importantly, even in non-
> custodial situations, we have stressed that deliberate indifference
> claims require "something more": A something that we have
> variously described as callous disregard for the risk of injury, or
> action in an arbitrary manner that shocks the conscience or that
> indicates an intent to injure. That additional element—be it termed
> callous disregard or intent to injure—ensures that only the most
> egregious official conduct can be said to be arbitrary in the

constitutional sense. *Id*. (internal quotations and brackets
omitted)."

This passage makes clear that the "something more" is conduct that "shocks
the conscience." *Guertin* did not impose a requirement beyond the two elements of
deliberate indifference and shocks-the-conscience; indeed *Guertin* allowed the
plaintiffs' bodily integrity claims to proceed on facts almost identical to those
alleged here.

As its name suggests, the "something more" standard is difficult to articulate
and therefore it is unclear why exactly the District Court found Plaintiffs'
allegations lacking. The District Court summarized bodily integrity cases such as
*Rochin v. California*, 342 U.S. 165 (1952) and *Washington v. Harper*, 494 U.S.
210, 229 (1990) and stated that these cases "[a]ll relate to some direct, forced, and
intentional invasion of an individual's body." ROA.1940. In reaching the
conclusion that the conduct did not meet its "something more" standard, the
District Court construed the Complaint in a light most favorable to the City,
describing its conduct as "inept" and "negligent" as opposed to intentional.
ROA.1430.

The problem is that by equating "something more" with "direct, forced, and
intentional," the District Court effectively erased the possibility for deliberate
indifference claims, which is an impermissible departure from the clear framework
established by *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). There the

Supreme Court clearly stated that deliberate indifference is actionable where it shocks the conscience, *id.* at 849, and courts must undertake "an exact analysis of circumstances" to determine whether allegations shock the conscience. *Id.* at 850. Indeed, *Lewis* supports finding that the present allegations shock the conscience. *Id.* at 853 ("When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."). The District Court departed from the *Lewis* framework, which merits reversal.

### C.    The Alleged Conduct of City Officials Shocks the Conscience

A generation of Jackson residents will grow up with reduced IQ, nerve damage, and other lifelong health impairments due to having consumed lead that City officials knew would be present if they continued on their course of action. This was not a difficult-but-necessary policy choice between unsavory alternatives, but instead was reckless and unforced decision making done in full awareness of the consequences. Then, City officials publicly stated that the water was safe to drink when they knew it was not. These allegations, construed in the light most favorable to Plaintiffs, shock the conscience.

This appeal is, at root, a call for a reevaluation of the conclusion that the allegations, read in total, cannot shock the conscience even interpreted in the light most favorable to Plaintiffs' claims. Plaintiffs urge this Court not to follow the District Court for three reasons: (1) this case is closer to mainstream bodily

integrity precedent than the District Court's opinion concludes; (2) this case is factually very similar to the events in Flint, where bodily integrity claims moved forward; and (3) the District Court failed to account for the City's violations of the Safe Drinking Water Act, EPA directives, and state law standards. Plaintiffs also incorporate by reference the arguments made in the context of Plaintiffs' state-created danger claim, § IV.F.6, *infra*.

### 1. This Case Comports with Bodily Integrity Precedent

The instant case concerns the known introduction of toxic substances into Plaintiffs' bodies via contamination of their drinking water and subsequent untrue and misleading public statements that coerced Plaintiffs to drink that water. This is squarely in line with significant Supreme Court precedent on bodily integrity claims. In *Washington v. Harper*, 494 U.S. 210 (1990), the Court considered the constitutionality of state-law procedures for the involuntary medication of mentally ill prisoners. Although the Court ultimately concluded that the state law scheme was constitutional, the Court indicated that this holding was based on the fact that the scheme addressed those who are: (1) mentally incompetent, and (2) prisoners. *Id.* at 221–23. A free and competent person would thus, under *Harper*, have a near-absolute liberty interest in refusing medication; indeed it would be conscience-shocking to force medication upon a free and mentally competent person in nearly any circumstance. If even involuntary introduction of ostensibly health-promoting

medication into the body violates the Due Process Clause, certainly involuntary introduction of harmful substances does.

The District Court remarked that there is a "yawning gap" between this case and cases like *Rochin v. California*, 342 U.S. 165 (1952), *Missouri v. McNeely*, 569 U.S. 141 (2013), and *Winston v. Lee*, 470 U.S. 753 (1985), as well as *Harper*. ROA.1939 (ECF No. 118 at 20.) *Rochin*, *McNeely*, and *Winston* all involved physical intrusions to extract evidence from the body. However, the instant case is actually more conscience-shocking than these cases in a critical respect, namely that the invasion here caused permanent bodily harm (especially in children), whereas in *Rochin* (use of vomit-inducing solution through a tube) and *McNeely* (blood draw) there was essentially no lasting harm. In *Winston* the potential for harm was disputed, and this supported the Court's holding that nonconsensual surgery to extract a bullet from a criminal defendant's chest was unconstitutional. *Winston* makes clear that the potential for lasting harm should be a core concern when undertaking a bodily integrity analysis. 470 U.S. at 766. The District Court did not analyze the harmfulness of the invasion at all when evaluating whether the allegations shock the conscience.

The District Court also characterized *Rochin*, *McNeely*, *Winston*, and *Harper* as "intentional" invasions. ROA.1940. As explained above, this standard impermissibly forecloses deliberate indifference claims in violation of the

framework set forth in *Lewis*. Even setting that point aside, the present case is not any less "intentional" than those four cases. None of those cases alleged an actual intent to harm, and in *Harper* the intent was to benefit the prisoner with medication. Yet the Supreme Court found bodily integrity violations in all those cases except *Harper*. Additionally, it was improper for the District Court to infer that City Officials were merely "negligent" before any discovery occurred.

The sole distinction that remains is the District Court's characterization of the invasions in those four cases as "direct." The District Court may be correct that factually, the state actor in those four cases was in immediate spatial proximity to the invasion, whereas here the invasion was mediated through miles of pipes—although the pipes delivered water directly into Plaintiffs' homes. But immediate spatial proximity is not required nor particularly significant in the shocks-the-conscience analysis. What is significant is whether the invasion was substantially likely to result from government action and whether the government actors were deliberately indifferent to that fact. *See* 42 U.S.C. § 1983 ("Every person who […] causes to be subjected any citizen of the United States […] to the deprivation of any rights, privileges, or immunity secured by the Constitution […] shall be liable[.]"). In sum, the District Court mischaracterized the lessons to be drawn from *Rochin*, *McNeely*, *Winston*, and *Harper*, and failed to analyze important aspects of the present case.

## 2.     The District Court Did Not Distinguish *Guertin*

In *Guertin v. State*, 912 F.3d 907 (6th Cir. 2019), the Sixth Circuit considered whether the conduct of state actors in the Flint Water Crisis could constitute a 1983 Claim for a violation of the right to bodily integrity. Although the District Court referenced *Guertin* several times in its orders, even calling it "Plaintiffs' most persuasive authority[,]" ROA.1935, the District Court never undertook any reasoned analysis of why the facts in *Guertin* shocked the conscience whereas the present allegations do not. Given the striking similarities to the instant case, this is a glaring omission.

The Flint Water Crisis began when City of Flint official switched the municipal water supply source from the Detroit Water and Sewerage Department to the Flint River, which was known to have much lower pH. 912 F.3d 907, 915. This switch routed the water through an outdated water treatment plant where, with the approval of an engineering firm, it passed to delivery without the introduction of any corrosion control. *Id.* Flint Public Works Director Croft, as well as Emergency Managers Early and Ambrose were "among the chief architects of Flint's decision to switch water sources and then use a plant they knew was not ready to safely process the water[.]" *Id.* at 926. They also "made numerous statements to the public proclaiming that the water was safe to drink." *Id.* at 927.

At issue were the claims against the individual City defendants, as the claim against the City had not been dismissed by the district court in that case. The Sixth Circuit held that the bodily integrity claims against the City officials were proper because they allegedly carried out the transition with knowledge of the harms that would result, and made false and misleading statements that caused residents to consume the water. *Id.* The Sixth Circuit stated that any claim of mistaken judgment or legitimate government purpose was inappropriate for resolution at the motion to dismiss stage. *Id.*

The similarities to the instant case are obvious: Former Mayors Yarber and Lumumba and Former Director of Public Works Powell knew that the Jackson water sources in the Pearl River and the Reservoir exhibited low pH levels which would cause City pipes to contaminate the water without corrosion control, ROA.1471–73; Yarber and Powell directed the switch to even more acidic surface water, ROA.1476–77, 1496–99, and made false and misleading statements to the public that the water was safe to drink, ROA.1482–84. Former Director of Public Works Miller also made misleading public statements, ROA.1485–86, and all these individuals along with Former Director of Public Works Smash knew that the soda ash solution would likely fail, yet decided to implement it despite this knowledge, ROA.1495–97. The Flint Water Crisis shocks the conscience and so do the allegations here.

### 3. The District Court Failed to Analyze the City's Safe Drinking Water Act Violations

Plaintiffs allege that the City, through its official policymakers, violated the Safe Drinking Water Act ("SDWA") first in June 2015 when testing from the Mississippi State Department of Health ("MSDH") showed lead levels above the actionable levels set forth in the National Primary Drinking Water Regulations. ROA.1479–80. Neither the City nor MSDH notified residents of these test results. ROA.1480. In January 2016, MSDH formally notified the City of the violative lead levels in its sampling. ROA.1480. Then in February 2016, MSDH issued an official compliance plan for the City. ROA.1487. The City violated the compliance plan, notwithstanding multiple notices and deadline extensions. ROA.1488–89. Then in 2020, the EPA issued an Emergency Administrative Order addressing numerous SDWA violations. ROA.1507–08. The City did not publicly reveal the Emergency Administrative Order to its citizens until a year later. ROA.1511.

These allegations have four impacts on the shocks-the-conscience analysis. First, simply stated, these violations themselves are conscience-shocking. While Plaintiffs do not assert that violations of the SDWA or EPA Orders are per se constitutional violations, the National Primary Drinking Water Regulations are objective benchmarks which are not to be crossed. In essence, the regulations are a "playbook" that give city officials very specific instructions on how to deal with

43

lead contamination of public drinking water supplies. The intentional failure to follow this playbook is shocking.

Second, these violations further blur the line between action and failure to act. To be clear, Plaintiffs' allegations include many actions which are undoubtedly affirmative actions. But where there is a duty to avoid a certain result, engaging in conduct which brings about that result violates that duty. Whether that conduct consists of action or inaction is irrelevant. In other words, the intentional failure to take actions required by law is, in essence, an "affirmative action." Any description of Plaintiffs allegations as "inactions" must be made against the statutory background of the SDWA and the duty of City officials not to let the water system violate the SDWA standards. These violations speak to the knowingness and deliberateness of Defendants' conduct.

Third, these violations weaken the contention that the issues with the water system were the result of discretionary government decision making and are thus immune from constitutional scrutiny. City officials have a duty not to violate the SDWA. Beyond this, City officials had duties expressly set forth in the MSDH compliance plan. Preventing violations of the SDWA and the compliance plan is thus not a purely discretionary choice like the choice between spending money on bike lanes versus sports arenas.

Finally, the fact that City officials did not communicate violations of the SDWA and the imposition of the EPA Emergency Administrative Order to the public is especially conscience-shocking. ROA.1512 ("[Jackson City Council member Ashby] Foote also said: 'An emergency administrative order was issued by the EPA, which is a formal document with a long list of things that needs to do, and we were not informed that it had been issued. And we had those responsibilities dictated by the EPA. So I was very disappointed when I found out a week ago that this was this has been around for a year, and we had not been notified of it.'").

## III. The District Court Erred in Granting Qualified Immunity to Defendant City Officials on Plaintiffs' Bodily Integrity Claim

The qualified immunity defense "shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005). Here, City Officials' violations of Plaintiffs' clearly established right to bodily integrity are not shielded by qualified immunity.

### A. Plaintiffs Have Sufficiently Alleged Violations of Their Constitutional Right to Bodily Integrity.

The qualified immunity analysis first requires the Court to determine "whether the undisputed facts and the disputed facts, accepting the plaintiffs'

version of the disputed facts as true, constitute a violation of a constitutional right."

*Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015). For the reasons articulated

*supra* in Section II, the District Court incorrectly held that Plaintiffs failed to allege

a violation of Plaintiffs' constitutional right to bodily integrity.

**B.      Defendant City Official's Contamination and Cover Up of the Lead Water Crisis Is a Violation of Plaintiffs' "Clearly Established" Right to Bodily Integrity.**

The District Court erred in finding that the Defendant City Officials

contamination and cover up of the lead poisoning of the public water supply was

not a violation of Plaintiffs' "clearly established" right to bodily integrity. The

second prong of the qualified immunity test asks the court to "decide whether the

conduct was objectively reasonable in light of clearly established law at the time of

the incident." *Wallace*, 400 F.3d at 289 (citing *Harlow v. Fitzgerald*, 457 U.S. 800,

818 (1982)). "A clearly established right is one that is sufficiently clear that every

reasonable official would have understood that what he is doing violates that

right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation omitted).

The District Court incorrectly held that Plaintiffs' right to bodily integrity is

not clearly established in this instant case based on the following flawed

propositions: (1) *Guertin* was decided after much of the alleged wrongdoing here;

and (2) "This is not a case involving an obvious constitutional violation."

ROA.1436 (ECF 97 at 25.) Both statements are incorrect.

When determining whether a right is "clearly established," the Fifth Circuit has held that it is appropriate to look to the law of its sister circuits. *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) ("*Shipp*'s statement that 'we are confined to precedent from our circuit or the Supreme Court' in analyzing whether a right is clearly established […] is overruled.") (citation omitted). Plaintiffs cited *Guertin*, a factually analogous lead contamination case described *supra* at II.C.2, where the Sixth Circuit held, "plaintiffs have properly pled a violation of the right to bodily integrity […] and that the right was clearly established at the time of their conduct." 912 F.3d 907, 935.

First, while *Guertin* was decided in 2019, *Guertin* held that the plaintiffs' bodily integrity rights were clearly established at the time of the defendants' conduct which stemmed back to 2014. *Id.* at 915. Second, even while the 2019 decision was after some of the misconduct alleged here, Plaintiffs also detail alleged misconduct that occurred *after* this date including boil water advisories, the City's 2020 and 2021 violation of the Lead and Copper Rule, and the April 2021 EPA Notice of Violation. ROA.1503, 1506, 1512–15. Indeed, Plaintiffs allege that the City's lead water crisis is *ongoing*: "the water remains unsafe to this day" and the City is still not in compliance with federal law. Therefore, the District Court erred when it found Plaintiffs had failed to identify a factually analogous case.

But more importantly, the second prong of the quailed immunity analysis does not even require plaintiffs to demonstrate that "the exact act has been previously held unlawful," rather, "it requires only that the unlawfulness of the challenged act be apparent in light of pre-existing law. A court may deny qualified immunity to government officials where the constitutional violation is obvious, or where 'reasonable warning' may be imparted to government officials by cases with 'notable factual distinctions.'" *Hope v. Pelzer*, 536 U.S. 730, 740 (2002); *see also Villarreal v. City of Laredo, Texas*, 44 F.4th363, 367 (5th Cir. 2022), *reh'g en banc granted, opinion vacated*, 52 F.4th 265 (5th Cir. 2022) ("as the Supreme Court has repeatedly held, public officials are not entitled to qualified immunity for obvious violations of the Constitution."); *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (holding the "Fifth Circuit erred in granting the officers qualified immunity" where there was no binding caselaw involving the particular facts but the constitutional violation was obvious).

In *Kinney*, the Fifth Circuit applied Supreme Court precedent to deny qualified immunity despite the novel factual circumstances, explaining "the 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (citation omitted); *id*. ("the [Supreme] Court held that one of our sister circuits had erred in defining

clearly established law in such a way that qualified immunity was mandated unless the facts of past cases were 'materially similar' to the conduct then being challenged.") (citation omitted). Indeed, "[i]f we accepted the defendants' view of what it means for the law to be clearly established, qualified immunity would be available in almost every case, even those cases in which 'in the light of pre-existing law the unlawfulness [was] apparent.'" *Id*. at 371 (citation omitted); *see also Cope v. Cogdill*, 3 F.4th 198, 205 (5th Cir. 2021) ("an exact case on point is not required").

The "obviousness" of this constitutional violation is why the Sixth Circuit held that government contamination and cover up constituted a violation of a "clearly established" right. "The lack of a comparable government-created public health disaster precedent does not grant defendants a qualified immunity shield. Rather, it showcases the grievousness of their alleged conduct." *Guertin*, 912 F.3d at 933. So too here. Defendant City Officials engaged in obvious violations of the Constitution and qualified immunity cannot shield their actions. *Guertin*'s finding that Supreme Court precedent sufficiently defined the contours of the bodily integrity right to encompass lead contamination demonstrates that Plaintiffs' right to bodily integrity is clearly established. *Guertin*, 912 F.3d at 920 (citing *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 269–70 (1990); *Washington v. Harper*, 494 U.S. 210, 213–17 (1990); *Riggins v. Nevada*, 504 U.S. 127, 135–38

(1992); *Sell v. United States*, 539 U.S. 166, 177–86 (2003)). Applying Supreme Court precedent, the Sixth Circuit found, "if an individual has a right to refuse the consumption of beneficial water, then certainly any reasonable official would understand that an individual has a right to refuse the consumption of water known to be lead-contaminated, especially when those individuals involved in tainting the water simultaneously vouched for its safety." *Guertin*, 912 F.3d at 934 (quoting *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 277–79 (1990)) (punctuation omitted); *see also id.* at 935 ("[D]efendants' conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe their conduct is constitutionally permissible under the Due Process Clause.") (internal quotation omitted).

Finally, the Supreme Court's *Hope* decision recognized that administrative notice to the defendant can show obviousness and fair notice: "Our conclusion that 'a reasonable person would have known' of the violation is buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of its practices before the incidents in this case took place." 536 U.S. at 744 (internal citation omitted). Here, similar notice was provided to Defendants by MSDH in 2013 who tagged Hinds County as "high-risk for lead poisoning" and recognized that "children are especially at risk since their bodies absorb lead more easily than adults." ROA.1463. Similarly, then-Interim Director of Public Works Willie Bell

raised urgent warnings on Jackson's increasing lead levels and the acute dangers to children. ROA.1469–76. The concealment of lead exceedance levels not only violated the Constitution, but it also violated state and federal law of which these Defendants would have known. Miss. Code. § 41-26-13; 40 C.F.R. §141.85(d)(2). These considerations are indicia of deliberate indifference that was objectively unreasonable, which underscore the obviousness of the violation under *Hope*.

## IV.    The Court Should Adopt the State-Created Danger Theory

A state-created danger claim under 42 U.S.C. § 1983 is a claim for redress of harms caused when a government actor unjustifiably creates or substantially increases a risk of injury to a person. The claim stems from the constitutional protection from government-caused deprivations without due process under the Fifth and Fourteenth Amendments. Recognized by ten circuits, the claim generally requires that a government affirmatively act to create a danger to particular persons and that the course of government conduct shocks the conscience. A state-created danger claim is related to a bodily integrity claim—some cases such as the present case may satisfy both criteria—but captures a different set of harms and has different requirements.

The Fifth Circuit has heretofore declined to definitively rule on whether the state-created danger theory is valid in this Circuit. This case provides an ideal opportunity because the link between the harm and the state action is clearer than

in the majority of cases where the theory has been considered. Here, the City itself

constructed the public water system and essentially mandated that Plaintiffs receive

water into their homes that City officials knew was contaminated with lead and

then lied about it. These actions harmed Plaintiffs independently of any actions by

a third party. The state-created danger theory is thus, on these facts, only a modest

step from existing bodily integrity precedent. The Court should take this

opportunity to end decades of uncertainty in this Circuit and adopt the state-created

danger theory.

### A.     Standard of Review

The standard of review of Plaintiffs' § 1983 state-created danger claim is the

same as for Plaintiffs' bodily danger claim. *See* § II.A, *supra*. The reviewing court

reviews the claims de novo, must accept all well-pleaded facts as true, and view

those facts in the light most favorable to the plaintiffs. *Meador v. Apple, Inc.*, 911

F.3d 260, 264 (5th Cir. 2018). Constitutional issues are matters of law reviewed de

novo. *Chamber of Com. of United States v. United States Sec. & Exch. Comm'n*, 85

F.4th 760, 767 (5th Cir. 2023).

### B.     Ten Circuits Recognize the State-Created Danger Claim

Prior to the coining of the term "state-created danger," courts recognized

claims for harms that arose as a result of government action. *See Kennedy v. City of*

*Ridgefield*, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006) (collecting cases employing the

theory before the doctrine was named as such). There is a line of cases known as the "snake pit" cases, a moniker which stems from Judge Posner's opinion in *Bowers v. DeVito*, 686 F.2d 616 (7th Cir. 1982). In *Bowers*, the estate of a woman murdered in public by a schizophrenic man who had been committed for a prior murder brought a § 1983 action against the state mental health agency and state facility which released him from custody. *Id.* at 617. Although the Seventh Circuit held there was no liability since the state did not place the woman in a unique position of danger, Judge Posner remarked: "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.* at 618.

A particularly apt case is *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979). In *White*, the Seventh Circuit held that a § 1983 claim could lie against a police officer who arrested a father for drag racing and left his three young children on the side of the road, who suffered injuries due to prolonged exposure to the cold. 592 F.2d at 382; *see also id.* at 386 (citing *Malinski v. New York*, 324 U.S. 401, 416–17 (1945) (Frankfurter, J., concurring). Like the instant case, *White* rested on commonsense notions of harm since the harm was environmental and not caused by third party tortfeasors. Also analogous is the fact that the officer's motivations

were unknown; ostensibly the officer did not have actual intent to harm the children, but that was an issue of fact proper for development in discovery.

The use of the term "state-created danger" arose out of *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989). In *DeShaney*, the Supreme Court held there was no constitutional liability when the county department of social services failed to protect a child from an abusive father after several complaints and incidents involving the father. *Id.* at 193–95. However, in reaching this decision the Court stated, "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. This language led to the coining of the term "state-created danger." (*DeShaney* also gave rise to the "special relationship" theory of liability, not at issue here, which holds that government actors can be liable even for negligent acts when the government assumes a special relationship with the plaintiff, such as the plaintiff being in state custody.)

Ten other circuits have adopted the state-created danger theory. *See Irish v. Fowler*, 979 F.3d 65, 73 (1st Cir. 2020) (adopting the doctrine and collecting cases showing that nine other circuits have adopted the doctrine). The adopting cases reason that while the Constitution does not protect against government failure to prevent worldly harms such as private violence, the Due Process Clause does

protect against affirmative governmental conduct which causes injury since such conduct would constitute a deprivation without due process. *See, e.g.*, *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 427–28 (2d Cir. 2009); *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996).

Many of these cases involve fact patterns where the harm is ultimately caused by a third-party tortfeasor and the state acted to trigger or place the plaintiff in the way of the third-party. For this reason, in a minority of circuits, the elements expressly reference third party actions. *See, e.g.*, *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020) ("An official must initially take an affirmative act that either creates or increases the risk that the plaintiff will be exposed to private acts of violence.") (internal quotations omitted).

For the most part, however, the elements are set forth in such a way that they could be readily applied in situations such as the instant case where the harm is a direct result of government action. Different circuits organize the elements in different ways. *Compare Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (setting forth six discrete elements) *with Irish*, 979 F.3d at 75 (setting forth four elements where the "shocks the conscience" element is accompanied by two discrete subparts describing unhurried versus rapid situations) *and Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011) (setting forth five elements) *and Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020) (three

elements).

The common points are generally that the government entity or officials take an affirmative act, that the act targets the plaintiff specifically as opposed to affecting the general public, and that there is a sufficiently culpable mental state, generally the shocks-the-conscience standard. Differences in the formulations mostly appear to stem from whether causation is also described as an element and whether it is combined with other elements, and whether the shocks-the-conscience standard is set forth individually or in combination with the mental state.

### C. This Court's Prior Consideration of the State-Created Danger Theory

After *DeShaney*, this Court decided *Salas v. Carpenter*, 980 F.2d 299 (5th Cir. 1992). *Salas* involved complex facts where a woman was held hostage at gunpoint by her ex-boyfriend, a county sheriff's officer, and she was killed following an allegedly substandard negotiation and rescue operation. *Id.* at 302–04. Although *Salas* held that the elements were not met because the danger to the plaintiff was not affirmatively increased, *Salas* treated the state-created danger claim as established by the snake pit cases and *DeShaney*. *Id.* at 307 ("[U]nintentional conduct more culpable than negligence may deny due process."), 309 ("Courts have found a denial of due process when the state creates the faced dangers.").

Two of this Court's cases in 1994 addressed the theory regarding public school students tragically killed by random violence in school shootings: *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994) and *Leffall v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 530 (5th Cir. 1994). These cases held that the elements were not met since the school did not affirmatively increase the dangers and were not deliberately indifferent, but assumed without deciding that the Circuit would recognize the claim. Although *Leffall* questioned whether the language from *DeShaney* was *dicta*, both *Leffall* and *Johnson* favorably cited pre-*DeShaney* "snake pit" cases and *Salas*, and neither proffered any legal or policy arguments against the theory. Thus, this Circuit's early post-*DeShaney* cases appear favorable to the doctrine, though there was no need to expressly adopt it.

Several years later, this Court employed the doctrine to reverse dismissal in *Scanlan v. Texas A&M Univ.*, 343 F.3d 533 (5th Cir. 2003). *Scanlan* stemmed from the deaths of 12 students at Texas A&M University when the school's annual traditional bonfire stack collapsed. *Id.* at 355. Citing *Johnson*, this Court stated that the elements of a state-created danger claim are that "the defendants used their authority to create a dangerous environment for the plaintiff and that the defendants acted with deliberate indifference to the plight of the plaintiff." *Id.* at 537–38. This Court found the plaintiffs' allegations sufficient since the school knew the bonfire construction environment was dangerous and used their authority

to create opportunity for the resulting harm. After remand, this Court again took appeal of the case in *Breen v. Texas A&M Univ.*, 485 F.3d 325 (5th Cir. 2007), which held that the state-created danger claim was the law-of-the-case, but that the defendants, all individuals, were entitled to qualified immunity. The panel then withdrew the sections on law-of-the-case, leaving the qualified immunity holding intact. 494 F.3d 516 (5th Cir. 2007).

Later panels have remarked that *Breen*'s withdrawal of those sections was a rebuke of the state-created danger theory. *E.g.*, *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 865 (5th Cir. 2012). However, that observation seems incorrect: The *Breen* panel did not expressly repudiate the state-created danger theory, nor overrule *Salas*, even though it could have.

Subsequent cases through the present continued to employ the method of assuming without deciding that the claim may exist, but holding that the facts would not fit the claim or applying qualified immunity on the "clearly established" prong. *E.g.*, *Morrow v. Meachum*, 917 F.3d 870, 880 (5th Cir. 2019). Some cases have held that the claim only applies when the harm is caused by a third party. *E.g.*, *J.W. by & through Williams v. City of Jackson, Mississippi*, 663 F. Supp. 3d 624, 648 (S.D. Miss. 2023) (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001)). However, none of those cases provide substantive reasoning for

limiting the doctrine to third-party harms; that "element" was only articulated to address specific fact patterns in those cases.

### D      Our Nation's History and Traditions Support the Conclusion that the Constitution Prohibits State-Created Dangers

In *Fisher v. Moore*, 73 F.4th 367, 373–74 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024), this Court explained that since the Supreme Court has recently "reiterated—with gusto—that rights protected by substantive due process 'must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty[,]'" a future proponent of the state-created danger theory would need to provide "meticulous briefing on how the state-created danger liability meets todays reinvigorated test[.]" (citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 229 (2022)). Plaintiffs readily accept this Court's invitation. The notion that individuals have the right to be free from personal injury by reckless or deliberately indifferent government conduct predates our Nation and was imported by our forefathers. It is a critical check on government misconduct.

In *Hurtado v. People of State of California*, 110 U.S. 516, 539 (1884), Justice Harlan discusses how common law protections against state action that cause injury were imported into our Nation from the English legal tradition which dates back to the Magna Carta: "The phrase 'due process of law' is not new […] Those who had been driven from the mother country […] brought with them, as their inheritance, which no government could rightfully impair or destroy, certain

guaranties of the rights of life, liberty, and property […] In the congress of the colonies, held in New York in 1765, it was declared that the colonists were entitled to all the essential rights, liberties, privileges, and immunities confirmed by *Magna Charta*[.]" *See also id.* at 542 ("By that instrument the king, […] declared that 'no freeman shall be […] disseized of his freehold, or […] otherwise destroyed […] but by lawful judgment of his peers, or by the law of the land.'"). It is thus evident that the concept of "due process" has, from the very beginning, been understood to protect life and property against government action.

The notion of the sanctity of the individual body in the face of state-sponsored intrusion likewise permeates early American jurisprudence. *See, e.g.*, *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person[.]"); *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129–130 (1914) (Cardozo, J.) ("Every human being of adult years and sound mind has a right to determine what shall be done with his own body[.]"). The sphere of sanctity extends to the home as well. *See, e.g.*, U.S. CONST. AMEND. III ("No soldier shall, in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law."); AMEND. IV ("The right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]").

The text of the Fourteenth Amendment itself plainly envisions liability for state-created danger: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law[.]" U.S. CONST. AMEND. XIV § 1. This clause follows the previous clause which sets forth the prohibition against states making or enforcing laws which abridge the privileges and immunities of citizens of the United States. The canon against surplusage leads clearly to the conclusion that the "nor shall any state deprive" clause refers to state actions beyond merely making and enforcing laws.

Historical support also comes from the text and legislative history of 42 U.S.C. § 1983. Section 1983 reads, in part, as follows:

> Every person who, under color of any statute, […] custom, or usage, of any State […], subjects, *or causes to be subjected*, any citizen of the United States […] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]

(Emphasis added.) Section 1983 is the codification of the Ku Klux Klan Act of 1871. 17 Stat. 13. The Klan was, on its face, a group of private actors, not state officials. However, the Congressional record makes clear that Congress was concerned that local officials acted in complicity with the Klan to cause harm to Black Americans. Cong. Globe, 42nd Cong., 1st Sess. 377 (1871).

For this reason, section 1 of the Act was crafted to include the language "or causes to be subjected[.]" This text makes explicit that government conduct which causes a person to be subjected to constitutional harm, either directly or through private actors, is covered by the Act. The "causes to be subjected" clause was discussed in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978) where the Supreme Court held that this language "plainly imposes liability on a government, that, under color of some official policy, 'causes' an employee to violate another's constitutional rights." Although this discussion regarded a government employee, this analysis encompasses government-caused harms by third parties as well. *See Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999) ("Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable. [… I]n order to establish Dearborne's liability, the Plaintiffs must prove that she set in motion events that would foreseeably cause the deprivation of Plaintiffs' constitutional rights."); *see generally* David Pruessner, *The Forgotten Foundation of State-Created Danger Claims*, 20 Rev. Litig. 357, 374 (2001). Although third-party harms are not the focus of the instant case, the state-created danger claim would encompass such fact patterns.

### E.      Proposed Elements of the State-Created Danger Theory

The elements set forth by this Court's neighbor in the Tenth Circuit are rooted in the constitutional and statutory text, as well as the legal traditions of our

Nation. These elements are as follows:

> (1) the charged state entity and the charged individual actors created the
> danger or increased plaintiff's vulnerability to the danger in some way;
>
> (2) plaintiff was a member of a limited and specifically definable group;
>
> (3) defendant's conduct put plaintiff at substantial risk of serious, immediate,
> and proximate harm;
>
> (4) the risk was obvious or known;
>
> (5) defendants acted recklessly in conscious disregard of that risk; and
>
> (6) such conduct, when viewed in total, is conscience shocking.

*Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013). Plaintiffs appreciate

the concern that this claim should "not transform every tort committed by a state

actor into a constitutional violation." *DeShaney v. Winnebago Cnty. Dep't of Soc.*

*Servs.*, 489 U.S. 189, 202 (1989). The first element requiring an affirmative act, the

fourth element that the risk be obvious or known, and the fifth element that the risk

be consciously disregarded distinguish this claim from garden-variety "should have

known" fact patterns. The "reckless" and "conscience shocking" elements bring

the requisite culpable mental state clearly above a mere breach of the duty to use

reasonable care.

The state-created danger claim would be distinct from a bodily integrity

claim in several respects, although some cases, such as the instant case, would be

properly cognizable under both theories. First, state-created danger is based on "harm" whereas bodily integrity is based on the invasion of the sanctity of the body on personal autonomy grounds, whether or not the invasion is "harmful." *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 221–22 (1990) (discussing substantive due process interest in "avoiding the unwanted administration of antipsychotic drugs"); *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 277 (1990) (discussing "right of a competent individual to refuse medical treatment"). In that sense, the state-created danger claim is narrower.

Another distinction is that the state-created danger claim would provide recourse in situations where the government actor created a serious and proximate risk to the plaintiff, even if that risk did not necessarily result in an actual bodily injury. As a practical matter, it is doubtful that many individuals would bring § 1983 claims without pecuniary injury. But, to borrow from *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979), the constitutional wrong associated with leaving young children stranded in a car in harsh elements on the side of the highway should not depend on whether the children actually receive frostbite. *See also Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989) (police officer left woman stranded in vehicle alone at night in a high-crime area, leading to rape). At least in situations involving the person's own body and home, the constitutional wrong is completed when an individual is made to suffer a serious risk of harm as a result of

conscience-shocking affirmative government conduct in reckless disregard of that risk. In other words, the risk can be the injury. *See M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 250 n.18 (5th Cir. 2018) (explaining that being exposed to an unreasonable risk of harm "is the legal injury").

In sum, the state-created danger claim is only a modestly distinct variant of other recognized constitutional claims such as bodily integrity where the government directly causes harm through its affirmative acts. The elements can be taken without modification from existing precedent from the Tenth Circuit, which is firmly rooted in constitutional and statutory text, as well as in the legal traditions of our Nation.

## F. Plaintiffs Plead Facts Sufficient for Liability Under the State-Created Danger Theory

With this theory in mind, Plaintiffs have pled sufficient facts for this case to proceed to discovery. The Court can decide now whether Plaintiffs allegations, construed in the most favorable light and assumed to be true, meet the elements as a matter of law, since review is de novo.

### 1. Affirmative act to create the risk of harm

Plaintiffs allege that the City of Jackson, by and through its officials and through its official laws and policies, affirmatively acted at multiple levels and stages to create a risk of harm; namely that plaintiffs would consume the water delivered by the City to their homes. These officials, Lumumba, Yarber, Powell,

Smash, and Miller, were all final policymakers as defined in the jurisprudence of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), and themselves took affirmative actions as well as ordered and/or approved the affirmative actions of others. ROA.1457–59.

First, at a foundational level, the City of Jackson built and maintained the public water system. ROA.1455. Since the risks stem entirely from the lead present within the pipes and fixtures of that public water system, the City literally created the danger by using lead pipes in its water system. This alone may be sufficient to satisfy the affirmative act requirement. But there is more. The City of Jackson also effectuated ordinances, Jackson Code of Ord. §§ 122-268, 122-270, which required Jackson residents to take and pay for water from the public water system unless they have a private well or other supply source. ROA.1455.

Additionally, the City, through then-Mayor Defendant Yarber: decided to switch a section of the City's water source from well water to surface water, adding 16,000 connections from the Maddox Road Well System while knowing that this would cause further corrosion, ROA.1476–77; knew that Director Bell cautioned against taking actions that might shock the water system and then ousted Director Bell as Director of Public Works and installed Defendant Kishia Powell, ROA1471, 73; misled Plaintiffs by making the public statement, "I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint."

ROA.1483; hired Trilogy Engineering Services to conduct corrosion control based on his own personal and financial self-interest, ROA.1493–94; and pursued a soda ash method of corrosion control at Trilogy's recommendation, ROA.1495–97.

Defendant Powell also decided, alongside Defendant Yarber, to switch a section of the City's water source from well water to surface water. ROA.1496–99. Defendant Powell made numerous factually false or substantially misleading statements such as that the City had not violated the Safe Drinking Water Act ("SDWA") when there were "numerous SDWA violations" which would be reflected in an EPA Emergency Administrative Order, ROA.1481–82, 1508; that the lead concentrations are "nowhere near the level seen in Flint" when a greater percentage of homes were testing *above* the action threshold in Jackson than in Flint, ROA.1482–83; and that "there is no lead in the drinking water as it leaves the plant" while knowing this was misleading since lead contamination occurs through the corrosion of City pipes and not at the water source, ROA.1483–84. Defendant Powell also decided to pursue a soda ash method of corrosion control at Trilogy's recommendation,  ROA.1495–99.

Defendant Miller also made false and misleading statements. He stated that there has "been no detecting of lead or copper in the water supply[,]" ROA.1485–86 and that the "water is still safe to drink." ROA.1486. The false and misleading statements from these policymaking individuals are affirmative acts which

increased the already substantial likelihood that Plaintiffs would drink the water in their own homes, since these statements dissuaded Plaintiffs from seeking water from alternate sources.

In addition to the above affirmative acts, this case also alleges that policymakers continued on courses of action after learning of the substantial and increasing dangers of corrosion and lead contamination if corrective action was not taken. ROA.1470–76. Plaintiffs assert that these fact patterns also constitute affirmative acts in the same sense that continuing to drive a car in a straight line down the road becomes an affirmative act when the driver sees a pedestrian in line ahead and consciously declines to change the direction of the car. Moreover, Defendants were obligated to act by virtue of the Safe Drinking Water Act. But the Court need not rule on this distinction since Plaintiffs have provided ample references to clearly affirmative acts in the SAC which satisfy this element. Discovery may reveal additional affirmative acts taken by City policymakers.

## 2. The Plaintiffs are members of a specifically defined group

This element ensures that this cause of action will not proceed based on generic dangers to the general public that result from government action. This element is satisfied here since Plaintiffs, although numerous, can each be identified individually by name through records in the possession of the City of Jackson which show the residences connected to the public water system. Far from being a

generalized danger which citizens of Jackson might encounter in a public space, the danger here was specifically directed into the privacy of each of Plaintiffs' homes.

### 3. Defendant's conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm

Plaintiffs drank the water in their homes. Even if, as noted by the District Court, Plaintiffs theoretically could have purchased bottled water, ROA.1931, the fact remains that there was a substantial risk that Plaintiffs would consume the water in their own homes.

Beyond this foundational fact, Plaintiffs further allege that this risk was increased even further by Defendants' misrepresentations and false assurances that the water was safe to drink, which deterred Plaintiffs from seeking alternate sources of water. In circuits that have recognized a state-created danger claim, courts have found that verbal representations of government actors can create a danger where those representations induce the plaintiff to take a course of action that the plaintiff otherwise would not have. *See, e.g.*, *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir. 2006) (police officer stated to plaintiff that police would patrol plaintiff's home the evening after informing plaintiff's neighbor that plaintiff had filed child molestation complaint against the neighbor, inducing plaintiff to stay at home, but police did not patrol the area and the neighbor killed plaintiff's husband); *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir. 1992) (state

medium security correctional facility informed female nurse plaintiff that she would not work with violent sex offenders, but then placed her alone with a violent sex offender, leading to rape).

#### 4. The risk was obvious or known

The Second Amended Complaint is replete with allegations that Defendants, in their capacities as final policymakers for the City of Jackson, had actual knowledge of the dangers of their actions and the falsity of their statements. Defendants Powell knew firsthand that segments of the Pearl River had been identified as impaired due to low pH levels, ROA.1473–74, and that switching to the surface water would cause serious pH and corrosion control issues, and shared this information with Defendant Yarber. ROA.1477–78.

Defendants Powell and Yarber then made false and misleading statements to the public, notwithstanding their actual knowledge. ROA.1481–84. Likewise, Defendant Miller stated that "the water is still safe to drink" and "there has been no detecting of lead or copper in the water supply" when testing affirmatively showed otherwise and after the City had been cited for failing to comply with the Compliance Plan that had been put in place by the MSDH. ROA.1485–86. Plaintiffs allege with more than the requisite specificity that these Defendants had actual knowledge that their courses of action would result in lead contamination and that their statements about the contamination were false and misleading. *See*

*Guertin v. State*, 912 F.3d 907, 928 (6th Cir. 2019) (holding sufficiently definite and actionable the allegation that defendant Busch likely knew that there was no corrosion control being used in Flint at the time he publicly stated that "the Flint Water Treatment Plant had an optimized corrosion control program").

> **5.** **Defendants acted recklessly in conscious disregard of the risk**

Recklessness is conduct where the actor consciously takes a risk without regard to the harmful consequences that the actor knows or reasonably should know will result. *See* RECKLESSNESS, Black's Law Dictionary (12th ed. 2024). It is similar to deliberate indifference. *See M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 252 (5th Cir. 2018) ("To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety.").

The element of recklessness is ultimately a mental state that must be proved at trial. At the pleading stage, however, the element of recklessness is satisfied when the allegations give rise to a reasonable inference of recklessness. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, a plaintiff's showing on the recklessness element should generally be satisfied provided the plaintiff has shown the above elements of an affirmative act, creation of a substantial risk of serious and immediate harm, and the risk having been obvious or known. *See Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*, 380 F.3d 872, 881 (5th

Cir. 2004) ("As the Supreme Court has recently reminded us, under a deliberate indifference standard, 'we may infer the existence of this subjective state of mind from the fact that *the risk of harm is obvious*.'") (emphasis in original) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)).

Nonetheless, Plaintiffs plead additional facts which bolster the inference of recklessness here, namely the absence of any studies, documents, or other information relied upon by Defendants which supported their courses of action in pursuing the lack of corrosion control in the face of increasing acidity in the O.B. Curtis Water Treatment Plant, ROA.1474, and the switch to more acidic surface water, ROA.1478–79. Despite this, the District Court invoked a "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces" in its analysis of whether Plaintiffs bodily integrity claim shocks the conscience. ROA.1428. Plaintiffs have addressed this above for the bodily integrity claim, but it is also relevant here insofar as these competing policy considerations may bear upon the inference of recklessness.

First, insofar as there is a presumption of government rationality applicable here, Plaintiffs have provided enough specific allegations to rebut the presumption. Plaintiffs specifically plead that "Jackson has not identified" any materials which show that such a rational process actually occurred for the lack of corrosion control

at O.B. Curtis and the switch to more acidic surface water. ROA.1474, 1478. The absence of a fact is a fact. It does not make sense to presume that government officials were relying in good faith on competing studies, policies, or materials when there is no competing material.

In the Flint cases, there actually were opinions from the Michigan Department of Environmental Quality and professional engineering firms which defendant Emergency Managers Earley and Ambrose claimed to have relied on. *Guertin v. State*, 912 F.3d 907, 927 (6th Cir. 2019). The Sixth Circuit nonetheless held that the plaintiffs' case should proceed to discovery since the allegations gave rise to a plausible inference of deliberate indifference. The evidence of government rationality is even weaker in the instant case than in Flint, where the presumption of government rationality was overcome at the pleading stage.

With respect to the false and misleading statements, Plaintiffs have pleaded very specific facts showing that the speakers knew that their statements were false or misleading at the time of utterance. *See supra* §§ IV.F.1, IV.F.4. These allegations are sufficient to overcome even a robust presumption.

Second and more fundamentally, this area of inquiry is appropriate for discovery, making dismissal on a motion to dismiss improper. *See, e.g.*, *Guertin*, 912 F.3d at 907. Indeed, it is difficult to square this presumption with the axiom that the court must accept the plaintiff's allegations as true at the pleading stage. At

this stage, the presumption of government rationality should be fairly weak since the plaintiff will not have had the benefit of discovery. *See Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 730 (5th Cir. 2018) ("[W]hen discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint.").

### 6. The conduct, when viewed in total, is conscience shocking

The District Court analyzed the shocks-the-conscience standard in the context of the bodily integrity claim, but since the District Court concluded that the state-created danger claim is foreclosed in this Circuit, the District Court did not analyze the shocks-the-conscience standard in the state-created danger context. However, since Plaintiffs' state-created danger claim is only a modest variant of their bodily integrity claim, Plaintiffs will address some of the District Court's remarks here. Plaintiffs also incorporate by reference the arguments made in § II.C, *supra*.

### i. The District Court's comparisons of the instant case to *Collins* and *Greene* are inapposite

As described above, the District Court addressed Plaintiffs' bodily integrity claims in two orders. The first order held that all of Plaintiffs' bodily integrity allegations do not shock the conscience except potentially for the allegations of false and misleading statements, which were dismissed with leave to amend to

allow the parties to brief the standard for misleading statements and to address reliance. ROA.1432. In the second order, the District Court held that the misleading statements do not shock the conscience since the allegations do not contain the "something more" required in a deliberate indifference case. ROA.1938, 1941.

In its first order, the District Court, on its own accord, separated Plaintiffs' allegations into failures to act versus actions taken. ROA.1424. The distinction between action and failure to act may ultimately be semantic, but even taking it at face value, the District Court's comparison of Plaintiffs' failure-to-act allegations to the facts in *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992) is inapposite. ROA.1426–28. In *Collins*, the plaintiff alleged that the city failed to train city sanitation employees and provide adequate personal protective equipment, leading to the plaintiff's death by asphyxiation in a manhole. 503 U.S. at 117–18. The plaintiff alleged that the city had notice of the dangers because the plaintiff's supervisor had been rendered unconscious in a manhole one month prior. *Id.* at 118 n.1. The Supreme Court held that the Fourteenth Amendment does not impose a general constitutional duty for government employers to provide a safe working environment and that the plaintiff's allegations did not shock the conscience. *Id.* at 127–28.

As a preliminary matter, contrary to the District Court's characterization, the allegations in this case have never rested on the contention that local governments owe an affirmative constitutional duty to provide clean water. However, when a local government affirmatively undertakes to provide a public water system, the local government and its officials have a constitutional duty to not be deliberately and conscience-shockingly indifferent to the delivery of contaminants into the water and then publicly state that the water remains safe.

Plaintiffs' allegations are substantially more conscience-shocking than *Collins* in four respects. First, the degree of certainty of harm is substantially higher here than *Collins* since the introduction of lead into a large number of homes was, by virtue of known chemical processes, certain to result from the lack of corrosion control and affirmatively harmful choices made by Defendants. This is in contrast to *Collins* where the presence of noxious gasses in manholes was unpredictable. Second, the degree of notice is substantially higher here since the Defendants were given a large amount of pH and lead sampling data which revealed the issues with the water system, as well as directives and notices issued by the EPA and MSDH. In *Collins* the only notice was one anecdotal incident that occurred to one individual. Third, the scope of the harm is exponentially greater here than in *Collins*: although the plaintiff's death in *Collins* was tragic, deliberate indifference to a safety issue which may affect at most several dozen government

employees is simply less conscience-shocking than deliberate indifference to a problem that could—and did—cause lifelong debilitation for thousands of residents and children who consumed the water.

Finally, and importantly, *Collins* entirely lacked a key component of the present case: the false and misleading statements made in response to the issue. The District Court improperly separated out (into separate orders) the false and misleading statements from the rest of its analysis, ignoring the principle that the totality of the allegations must be considered in the shocks-the-conscience analysis. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).

The District Court also relied heavily on *Greene v. Plano, I.S.D.*, 227 F. Supp. 2d 615 (E.D. Tex. 2002), *aff'd sub nom. Greene v. Plano Indep. Sch. Dist.*, 103 F. App'x 542 (5th Cir. 2004). ROA.1428, 1434, 1939. In *Greene*, a public school teacher suffered personal injuries after exposure to mold while teaching in the public school facility, and she alleged that the school district knew of the mold and failed to warn her. 103. F. App'x at 543. This Court held that the plaintiff could not meet the standard for a state-created danger claim even assuming the claim existed because a government employer merely providing an unreasonably dangerous workplace and failing to warn cannot violate the Due Process Clause. *Id.* at 545 (citing *Collins*).

Many of the same distinctions between the instant case and *Collins* apply here: the certainty of the harm, the degree of knowledge of the harm, and the scale of the harm are all substantially higher in the instant case, and the instant case also has allegations of false or misleading statements not present in *Greene*. Although the precise nature of the personal injury alleged in *Greene* is not entirely clear, the severity of the harm is likely higher here since lead poisoning carries profound lifelong consequences whereas illness caused by mold is likely transitory. Further, unlike the case here, the mold in *Greene* was not knowingly introduced into the environment by the school district. In sum, *Collins* and *Greene* are substantially distinct and should not guide this Court's analysis, either here or for the bodily integrity claim.

### ii. The allegations comport with Fifth Circuit precedent on the shocks-the-conscience standard.

The deliberate indifference of official policymakers Defendants Yarber, Powell, Miller, and the other Defendants in the face of uncontroverted evidence that lead contamination was occurring, followed by intentional and knowingly false and misleading statements, shocks the conscience in the same way as similar cases of protracted government misconduct considered by the Fifth Circuit. In *Conroe Creosoting Co. v. Montgomery Cnty., Tex.*, 249 F.3d 337 (5th Cir. 2001), a county tax assessor seized the plaintiff's business property and equipment after a "writ of execution" was issued pursuant to a tax judgment. The tax assessor

78

conducted an auction and completely sold the plaintiff's assets, notwithstanding the fact that the tax debt could have been satisfied by sale of only several nonessential vehicles, a fact which the plaintiff had informed the tax assessor of. *Id.* at 339. The tax assessor had also proceeded without authority since Texas law allowed only a peace officer to seize assets pursuant to a writ of execution, as opposed to a tax warrant, and the parties disputed whether the tax assessor took certain actions after learning of his lack of authority. *Id.* at 339–40.

This Court upheld the denial of qualified immunity for the tax assessor, holding that the plaintiff's following allegations would shock the conscience if ultimately proven: "(1) he selected the auctioneers, who were allegedly his friends; (2) he notified state authorities of the sale; (3) he signed a false affidavit in support of a tax warrant; and (4) he authorized the 'complete dispersal' of the company's assets without legal authority." *Id.* at 342. The opinion also noted "[w]hether [the tax assessor] was simply a county official acting on the advice of the County's legal counsel when he signed the dispersal order, as he would have it, cannot be determined as a matter of law from this record." *Id.*

Although the harm is distinct, there are several common fact patterns which bear on the instant case. *Conroe Creosoting* involved a protracted plan of government action over many months, meaning that the defendants had ample time to deliberate. *Conroe Creosoting* also involved a government official taking

harmful actions after being presented with information about the harm of those actions. In *Conroe Creosoting*, any presumption of rational government decision making was held to be inappropriate since there were issues of fact which bore on whether that rational decision making actually occurred. If *Conroe Creosoting* shocks the conscience, so does the instant case.

In *Brown v. Nationsbank Corp.*, 188 F.3d 579 (5th Cir. 1999), this Court held that a *Bivens* due process claim could lie against several FBI agents who, in a yearslong scheme to try to uncover contract procurement fraud and other illegal activity in the aerospace industry, coopted the plaintiffs' businesses for several years with fictitious projects, convinced one plaintiff to dissolve his business relationships based on a fictitious alternative employment offer, and then threatened and interrogated two plaintiffs without the presence of counsel after those plaintiffs learned of the undercover scheme. *Id.* at 583–85. While the Court held that two of the plaintiffs' claims were barred by the statute of limitations and that the third plaintiffs' claim would be dismissed under the "clearly established" prong of qualified immunity, the Court held that the allegations stated a constitutional claim since they shocked the conscience. *Id.* at 591–92. The Court noted that this was a case of "mid-level-culpability" since the FBI agents did not specifically intend to harm the plaintiffs, and reasoned that the fact that the agents

"invested two years and thousands of man hours" provided "ample opportunity for cool reflection." *Id.*

So too here. Defendants provided false and misleading information to the public after having had notice of the rising acidity and lead levels for years. While Defendants may not have specifically intended to harm Plaintiffs, they were deliberately indifferent to the harms that would result from their course of conduct. Because the allegations here shock the conscience, the Court should hold that Plaintiffs state a claim for state-created danger against the City of Jackson.

## V.    Conclusion

The allegations that the City of Jackson was deliberately indifferent to the consequences of their actions which led to the ingestion of lead by thousands of residents—and then lied to the public and covered up testing results and an EPA emergency notice—shock the conscience. The Court should end decades of uncertainty by expressly adopting the state-created danger claim and holding that Plaintiffs state a claim for state-created danger. This Court should find that the District Court erred when it held that "something more" than conscience-shocking deliberate indifference is required for deliberate indifference bodily integrity claims, that Plaintiffs' allegations cannot shock the conscience as a matter of law, and that the individual Defendants are entitled to qualified immunity. The Court

should reverse the District Court's rulings in ECF Nos. 97 and 118 and remand for further proceedings consistent with the Court's opinion.

Date: October 11, 2024

/s/ Stuart C. Talley
Stuart C. Talley (CA 180374)
Jack R. Davis (CA 350365)
Kershaw Talley Barlow PC
401 Watt Ave., Ste. 1
Sacramento, California 95864
Telephone:
Facsimile:
stuart@ktblegal.com
jack@ktblegal.com

Tiseme G. Zegeye (CA 319927)
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, Suite 2900
San Francisco, California 94111
Telephone: (415) 956-100
tzegeye@lchb.com

Mark P. Chalos (TN 19328)
Lieff Cabraser Heimann & Bernstein LLP
222 2nd Ave. South, Suite 1640
Nashville, Tennessee 37201
Telephone: (615) 313-9000
mchalos@lchb.com

Larry D. Moffett (MS 3401)
Law Office Of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655
Telephone: (662) 298-4435
larry@larrymoffefett.com

*Attorneys for Plaintiffs-Appellants*

**Certificate of Service**

I, Stuart C. Talley, attorney for Appellants hereby certify that I have this day caused to be delivered the foregoing document via the ECF electronic system to all counsel of record.

So certified, this 11th day of October, 2024.

*/s/ Stuart C. Talley*
Stuart C. Talley

**Certificate of Compliance**

1.  This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this Court granted Plaintiffs-Appellants' motion to extend the word-volume limitation to 15,500 words and, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 15,498 words.

2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype.

Respectfully submitted,

*/s/ Stuart C. Talley*
Stuart C. Talley
