**No. 24-60370**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

PRISCILLA STERLING, individually and on behalf of all others similarly situated; RAINE BECKER, individually and on behalf of all others similarly situated; SHAWN MILLER, individually and on behalf of all others similarly situated; JOHN BENNETT,

*PLAINTIFFS – APPELLANTS*

v.

THE CITY OF JACKSON, MISSISSIPPI; CHOKWE A. LUMUMBA; TONY YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH; TRILOGY ENGINEERING SERVICES, L.L.C.,

*DEFENDANTS - APPELLEES.*

On Appeal From The United States District Court,
For the Southern District of Mississippi, Northern Division
USDC No. 3:22-cv-00531-KHJ-MTP

### REPLY BRIEF OF APPELLANTS PRISCILLA STERLING, RAINE BECKER, SHAWN MILLER, AND JOHN BENNETT

Stuart C. Talley (CA 180374)
Jack R. Davis (CA 350365)
Kershaw Talley Barlow PC
401 Watt Ave., Ste. 1
Sacramento, California 95864
Telephone: 916-779-7000
Facsimile: 916-244-4829
stuart@ktblegal.com
jack@ktblegal.com
*Attorneys for Plaintiffs-Appellants*

Mark P. Chalos (TN 19328)
LIEFF CABRASER HEIMANN &
BERNSTEIN LLP
222 2nd Ave. South, Suite 1640
Nashville, Tennessee 37201
Telephone: (615) 313-9000
mchalos@lchb.com
*Attorney for Plaintiffs-Appellants*

(Additional counsel listed at signature)

## Table of Contents

Page

I    INTRODUCTION ............................................................................7

II.    PLAINTIFFS PROPERLY PLEADED A BODILY INTEGRITY CLAIM..9

    A.    The Facts in this Case Are Conscience-Shocking ................................9

        i.    Defendants' Deliberate Indifference to the Lime Feed Issue Is Worse than Flint..........................................................................9

        ii.    Defendants Knew of the Falsity of Their Public Statements....11

        iii.    Defendants Failed to Provide Public Notice in Compliance With the Safe Drinking Water Act. ...........................................13

        iv.    Appellees' Attempts to Construe the Facts Differently Than Alleged Shows that Discovery Is Warranted. ...........................15

    B.    Ample Bodily Integrity Precedent Supports the Present Action ........17

        i.    This Is Not an Environmental Rights Case...............................20

        ii.    Plaintiffs Allege Coercion by Deception. .................................24

        iii.    An Intent-to-Injure Requirement for Public Statements Is Not Necessary and Would Be Foreclosed by Precedent .................26

III.    QUALIFIED IMMUNITY ...........................................................29

IV.    STATE-CREATED DANGER .......................................................31

V.    CONCLUSION.............................................................................33

Certificate Of Service.................................................................................35

Certificate Of Compliance .........................................................................36

# Table of Authorities

Page(s)

## **Cases**

*Alton v. Texas A&M Univ.*,
  168 F.3d 196 (5th Cir. 1999) .......................................................................... 17

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir.), *opinion modified on denial of reh'g*,
  409 F.3d 653 (5th Cir. 2005) .......................................................................... 16

*Benzman v. Whitman*,
  523 F.3d 119 (2d Cir. 2008) ..................................................................... 27,28

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ............................................................................... *passim*

*Collins v. City of Harker Heights, Tex.*,
  503 U.S. 115 (1992) ........................................................................................ 24

*Dandridge v. Williams*,
  397 U.S. 471 (1970) ........................................................................................ 23

*Dobbs v. Jackson Women's Health Org.*
  597 U.S. 215 (2022) ............................................................................... 9,19,31

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
  489 U.S. 189 (1989) ................................................................................. 23,31

*DiNoto v. USAA Cas. Ins. Co.*, No. CIV.A. H-13-2877,
  2014 WL 4923975 (S.D. Tex. Sept. 30, 2014) ........................................... 16

*Doe v. Taylor Indep. Sch. Dist.*,
  15 F.3d 443 (5th Cir. 1994) ............................................................................ 17

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) .................................................................... 16,17

*Fisher v. Moore*,
  73 F.4th 367 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024) ............... 31

*Gagne v. City of Galveston*,
 805 F.2d 558 (5th Cir. 1986)............................................................ 30

*Gasper v. Louisiana Stadium & Exposition Dist.*,
 418 F. Supp. 716 (E.D. La. 1976),
 *aff'd*, 577 F.2d 897 (5th Cir. 1978)....................................... 20,21,22

*Goldberg v. Kelly*,
 397 U.S. 254 (1970)......................................................................... 23

*Guertin v. State*,
 912 F.3d 907 (6th Cir. 2019)........................................................... 29

*Helling v. McKinney*,
 509 U.S. 25 (1993)........................................................................... 23

*Hope v. Pelzer*,
 536 U.S. 730 (2002)......................................................................... 30

*In re BP p.l.c. Sec. Litig.*,
 922 F. Supp. 2d 600 (S.D. Tex. 2013) ........................................... 14

*In re Cincinnati Radiation Litig.*,
 874 F. Supp. 796 (S.D. Ohio 1995) ........................................... 26,27

*In re Flint Water Cases*,
 960 F.3d 303 (6th Cir. 2020)........................................................... 29

*Johnson v. Dallas Indep. Sch. Dist.*,
 38 F.3d 198 (5th Cir. 1994)............................................................. 31

*J.W. v. City of Jackson*,
 663 F. Supp. 3d 624 (S.D. Miss. 2023) .......................................... 23

*Katz v. United States*,
 389 U.S. 347 (1967)..................................................................... 17,18

*Lombardi v. Whitman*,
 485 F.3d 73, 79 (2d Cir. 2007)................................................... 27,28

*Meador v. Apple, Inc.*,
    911 F.3d 260 (5th Cir. 2018)............................................................... 15

*Missouri v. McNeely*,
    569 U.S. 141 (2013)................................................................... 7,24

*Pollak v. Public Utilities Commission of District of Columbia*,
    343 U.S. 451 (1952)................................................................. 21,22

*Rochin v. California*,
    342 U.S. 165 (1952)............................................................. 7,24,29

*Ruiz v. McDonnell*,
    299 F.3d 1173 (10th Cir. 2002)...................................................... 33

*Scanlan v. Texas A&M Univ.*
    343 F.3d 533 (5th Cir. 2003)...................................................... 8,32

*Shillingford v. Holmes*,
    634 F.2d 263 (5th Cir. 1981)............................................... 17,25,26

*Tanner v. Armco Steel Corp.*,
    340 F. Supp. 532 (S.D. Tex. 1972) ............................................... 22

*Union Pac. R. Co. v. Botsford*,
    141 U.S. 250 (1891).................................................................... 17

*Valencia v. Wiggins*,
    981 F.2d 1440 (5th Cir. 1993)...................................................... 26

*Washington v. Harper*,
    494 U.S. 210 (1990).......................................................... *passim*

*White v. Rochford*,
    592 F.2d 381 (7th Cir. 1979)...................................................... 8,32

*Winston v. Lee*,
    470 U.S. 753 (1985)........................................................... 7,24,29

## Statutes

40 C.F.R. § 141.202(a)(9) (2013)................................................................13

40 C.F.R. § 141.202(a)(10) ......................................................................13

40 C.F.R. § 141.203 (Safe Drinking Water Act ("SDWA")) ..........................*passim*

Federal Rules of Civil Procedure Rule12(b)(6)...................................................15,16

## Miscellaneous

COERCION, Black's Law Dictionary (12th ed. 2024).......................................24,25

ENVIRONMENT, Black's Law Dictionary (12th ed. 2024)..................................20

Kate Galbraith, *High Levels of Lead Found in Mississippi Capital's Water Likened to Flint Crisis,* THE GUARDIAN, Mar. 17, 2016, https://www.theguardian.com/us-news/2016/mar/17/high-levels-lead-mississippiwater-flint-michigan ....................14

## I.     INTRODUCTION

The rights asserted in this case are clear and amply supported by historical precedent: the right to bodily integrity and to be free from state-created dangers. There are two aspects of the right to bodily integrity, namely freedom from personal injury and an autonomy interest in controlling the most personal aspects of one's own body, such as the compounds introduced into it. The existence of this right is indisputable in light of Supreme Court cases like *Lewis*, *Harper*, *Rochin*, *McNeeley*, and *Winston*, though the means by which the right was violated here are distinct, as they are in every case. Ignoring the factual allegations in this case, Defendants-Appellees ("Defendants") continue to obfuscate this right by attempting to subdivide and misconstrue it into putative rights such as "the right to a clean environment" and "protection from public statements." Plaintiffs do not make such sweeping assertions and have never based their claims on a "right to clean water." Rather, Plaintiffs assert that they have a constitutional right to be free from government conduct that poisoned their water and caused them to drink it through deception.

Defendants' effort to exonerate themselves on the facts fails. Plaintiffs allege that specific individual Defendants had actual knowledge of the lime feed issue which would cause lead leeching, that Defendants knew of the lead exceedances in June 2015 but delayed public notice until January 2016 in violation of the Safe

Drinking Water Act, and that individual Defendants knowingly made false statements about the safety of the water. Plaintiffs have sufficiently pleaded conscience-shocking conduct and deliberate indifference that resulted in Plaintiffs consuming lead-contaminated water. More than this, Defendants' effort to substantively dispute the meaning and effect of evidence demonstrates that this case should proceed to discovery. The present issue at the pleading stage is not whether Plaintiffs have already *proven* that Defendants had the mental state of deliberate indifference or knowingly making false statements, but whether the allegations pleaded are sufficient enough that these mental states are reasonably possible. The pattern of reckless management of the public water system and the deceitful statements which dissuaded the public from seeking alternate water sources, viewed in total, could shock the conscience when all facts are brought to light.

On the state-created danger claim, Plaintiffs adequately pleaded the harm and type of state actions that the claim is designed to address. Defendants' assertion that this claim requires a third party actor is incorrect in light of numerous cases where the harm was not caused by a third party, such as *White v. Rochford* and this Court's decision in *Scanlan v. Texas A&M*. More fundamentally, this Court has not adopted or rejected the claim yet and so previous *dicta* on its potential elements are not binding. The Court should recognize the claim here. At

this early stage of the litigation, Plaintiffs have sufficiently alleged their bodily integrity and state-created danger claims and they should proceed to discovery.

## II.    PLAINTIFFS PROPERLY PLEADED A BODILY INTEGRITY CLAIM

The existence of a right to bodily integrity with respect to state action is beyond dispute. Perhaps knowing that they cannot prevail against this fundamental fact, Defendants erect several straw-men, claiming that their new methodology is now required as a result of the *Dobbs* opinion, which is incorrect. Likewise, Defendants offer cherry-picked facts which are both unpersuasive and prove the more fundamental point that since this case is merely at the pleading stage, further discovery is warranted.

### A.    The Facts Plead Are Conscience-Shocking.

There are several fundamental facts which Defendants seek to gloss over in their response brief. These facts, laid bare, are conscience-shocking in themselves, and are even more so when viewed in totality, as the Court must do. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998).

### i.    Defendants' Deliberate Indifference to the Lime Feed Issue Is Worse than Flint.

Plaintiffs' Second Amended Complaint ("Complaint") alleges: (1) Defendants Yarber, Powell, and Lumumba had actual knowledge viz. Willie Bell's

presentation that there was a defective lime feed system at the O.B. Curtis water treatment plant, which would necessarily cause lead leeching, ROA.1472–73; and (2) did not take any steps to address this issue from when Yarber took office in 2014, ROA.1471–73, through the detection of lead above the action level in June 2015, ROA.1479–80, up until the (inadequate) soda ash treatment was implemented in October 2017, ROA.1489. This is deliberate indifference to a substantial risk of serious harm.

Defendants' attempt to differentiate this case from the situation in Flint Michigan is not persuasive, and any comparison actually supports Plaintiffs' position. For example, Defendants point out that in Flint, a switch was made to an "unknown, untested source[,]" namely the Flint River. Appellees' Br. at 33. At the very least, then, in Flint there was a chance the switch could have turned out okay if the Flint River had non-corrosive pH levels. By contrast, here Plaintiffs allege that Defendants Yarber and Powell actually knew that the Pearl River and the Ross Barnett Reservoir were too acidic to be used in the water system without proper treatment, ROA.1465–66, 1470, and they knew the lime feed system had failed, ROA.1471, effectively leaving the water untreated. In other words, the degree of notice that lead leeching would occur was actually higher here than in Flint, which is conscience-shocking. Defendants' blithe attempt to downplay this situation (*e.g.*, "the system was not the most efficient system[,]" Appellees' Br. at 7) cannot mask

the reality that Defendants knowingly permitted lead leeching to occur for years.

The switch to the surface water system is an aggravating factor in light of Defendants' actual knowledge of the failed corrosion control system. That section of the water system previously drew from the Maddox Road Well Water System, which has a relatively safe pH of over 8, and switched to the surface water system which was highly acidic at a pH just over 6. ROA.1477. Plaintiffs allege Defendant Powell had actual knowledge of these pH levels and shared this information with Defendant Yarber. ROA.1477–78.

### ii.    Defendants Knew of the Falsity of Their Public Statements.

Defendants again attempt to gloss over Plaintiffs' allegations, but cannot hide the fundamental facts: (1) Defendants Powell, Yarber, and Miller were told by MSDH that its testing revealed lead exceedances, ROA.1480; and (2) after receiving this actual knowledge, made false and misleading statements, including: (i) Powell stating that "This is not a situation where you have to stop drinking the water" and "our water is safe", ROA.1481–82; (ii) Yarber stating that "We're not Flint" when an even greater percentage of homes were testing with lead exceedances than Flint, ROA.1482–83; and (iii) Miller stating that "there's been no detecting of lead and copper in the water supply[,]" ROA.1485–86.

Defendants state, without citation, that the water is safe to drink subject to the precautionary measures suggested by Defendants. Appellees' Br. at 38 n.29.

This is, at best, a disputed factual issue appropriate for development in fact and expert discovery, but in reality, is entirely false: Plaintiffs allege that lead is harmful to both children and adults, ROA.1498–1500, and that Defendants said it was "safe" notwithstanding the fact that at that moment, homes were testing above the action levels. Defendants' assertion that their generic precautionary advice sufficed to keep Plaintiffs safe does not withstand scrutiny: Defendants never told residents to stop drinking the water, and their suggestion that children simply have "adequate lead testing done" (Appellees' Br. at 12) fails critically, since this would only detect an issue *after injury has already occurred*. And, while the suggestion that pregnant women and children aged 5 and below drink filtered or bottled water may have alleviated some damages (although not for adults or *children above age 5*), whether this suggestion would reasonably be heard or heeded by residents is again a factual issue to be evaluated in light of the concurrent statement that "the water is safe to drink."

As explained further below, Plaintiffs do not assert a broad right to be free from false and misleading statements by public officials; Plaintiffs assert a right to bodily integrity from public officials. In this case, the false and misleading statements are part of the causal mechanism by which Plaintiffs were induced to consume poisoned water supplied by Defendants, and they also speak to Defendants' mental state which is conscience-shocking. Appellees and the District

Court erred by taking these allegations out-of-context and failing to consider the totality of the allegations in the complaint. *Lewis*, 523 U.S. at 850.

### iii.    Defendants Failed to Provide Public Notice in Compliance With the Safe Drinking Water Act.

Among Plaintiffs' most important allegations is that Defendants delayed over six months from when testing was performed in June 2015 to January 2016 in notifying the public—indeed the residents of the very homes from which these samples were taken—of the lead exceedances in their water. Defendants do not and cannot dispute that this is a violation of the federal Lead and Copper Rule, promulgated pursuant to the Safe Drinking Water Act ("SDWA"). *See* 40 C.F.R. § 141.203 (requiring public notice no later than 30 days[1]).

At the very least, MSDH violated the Rule since it had notice of when the sampling was performed. Plaintiffs allege that Defendants also had notice of the sampling when it was performed and therefore also violated the Rule. ROA.1480.

---

[1] The 30-day notice requirement is for a "Tier 2" violation, which includes maximum contaminant level violations that are not a "Tier 1" violation. There is a strong argument that this violation was actually a Tier 1 violation, which would require 24-hour notice. In the version of the Lead and Copper Rule in effect from 2013 to 2021, Tier 1 violations included "Other violations or situations with significant potential to have serious adverse effects on human health as a result of short-term exposure, as determined by the primacy agency either in its regulations or on a case-by-case basis." 40 C.F.R. § 141.202(a)(9) (2013). After the Flint Water Crisis, Tier 1 was amended to expressly include "Exceedance of the Action Level for lead[.]" 40 C.F.R. § 141.202(a)(10). Because of the seriousness of lead exposure, it arguably should have been considered a Tier 1 violation even before lead exceedance was expressly made a Tier 1 violation. In any event, the six-month delay substantially exceeds the requirement for even a Tier 2 violation.

Defendants dispute this point (Appellees' Br. at 7 n.6) but offer no basis for their opposition. Plaintiffs' allegation is a commonsense inference to be drawn from the fact that in many of the news sources cited, MSDH officials and City officials are described as having worked together. *E.g.*, Kate Galbraith, *High Levels of Lead Found in Mississippi Capital's Water Likened to Flint Crisis,* THE GUARDIAN, Mar. 17, 2016, https://www.theguardian.com/us-news/2016/mar/17/high-levels-lead-mississippiwater-flint-michigan ("Officials from Jackson and the state of Mississippi believe the high lead levels were a short-term event.") (cited at ROA.1475, 1480). More fundamentally, it is simply not credible that MSDH would have conducted lead sampling of 58 homes in Jackson, discovered dangerous levels of lead in the samples, and then failed to inform anyone from the City of its findings. In any event, this factual dispute further illustrates why discovery is warranted in this case so that Jacksonians can learn the truth. *See, e.g.*, *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 627 (S.D. Tex. 2013) ("At this stage, however, Plaintiffs are required to present only an inference of scienter *at least* as compelling as any inference that scienter was lacking.") (emphasis in original).

However, it is important to note that this delay in notification is not the only SDWA violation alleged by Plaintiffs. Defendants offer no rebuttal to Plaintiffs' allegations that Defendants violated the compliance plan set forth by the MSDH. To be clear, Plaintiffs do not claim generally that any SDWA violation necessarily

rises to the level of a constitutional violation. But the SDWA cannot be ignored since it provides important benchmarks to measure the seriousness of the harm to Plaintiffs' bodily integrity and provides context on the nature of the governmental duties Defendants carried by the nature of their offices. This is not a case where state officials were asked to make split second, difficult decisions when confronted with an unforeseen event. The events here were entirely foreseeable and the SDWA provides explicit and direct instructions that Defendants had a duty to follow.

### iv.     Appellees' Attempts to Construe the Facts Differently Than Alleged Shows that Discovery Is Warranted.

This case was dismissed by the District Court as a result of motions to dismiss under Rule 12(b)(6) and motions for judgment on the pleadings under Rule 12(c). The standard for these motions is clear: the reviewing court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiffs. *Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018). This Court reviews the district court's decisions *de novo* [cite].

The above sections address Defendants' factual arguments regarding Defendants' notice of the lime feed issue and the circumstances surrounding their deliberate decision not to fix it, the falsity of Defendants' public statements and Plaintiffs' reliance thereon, and the timing of Defendants' notice of the lead exceedances. Plaintiffs explain above how Defendants' assertions are factually

15

misguided, but these issues underscore a more fundamental point: if this Court even begins to weigh in on disputed factual issues about notice, or the credibility or interpretation of statements made, then the Court must reverse the District Court and let this case proceed to discovery.

Courts in this Circuit commonly deny motions to dismiss because they involve issues of interpretation, notice, and reliance raised in the pleadings and the exhibits attached thereto. *E.g.*, *DiNoto v. USAA Cas. Ins. Co.*, No. CIV.A. H-13-2877, 2014 WL 4923975, at *9 (S.D. Tex. Sept. 30, 2014) ("[T]he issues raised by the parties are more in the nature of a Rule 56 motion for summary judgment than a Rule 12(b)(6) motion to dismiss. Although USAA correctly asserts that the EORs and Medicare representations attached as exhibits to the pleadings may be considered in context of a Rule 12(b)(6) motion, factual issues surround the elements of reliance and damages."). Likewise, this Court has held that the issue of whether harms arose as a result of good faith mistakes or recklessness is ultimately a factual issue. *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257–58 (5th Cir.), *opinion modified on denial of reh'g*, 409 F.3d 653 (5th Cir. 2005) ("Undoubtedly, the accounting issues are complex; whether they were handled within the parameters of good faith decision-making or whether the decisions amounted to recklessness will surely be the focus of any trial of this case. [...] The strong-inference pleading standard does not license us to resolve disputed facts at this

stage of the case.") (citing *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001)).

## B.    Ample Bodily Integrity Precedent Supports the Present Action.

There is a right to bodily integrity in the face of state action. *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891) ("No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person[.]"). This is a broad right, as it should be. As such, precedential cases cover many topics, ranging, for example, from forced administration of drugs (*Washington v. Harper*, 494 U.S. 210 (1990)), to, as Defendants point out, sexual abuse by government actors (*Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443 (5th Cir. 1994)), to injury to innocent non-detained bystanders caused by police (*Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. 1981), and hazing at a state educational institution (*Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) (recognizing right but finding no liability because state officials did not have actual notice)).

Although the *means* by which the right is violated differs from case to case, there is no doubt that the right exists. The rights guaranteed by the Constitution maintain their force even though technological developments in society may provide new means by which those rights can be infringed. *E.g.*, *Katz v. United States*, 389 U.S. 347 (1967) (holding that the privacy protections of the Fourth

Amendment, which expressly protects "persons, houses, papers, and effects," extend to wiretapping of phone booths).

However, Defendants' attempt to re-cast the *means* by which Plaintiffs' bodily rights were violated as the rights themselves is not persuasive. For example, Defendants repeat the refrains that there is no "right to clean water" or "protections from public statements" without truly addressing Plaintiffs' core assertion: Defendants knew that there was poison in the water, delivered it to Plaintiffs' homes, and then through conscience-shocking conduct, including misrepresentations, caused Plaintiffs to drink it. Attempting to recharacterize this situation as asserting a "right to clean water" is like attempting to recharacterize a police brutality case as asserting a "right to health"—of course no one would broadly assert a "right to health," but when state actors recklessly cause injury, that is a violation of the constitutional right to bodily integrity.

The Supreme Court has been consistent in its guidance that courts must understand the means and circumstances of an alleged Constitutional violation to gain a proper vantage point to see whether the right to bodily integrity has been violated. Indeed, this is *Cnty. of Sacramento v. Lewis*'s central premise. In *Lewis* the Court takes as its starting point that Lewis had a right to bodily integrity against arbitrary government action, 523 U.S. 833, 840. Then, by analyzing the means and circumstances by which this right was allegedly violated, namely a high-speed

18

vehicular police pursuit (a technological and infrastructural phenomenon which would have been largely unknown at the drafting of the Constitution), *id.* at 853, the Court decided that the officer had too little time to have possibly been deliberately and conscience-shockingly indifferent to Lewis's right. *Id* at 855.

The Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Org.* therefore provides little guidance here, except to underscore as a general matter that history and tradition must support the right claimed. 597 U.S. 215, 239. In *Dobbs* the factual circumstances were straightforward: a state enacted a statute which prohibited abortion after 15 weeks. The only question was whether the Fourteenth Amendment's Due Process Clause encompassed a right to abortion as held by *Roe v. Wade*. *Id.* at 233. By contrast, unlike in *Dobbs*, Defendants do not contest that the right to bodily integrity is protected by the Constitution. The inquiry is whether the right was in fact violated by virtue of the means employed and the circumstances of the violation. *Dobbs* could not possibly be interpreted to support the position that there is no right to be free from the government intentionally introducing poison into its citizens' bodies. Nowhere does *Dobbs* hold that courts must find exact historical analogues for the *means* by which the right was violated in bodily integrity cases.

Against this backdrop, Plaintiffs will address several specific mischaracterizations set forth by Defendants.

19

### i.    This Is Not an Environmental Rights Case.

In seeking to portray Plaintiffs' claims as asserting a right without historical support, Defendants argue that Plaintiffs assert a "right to a clean environment" or a "right to clean water." The term "environment" is commonly understood to refer to the natural world and the elements outside of our bodies and homes. *See, e.g.*, ENVIRONMENT, Black's Law Dictionary (12th ed. 2024) ("1. The natural world in which living things dwell and grow."). Of course, the word is capable of being used at many levels of scale, e.g. "bacterial environment." But as used in American jurisprudence, "environment" typically means land, water, timber, minerals, and air at large, before these elements are processed for distribution and consumption. Plaintiffs do not complain that Defendants failed to protect them from toxic chemicals in the "environment," but rather that toxic chemicals were *introduced by* the City directly and artificially into Plaintiffs' own homes by virtue of the City piping system.

The case on which Defendants rely, *Gasper v. Louisiana Stadium & Exposition Dist.*, 418 F. Supp. 716 (E.D. La. 1976), *aff'd*, 577 F.2d 897 (5th Cir. 1978), actually shows how this is not an environmental harm case. In *Gasper*, the court explained that the Louisiana Superdome was owned and operated by a political subdivision of the State of Louisiana. *Id.* at 716. The plaintiffs complained that the lack of a cigarette smoking ban in the Superdome violated their putative

right to breathe smoke-free air while on public property. *Id.* at 717. As Defendants note, the court held that the plaintiffs did not have a constitutional right to smoke-free air in public spaces.

However, in so doing, the court expressly differentiated factual scenarios in which an irritant or pollutant would be introduced in a plaintiffs home or another place in which the plaintiff was "captive." *Id.* at 720. Central to *Gaspar*'s holding was the fact that the plaintiffs left their homes and came into the public where they might randomly encounter cigarette smoke or other irritating environmental conditions. *Id.* at 719. When plaintiffs come into the public sphere, environmental hazards are to be expected which are best managed legislatively, the court said. *Id.* at 721. But in saying so, the court said that there are more rights in the home than in public spaces. *Id.* at 719 (citing *Pollak v. Public Utilities Commission of District of Columbia*, 343 U.S. 451 (1952)).

*Gaspar* cited *Pollak* which concerned a state-granted monopoly over the public transit system in D.C. which played music and advertisements to passengers. The court noted that the plaintiffs in *Pollak* were "captive" and "forced to listen to the broadcasts in question" because "[t]here was no other alternative to taking the bus or streetcar." *Id.* at 720. Since, by contrast, the Superdome plaintiffs were "free to attend or not attend as they see fit," the constitutional concerns that

operate within homes and in "captive" situations were not present, and the

plaintiffs' claims failed. *Id.* at 720–21.

Under the reasoning of *Gasper*, Plaintiffs here do not plead an

environmental rights case. The home has constitutional sanctity beyond that which

extends into the public generally, and Plaintiffs allege that Defendants were

deliberately indifferent to their own pumping of poison into Plaintiffs' homes.

Here, Plaintiffs were "captive" since they were required by municipal ordinance to

connect to and take delivery of the City's water without a viable alternative source

for municipal water. Plaintiffs here are thus "captive" in *Gaspar*'s sense. For the

same reason, there is little doubt that the outcome in *Gaspar* would have been

different if the defendant had actually pumped cigarette smoke into the plaintiffs'

homes and then told them the smoke was safe to breathe.

Likewise, the differences between the instant case and *Tanner v. Armco Steel

Corp.*, 340 F. Supp. 532 (S.D. Tex. 1972) underscores why this is not an

environmental harm case. In *Tanner*, the plaintiff sued over a dozen private

petroleum refineries located along the Houston Ship Channel for air pollution he

experienced by virtue of being a Harris County resident. *Id.* at 534. The court held

that the plaintiff's case failed for the obvious reason that there was no state action,

and the court also remarked that there is no general constitutional right to a clean

environment. *Id.* at 536–37. Far from alleging a general contribution to air

pollution levels out in the world, Plaintiffs here allege that Defendants were deliberately indifferent to the toxins that Plaintiffs drank which were introduced directly and only as a result of Defendants' closed water system.

Similarly, Plaintiffs' claims stem not from a claimed "right to clean water," but on the use of City-provided water as a targeted medium to violate their bodily integrity. In that sense, Judge Reeves's statement in *J.W. v. City of Jackson*, 663 F. Supp. 3d 624, 640 (S.D. Miss. 2023) that "the government does not have to provide a service, but once it does, the provision of that service is subject to constitutional constraints" is uncontroversial. There is no constitutional right to responsive police services either, *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989), but no one would dispute that police officers have constitutional duties not to violate bodily integrity rights once they are on the scene.[2]

This case is more akin to *Helling v. McKinney*, 509 U.S. 25, 35 (1993), where the Supreme Court held that a prisoner whose cellmate smoked 5 packs of cigarettes a day with the consent and assistance of prison staff stated an Eighth Amendment claim. Although this was a custodial case, it shows that the targeted

---

[2] Defendants seek to re-litigate Judge Reeves's citations to *Goldberg v. Kelly*, 397 U.S. 254 (1970) and *Dandridge v. Williams*, 397 U.S. 471, 522 (1970) (Marshall, J., dissenting) on this point. Plaintiffs can see how *Goldberg* and *Dandridge* are not exactly on point since they concern procedural due process in termination of public benefits, but these citations are not necessary to the point made.

and direct release of toxins into the home and body implicates constitutional concerns.

### ii.    Plaintiffs Allege Coercion by Deception.

In Plaintiffs' opening brief, Plaintiffs addressed the District Court's treatment of bodily integrity cases *Washington v. Harper*, 494 U.S. 210 (1990), *Rochin v. California*, 342 U.S. 165 (1952), *Missouri v. McNeely*, 569 U.S. 141 (2013), and *Winston v. Lee*, 470 U.S. 753 (1985), pointing out how these cases, while all concerning the core right of bodily integrity, involved multifaceted analyses of intentionality, the degree of certainty of harm, the probability of permanency of harm, and the certainty of causation, which is relevant to fault. Defendants did not address these important factors for evaluating bodily integrity claims. Likewise, Defendants restate their argument about *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115 (1992) without addressing any of the numerous distinctions highlighted by Plaintiffs, including the degree of certainty of harm, the degree of notice, the scope, and importantly, the false statements. Appellees' Br. at 74–78. Instead, Defendants simplify bodily integrity precedent into the requirement that "coercion" be present for a bodily integrity claim to be recognized.

Plaintiffs allege coercion through knowing deception. COERCION, Black's Law Dictionary (12th ed. 2024) ("1. Compulsion of a free agent by physical,

moral, or economic force or threat of physical force. • An act that must be voluntary, such as signing a will, is not legally valid if done under coercion. And since a valid marriage requires voluntary consent, coercion or duress is grounds for invalidating a marriage.") Plaintiffs did not consent to, nor were even given notice of the introduction of lead into their homes for significant time, thus their ingestion of the lead was coerced. The fact that Jackson's municipal code essentially required Plaintiffs to be connected to the public water system bolsters the presence of coercion, but Plaintiffs' claim does not strictly require that fact.

In any event, coercion in the sense of violating one's autonomy is not the only aspect of bodily integrity. Bodily integrity cases also arise from the simple concept of harm, irrespective of questions of consent. In *Shillingford v. Holmes*, 634 F.2d 263, 264 (5th Cir. 1981), a New Orleans police officer who was arresting a suspect clubbed a tourist bystander who was taking a photo of the scene. This Court discussed the differences between a typical tort claim and a constitutional bodily integrity claim and stated that the potential for lasting harm, the disproportionality of the force to the need, and the officer's intentionality were all factors that made the case conscience-shocking. While *Shillingford* is a rare example of an intent-to-harm case, it shows that bodily integrity cases can arise

/ / /

/ / /

from pure bodily harm, not only coercion against one's autonomy.[3]

The term "coercion" also implies an intent to harm which is clearly not the standard. In *Washington v. Harper*, 494 U.S. 210 (1990), the Supreme Court remarked that even forced medication with the intent to benefit a prisoner raised serious constitutional concerns, although the due process procedures set forth in the state statute at issue were ultimately deemed sufficient. There are a myriad of ways by which one's right to bodily integrity can be violated, which is why the test is ultimately whether the totality of the circumstances shocks the conscience.

### iii.     An Intent-to-Injure Requirement for Public Statements Is Not Necessary and Would Be Foreclosed by Precedent.

As explained throughout, Plaintiffs do not assert a right to protection from public statements or a right to truth in government generally. Plaintiffs assert a right to bodily integrity. Therefore, it is unnecessary to determine whether, as a standalone matter, the intent requirement for a purely public statement case should be "something more" than deliberate indifference. Nonetheless, Defendants' assertion that there has never been a bodily integrity case about false or misleading statements is incorrect: *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796 (S.D.

---

[3] Although *Shillingford* involved a non-detained bystander, it was made into a test for excessive force against pretrial detainees and prisoners under the Eighth Amendment, and then its use in that situation was later discontinued after the Supreme Court held that non-severe injuries could be constitutional violations in the custodial context. *Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993). Its remarks on bodily integrity in the non-custodial context remain salient.

Ohio 1995) concerned cancer patients who were told they were receiving a therapeutic dose of radiation but were actually receiving a higher dose pursuant to a clandestine medical study. The court's core concern was voluntariness, i.e. the fact that patients could not have consented to the study due to the false statements. Were the patients told the truth, there would be no claim.

Here, Defendants took many conscience-shocking actions, starting from deliberate indifference to the lime feed issue, continuing through the non-disclosure of the lead testing results from June 2015, up through the false and misleading statements including "the water is safe to drink." The false and misleading statements here are thus only one of many intentional and/or deliberately indifferent actions taken by Defendants. Indeed, Plaintiffs assert that the District Court erred by isolating Defendants' public statements from the rest of the analysis, contravening the totality-of-the-circumstances approach required by *Cnty. of Sacramento v. Lewis*.

For that reason, Defendants' citations to *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008) and *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007), are inapposite. These cases concerned statements made by the Administrator of the EPA that the air quality in the vicinity of the World Trade Center site was safe in the wake of the 9/11 attacks. The only alleged wrongdoing was the public statements; the EPA officials clearly did not create the danger. (The claims brought

were state created danger claims, not bodily integrity claims, which further distinguishes these cases on this point.) Moreover, there were factual considerations in those cases distinct from Plaintiffs' allegations here: in *Lombardi*, the plaintiffs were first responders and the case concerned statements made on the day of or shortly after the attack when the EPA was dealing with limited and evolving information. By contrast here, Plaintiffs allege that Defendants had notice of the rising pH, the lime feed issue, and the lead exceedances for many months and knew with certainty that these issues would harm Plaintiffs, yet they chose to mislead. In *Benzman*, the court noted that the EPA Administrator's statements were influenced by a report issued by the White House Council on Environmental Quality, creating a genuine issue of competing information and policies. Here Plaintiffs allege that Defendants did not point to any competing scientific or policy information.

In any event, these out-of-circuit cases are no rebuttal to the Supreme Court's clear framework in *Lewis* that deliberate indifference can underpin a bodily integrity claim if it shocks the conscience. 523 U.S. 833, 849. *Lewis* held that in some scenarios, actual deliberation is unlikely or impossible as a factual matter, such as in *Lewis*'s high-speed chase, so plaintiffs would have to show intent to harm. *Lewis* did not endorse a heightened intent standard for public statements, and

indeed *Lewis* would counsel towards Plaintiffs' claim here because Defendants did have so much time to respond to these critical issues.

## III.    QUALIFIED IMMUNITY

Defendants were on notice of the unlawfulness of their conduct at the time it occurred. As explained in *Guertin*, the unlawfulness of such deliberate indifference towards known lead contamination was clearly established at the time of the Flint water crisis. 912 F.3d 907, 933–35 (6th Cir. 2019). Precedents like *Rochin* and *Winston* clearly show that "bodily integrity is sacred, founded upon informed consent, and may be invaded only upon a showing of a government interest." *Id.* at 934. The primary wrongdoing of the Flint crisis occurred with knowledge of imminent contamination viz. the water source switch in 2013, the switch occurring in 2014, and false and misleading public statements in 2015. *In re Flint Water Cases*, 960 F.3d 303, 311–13 (6th Cir. 2020). Here Plaintiffs allege knowledge of imminent lead leaching in 2013–14 (ROA.1468–70), testing showing exceedances in 2015 (ROA.1479–80), and false statements in 2016 and later (ROA.1481–86). Thus, if these violations were clearly established for the Flint crisis, they are clearly established here. There is no doubt that Defendants Yarber, Powell,

/ / /

/ / /

/ / /

Lumumba, and Miller knew that introduction of lead into Plaintiffs' homes and bodies would violate constitutional rights.[4]

Not only do Supreme Court cases clearly establish the wrongfulness of the individual Defendants' actions, this precedent is "buttressed" by the state and federal Safe Drinking Water Acts as described in *Hope v. Pelzer*, 536 U.S. 730, 744 (2002). Statutory violations are clearly not "irrelevant" to the qualified immunity analysis, as Defendants claim. Defendants cite only *Gagne v. City of Galveston*, 805 F.2d 558, 559 (5th Cir. 1986) which stated only that violation of a police department's internal policy could not "by itself" deprive the officer of qualified immunity; it did not say that federal statutes are entirely irrelevant. The conduct in *Gagne* was also much more innocuous: the sole wrongdoing alleged was that the officer did not confiscate an arrestee's belt pursuant to policy before putting him in the drunk tank, which he then used to commit suicide. *Id.* Here the scale of the harm and the certainty with which it would result were far greater. Moreover, *Gagne* was decided over 15 years before *Hope*, so *Hope* controls. Plaintiffs do not claim that the SDWA violations "by themselves" defeat qualified immunity, but they can serve as a tiebreaking factor.

---

[4] Plaintiffs acknowledge that detailed information about Defendant Jerriot Smash is not presently available. If the Court upholds the dismissal of the claims against Defendant Smash, Plaintiffs would request leave to amend should discovery demonstrate the necessity.

## IV.   STATE-CREATED DANGER

Plaintiffs set forth in their opening brief a detailed history of this Court's consideration of the state-created danger theory throughout many factual circumstances, including where harm was not caused by third parties. Rather than engage with this history, Defendants cherry-pick several cases where this Court has framed the elements around third party harms and assert that third party harm is an ironclad requirement.

To be clear, this Court has never expressly adopted or rejected the theory, therefore the Court is not so hampered in its recognition of this otherwise well-established common law cause of action. Plaintiffs offer the Tenth Circuit's elements as a model because the exacting standards of the Tenth Circuit's elements address many of the concerns mentioned over the years, e.g. that the state must affirmatively create or increase the danger and not merely fail to prevent it (*Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)) and that the culpability standard be clearly above any tort or negligence standard (*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989)). Moreover, the strict standard of the Tenth Circuit is proffered in recognition of this Court's acknowledgement that the Supreme Court's decision in *Dobbs* "reinvigorated" the standard for substantive due process. *Fisher v. Moore*, 73 F.4th 367, 374 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024). Since review is *de novo*, the Court may

decide to modify the proposed elements and can evaluate Plaintiffs' allegations against the formulation it adopts.

Defendants are incorrect in asserting that a third party harm is a necessary component of all state-created danger claims. The seminal case *White v. Rochford*, 592 F.2d 381 (7th Cir. 1979) concerned a police officer who left three young children on the roadside who suffered injuries due to prolonged exposure to the cold. This Court's decision in *Scanlan v. Texas A&M Univ.*, 343 F.3d 533 (5th Cir. 2003) applied the theory when students, with the encouragement of faculty, constructed an extreme bonfire stack which collapsed upon them. Neither of these cases involved a third party tortfeasor causing the harm.

Tellingly, Defendants proffer no substantive reasoning for why the state-created danger claim should only apply when a third party tortfeasor causes the harm. To insist upon the third party requirement would actually create confusion: the very name for the theory strongly implies that the theory addresses harms caused directly by the state. This, of course, stems from the type of harm the theory is meant to address: deliberately indifferent or intentional government conduct which deprives citizens of rights without due process.

Finally, Plaintiffs pleaded that Defendants were aware of an immediate danger to them specifically. While Plaintiffs' tentative class definition in the Second Amended Complaint may be broad, there is no certified class presently, so

the precise definition of the class will be an issue for class certification.

It is not "amending the pleadings" to state that the City is capable of ascertaining the identity of each home connected to its water system; it is a commonsense background assumption based on the nature of a closed water system. This fixed and closed nature distinguishes the present case from the case cited by Defendants, *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002), where the plaintiff alleged that the state failed to properly investigate a childcare facility. It is true in that case that the state could not know in advance who would become a patron of the childcare facility, but that is not the situation here where customers are determined by fixed physical connections.

## V.    CONCLUSION

Defendants' deliberate indifference to Plaintiffs' bodily integrity in the face of their own state-created danger shocks the conscience. The Court should reverse the District Court's decision on Plaintiffs' bodily integrity claim and on the individual Defendants' entitlement to qualified immunity on that claim, and the Court should recognize the common law constitutional protection of the state-created danger claim and hold that Plaintiffs state that claim here.

Date: January 13, 2025

*/s/ Stuart C. Talley*
Stuart C. Talley (CA 180374)
Jack R. Davis (CA 350365)
Kershaw Talley Barlow PC

401 Watt Ave., Ste. 1
Sacramento, California 95864
Telephone: 916-779-7000
Facsimile: 916-244-4829
stuart@ktblegal.com
jack@ktblegal.com

Tiseme G. Zegeye (CA 319927)
Lieff Cabraser Heimann & Bernstein LLP
275 Battery Street, Suite 2900
San Francisco, California 94111
Telephone: (415) 956-100
tzegeye@lchb.com

Mark P. Chalos (TN 19328)
Lieff Cabraser Heimann & Bernstein LLP
222 2nd Ave. South, Suite 1640
Nashville, Tennessee 37201
Telephone: (615) 313-9000
mchalos@lchb.com

Larry D. Moffett (MS 3401)
Law Office Of Larry D. Moffett, PLLC
P.O. Box 1418
Oxford, MS 38655
Telephone: (662) 298-4435
larry@larrymoffefett.com

*Attorneys for Plaintiffs-Appellants*

**Certificate of Service**

I, Stuart C. Talley, attorney for Appellants hereby certify that I have this day caused to be delivered the foregoing document via the ECF electronic system to all counsel of record.

So certified, this 13th day of January 2025.

*/s/ Stuart C. Talley*
Stuart C. Talley

**Certificate of Compliance**

1. This document complies with the type-volume limit of Fed. R. App. P.
32(a)(7)(B) because, excluding the parts of the document exempted by
Fed. R. App. P. 32(f), this document contains 6,491 words.

2. This document complies with the typeface requirements of Fed. R. App.
P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)
because this document has been prepared in a proportionally spaced
typeface using Microsoft Word in 14-point Time New Roman.

Respectfully submitted,

*/s/ Stuart C. Talley*
Stuart C. Talley