# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT
### No. 24-60370

PRISCILLA STERLING, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; RAINE BECKER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; SHAWN MILLER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; JOHN BENNETT,

*Plaintiffs–Appellants*

v.

THE CITY OF JACKSON; MISSISSIPPI, CHOKWE A. LUMUMBA; TONY YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH; TRILOGY ENGINEERING SERVICES L.L.C.,

*Defendants–Appellees*

On Appeal from the United States District Court for the Southern District of Mississippi, Northern Division, Civil No. 3:22-cv-00531-KHJ-MTP

## PETITION FOR REHEARING EN BANC ON BEHALF OF DEFENDANTS-APPELLEES THE CITY OF JACKSON, MISSISSIPPI, MAYOR CHOKWE A. LUMUMBA, TONY YARBER,

## KISHIA POWELL, ROBERT MILLER, AND JERRIOT SMASH

Clarence Webster, III (MSB No. 102111)
Kaytie M. Pickett (MSB No. 103202)
Adam Stone (MSB No. 10412)
Abbey A. Reeves (MSB No. 105720)
Dakota J. Stephens (MSB No. 106695)
3100 North State Street, Ste. 300 (39216)
P.O. Box 427
Jackson, MS 39205-0427
Tel: (601) 949-4900
cwebster@joneswalker.com
kpickett@joneswalker.com

astone@joneswalker.com
areeves@joneswalker.com
dstephens@joneswalker.com

Drew M. Martin (MSB No. 101045)
City Attorney
P.O. Box 2779
Jackson, MS  39207
Tel: (601) 960-1799
dmartin@city.jackson.ms.us

John F. Hawkins (MSB No. 9556)
Hawkins Law, P.C.
226 North President Street (39201)
P.O. Box 24627
Jackson, MS 39225-4627
Tel: (601) 969-9692
john@hgattorneys.com

*Counsel for the City of Jackson*

John F. Hawkins (MSB No. 9556)
Hawkins Law, P.C.
226 North President Street (39201)
P.O. Box 24627
Jackson, MS 39225-4627
Tel: (601) 969-9692
john@hgattorneys.com

*Counsel for Chokwe A. Lumumba and
Robert Miller*

Terris C. Harris (MSB No. 99433)
The Cochran Firm-Jackson, LLC
197 Charmant Place, Suite 2
Ridgeland, MS 39157
Tel: (601) 790-7600
tharris@cochranfirm.com

*Counsel for Tony Yarber, Kishia Powell
and Jerriot Smash*

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT
No. 24-60370**

PRISCILLA STERLING, INDIVIDUALLY AND ON BEHALF OF ALL
OTHERS SIMILARLY SITUATED; RAINE BECKER, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY SITUATED; SHAWN MILLER,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED; JOHN BENNETT,

*Plaintiffs–Appellants*

v.

THE CITY OF JACKSON; MISSISSIPPI, CHOKWE A. LUMUMBA; TONY
YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH;
TRILOGY ENGINEERING SERVICES L.L.C.,

*Defendants–Appellees*

On Appeal from the United States District Court for the Southern District of
Mississippi, Northern Division, Civil No. 3:22-cv-00531-KHJ-MTP

## CERTIFICATE OF INTERESTED PARTIES

Counsel for Defendants–Appellees City of Jackson, Mississippi, Mayor

Chokwe A. Lumumba, Tony Yarber, Kishia Powell, Robert Miller and Jerriot

Smash (collectively the City Defendants) certify the following listed persons and

entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an

interest in the outcome of this case. These representations are made so the Judges

of this Court may evaluate possible disqualification or recusal.

i

1. Defendant-Appellee City of Jackson, Mississippi;

2. Defendant-Appellee Mayor Chokwe A. Lumumba;

3. Defendant-Appellee Tony Yarber;

4. Defendant-Appellee Kishia Powell;

5. Defendant-Appellee Robert Miller;

6. Defendant-Appellee Jerriot Smash;

7. Clarence Webster, III, Kaytie M. Pickett, Adam Stone, Abbey Reeves, Dakota Stephens, and Jones Walker, LLP, counsel for the City of Jackson;

8. Drew Martin and the Office of the City Attorney, counsel for the City of Jackson;

9. John Hawkins and Hawkins Law, PC, counsel for the City of Jackson, Mayor Chokwe A. Lumumba, and Robert Miller;

10. Terris Harris and The Cochran Firm, counsel for the City of Jackson, Tony Yarber, Kishia Powell, and Jerriot Smash;

11. Defendant-Appellee Trilogy Engineering Services, LLC;

12. Davide Macelloni, Jeremy Daniels, and Daniels, Rodriguez, Berkley, Daniels & Cruz, P.A., counsel for Trilogy Engineering Services, LLC;

13. D. Jason Childress and Fletcher & Sippel, LLC, counsel for Trilogy Engineering Services, LLC;

14. Plaintiff-Appellant Raine Becker;

ii

15.     Plaintiff-Appellant John Bennett;

16.     Plaintiff-Appellant Shawn Miller;

17.     Plaintiff-Appellant Priscillia Sterling;

18.     Honorable Robert Gibbs and Gibbs Travis, PLLC, counsel for Plaintiffs;

19.     Mark Chalos, Tiseme Zegeye, Amelia Haselkorn, Jacob H. Polin, Kenneth S. Byrd, and Lieff Cabraser, Heimann & Bernstein LLP, counsel for Plaintiffs;

20.     Larry D. Moffett and Law Office of Larry D. Moffett, counsel for Plaintiffs;

21.     Stuart Talley, Jack Davis, and Kershaw Talley Barlow, PC, counsel for Plaintiffs;

22.     Honorable Judge Kristi H. Johnson, United States District Court Judge; and

23.     Honorable Judge Michael T. Parker, United States Magistrate Court Judge.

/s/ Clarence Webster, III
Clarence Webster, III (MSB No. 102111)
3100 North State Street, Ste. 300 (39216)
P.O. Box 427
Jackson, MS 39205-0427
Tel: (601) 949-4900
cwebster@joneswalker.com

#110553244v12

## RULE 40(B)(2) STATEMENT

The split Panel decision pioneers new ground in Fifth Circuit substantive due-process jurisprudence.

Only two years ago, the Court held that it previously "repeatedly declined to recognize the state-created danger doctrine", and it again declined the invitation, rejecting the opportunity to consider the question en banc. *Fisher v. Moore*, 73 F.4th 367, 372 (5th Cir. 2023) (internal quotations omitted). By a two-judge majority, the Panel opinion adopts the doctrine, which conflicts with *Fisher* and the long line of prior cases that declined to do so. Further, the elements the Panel decision establishes for a state-created-danger claim conflict with those the Court previously "suggested. . . any such theory might include—should we ever adopt it, of course." *Fisher*, 73 F.4th at 372 (citing *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 865 (5th Cir. 2012) (en banc)). Under Federal Rule of Appellate Procedure 40(b)(2)(A), en banc consideration is appropriate.

In addition, as the dissenting opinion notes, the majority opinion fails to demonstrate that adoption of the state-created danger doctrine satisfies the Supreme Court's "reinvigorated test," a prerequisite to expanding substantive due process. *See Sterling v. City of Jackson*, No. 24-60370, 2025 U.S. App. LEXIS 30006, *119 (5th Cir. Nov. 17, 2025) (Englehardt, J., dissenting) (quoting *Fisher*,

iv

73 F.4th at 373-74 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 231 (2021)).  The Panel decision conflicts with a United States Supreme Court decision under Rule 40(b)(2)(C).

The Panel decision's adoption of the state-created danger doctrine, despite so many prior Panels declined to do so, alone warrants en banc rehearing.

But, this proceeding presents another question of exceptional importance under Rule 40(b)(2)(D). The Panel opinion's interpretation of the Due Process Clause significantly broadens the reach of substantive due process and introduces new causes of action in the Fifth Circuit and beyond. It explicitly establishes a new fundamental right to competent municipal water services, thereby subjecting policy choices about resource allocation to federal constitutional scrutiny.

The scope of the Panel decision is expansive, and its depth is yawning. The decision has significant consequences for thousands of state and local governments and their ability to provide public services.  In 2016 alone, the City was one of over 5,300 municipalities found to have violated lead-testing rules.[1]  The Panel decision opens those municipalities to liability to over 18 million Americans for alleged constitutional violations. *See id.* A decision of this magnitude warrants en banc consideration.

---

[1] *See* Brady Dennis, More Than 5,300 Water Systems Violated Lead-Testing Rules Last Year (June 28, 2016), https://www.washingtonpost.com/news/to-your-health/wp/2016/06/28/more-than-5000-u-s-water-systems-violated-lead-testing-rules-last-year/.

#110553244v12

Rehearing en banc is justified under Rules 40(b)(2)(A), (C), and (D). It is essential to ensure consistency in the Fifth Circuit's rulings and address questions of exceptional importance concerning the scope of substantive due process.

#110553244v12

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES .......................................................i

RULE 40(B)(2) STATEMENT ...............................................................................iv

TABLE OF CONTENTS ...................................................................................... vii

TABLE OF AUTHORITIES ...................................Error! Bookmark not defined.

STATEMENT OF ISSUES ......................................................................................1

STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE ..........................................................................2

STATEMENT OF FACTS ........................................................................................3

ARGUMENT AND AUTHORITIES ......................................................................7

I.  The Panel opinion's departure from precedent should be reviewed en banc ..............................................................................................................7

    A.  The Panel opinion adopts the state-created-danger doctrine without passing the "reinvigorated test" .................................................8

    B.  Accepting the First Circuit's test contradicts Fifth Circuit jurisprudence ......................................................................................9

    C.  Plaintiffs do not allege facts sufficient to state a cognizable claim ...........................................................................................................11

        1.  Plaintiffs cannot satisfy the Fifth Circuit test ...........................11

        2.  Plaintiffs cannot satisfy the First Circuit's test ........................12

II.  The Panel opinion's constitutionalization of the provision of municipal water services should be reviewed en banc ..................................13

CONCLUSION......................................................................................................16

CERTIFICATE OF SERVICE ............................................................................19

**CERTIFICATE OF COMPLIANCE** ..................................................................**20**

**CERTIFICATE OF ELECTRONIC COMPLIANCE** .....................................**21**

#110553244v12

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011)........................................................................11

*Estate of B.I.C. v. Gillen*,
    761 F.3d 1099 (10th Cir. 2014) ...........................................9

*Bickford v. Boerne Indep. Sch. Dist.*,
    2016 U.S. Dist. LEXIS 69101 (W.D. Tex. May 26, 2016) ...............15

*Cancino v. Cameron Cnty.*,
    794 F. App'x 414 (5th Cir. 2019) ........................................12

*Dixon v. Alcorn Cnty. Sch. Dist.*,
    499 F. App'x 364 (5th Cir. 2012) (unpublished)...............12

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2021)..................................................v, 13

*Doe v. Covington County Sch. Dist.*,
    675 F.3d 849 (5th Cir. 2012) (en banc) ......................*passim*

*Doe v. Edgewood Indep. Sch. Dist.*,
    964 F.3d 351 (5th Cir. 2020) ...........................................15

*Exelon Wind 1, LLC v. Nelson*,
    766 F.3d 380 (5th Cir. 2014) ...........................................10

*Fisher v. Moore*,
    73 F.4th 367 (5th Cir. 2023) ......................................*passim*

*Irish v. Fowler*,
    979 F.3d 65 (1st Cir. 2020).........................................8, 12

*Kinzie v. Dallas Cty. Hosp. Dist.*,
    106 F. App'x 192 (5th Cir. 2003) (unpublished)................11

*Okin v. Vill. Of Vill. of Cornwall-on-Hudson Police Dep't*,
    577 F.3d 415 (2d Cir. 2009) .............................................9

#110553244v12

*Rios v. City of Del Rio,*
    444 F.3d 417 (5th Cir. 2006) .............................................................12

*Sauers v. Borough of Nesquehoning,*
    905 F.3d 711 (3d Cir. 2018) .............................................................9

*Sterling v. City of Jackson,*
    No. 24-60370, 2025 LX 581477 (5th Cir. Nov. 17, 2025)........................*passim*

*U.S. v. Guidry,*
    456 F.3d 493 (5th Cir. 2006) .........................................................15

**Rules**

5TH CIR. R. 25.2.13 ........................................................................21

FED. R. APP. P. 32 .........................................................................20

FED. R. APP. P. 32(a)(5) ..................................................................20

FED. R. APP. P. 32(a)(6) ..................................................................20

FED. R. APP. P. 40(b)(2)(A) .......................................................... iv, vi

FED. R. APP. P. 40(b)(2)(C) ............................................................v, vi

FED. R. APP. P. 40(b)(2)(D) ...........................................................v, vi

#110553244v12

## STATEMENT OF ISSUES

**Issue 1:** The Court has rejected the argument that sister Circuits' adoption of some version of the doctrine can serve as a basis for recognizing a state-created-danger claim. The Panel opinion adopts the doctrine for that reason, without demonstrating its expansion of substantive due process passes the Supreme Court's "reinvigorated test". Should the Panel decision to overturn established precedent, based on a rationale the Court has declined to follow, be considered en banc to ensure consistency in the Fifth Circuit's rulings and address questions of exceptional importance concerning the scope of substantive due process?

**Issue 2:** The Panel decision broadens the scope of substantive due process in the Fifth Circuit by turning municipal-service failures into constitutional violations under federal law. The Supreme Court has repeatedly warned Circuits to exercise caution and respect historical limits before expanding the reach of substantive due process. The majority ignores that guidance and constitutionalizes municipalities' provision of government services, which finds no footing in this Nation's history or traditions. Should that decision be reviewed en banc to address questions of exceptional importance concerning the scope of substantive due process?

#110553244v12

## STATEMENT OF THE COURSE OF PROCEEDINGS
## AND DISPOSITION OF THE CASE

Plaintiffs' claims stem from the City of Jackson Defendants' oversight of an aging water system with multiple conflicting issues and priorities. Plaintiffs argue that the City Defendants' response to some of these issues violated their due process rights.

The City Defendants filed dispositive motions. The District Court granted the City's motion, dismissing Plaintiffs' constitutional claims. The District Court also dismissed the claims against the individual City Defendants based on qualified immunity.

Plaintiffs filed a Second Amended Complaint to reassert the bodily integrity claim. For a second time, the District Court granted the City's dispositive motion and declined to exercise supplemental jurisdiction over the state-law claims.

On appeal, the case was assigned to Judges Haynes, Dennis, and Englehardt. A divided Panel overturned the grant of the City's motions. A split Panel did not disturb the dismissals on qualified immunity grounds.

Judge Haynes wrote the majority opinion. Judge Dennis concurred, except for the qualified immunity analysis. And Judge Engelhardt dissented, except for the qualified immunity analysis. The City Defendants seek en banc consideration of the Panel opinion, except for the qualified immunity analysis.

2

## STATEMENT OF FACTS

The majority's characterization of the City Defendants as do-nothing, lying villains is not supported by Plaintiffs' documents. The majority shuts its eyes to those documents *sua sponte*; Plaintiffs do not ask them to. Doing so runs afoul of pleading standards. *See Sterling*, 2025 U.S. App. LEXIS 30006, *91-*92 (Englehardt, J., dissenting). The City Defendants' recitation of the facts gives proper context to the majority's factual conclusions.

The City's aging public water system faces multifaceted issues, the cause of which is "decades of underinvestment in a sprawling water system made up of roughly 1,500 miles of water mains, some of which are over 100 years old." ROA.1461-1462.[2]

The Second Amended Complaint focuses on conduct that began in late 2013 or 2014 when Interim Public Works Director Willie Bell met with Cynthia Hill to discuss the water system's corrosion control, including a lime-injection pump. ROA.1469-1470. Hill estimated the cost to repair the pump was $400,000.00.

---

[2]      Jason Breslow, *The Water Crisis in Jackson Follows Years of Failure to Fix an Aging System*, NPR (Aug. 31, 2022), cited in ROA.1462.

#110553244v12

ROA.1470.  After meeting with the mayor, Bell asked Hill whether repairing the

injection pump could wait until the next budget year. ROA.1475.[3]

That mayor passed in February 2014. ROA.1471. Tony Yarber was elected

to complete his term. ROA.1471. Yarber chose Kishia Powell to serve as public

works director. ROA.1473.

Before Yarber's election, the City approved notices of completion of a well

water replacement project, called the Maddox Road Booster Station project.

ROA.1200-1201. Following completion of the project, the City transferred

approximately 16,000 water connections from well to surface water. ROA.1603.

The City switched those 16,000 connections back to well water due to issues with

the station. ROA.1597.

In June 2015, the Mississippi State Department of Health performed Safe

Drinking Water Act testing. ROA.1479-1480. On January 28, 2016, the City

received notice that thirteen samples had detected lead above the action level.

ROA.1480. The next day,[4] the City held a press conference, announcing the

---

[3]    Anna Wolfe, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, CLARION-LEDGER
(Mar. 23, 2016), https://www.clarionledger.com/story/news/local/2016/03/22/offering-jackson-
water-solutions-new-treatment-needed/82120680/, cited at ROA.1475.

[4]    Plaintiffs aver "upon information and belief, the [City] Defendants and their employees
were made aware of these test results" before January 28, 2016.  ROA.1480.  Plaintiffs provide
no basis for that belief.  And the Court is not required to strain to make inferences favorable to
Plaintiffs or accept their conclusory allegations or unwarranted deductions as true.

#110553244v12

results. ROA.1481; ROA.1482.[5] Powell disclosed the results meant the "City is required to take additional compliance measures." ROA.1482 (cleaned up).[6] She offered assurances that "[t]his is not a situation where you have to stop drinking the water." ROA.1481. She continued, "We want people to understand how they should be flushing their internal plumbing system before using water . . . These are just measures you take." ROA.1482.[7] The City also issued recommendations and precautions for water usage. ROA.1475.[8]

Powell later stated, "[A] major difference between Flint, Michigan, and Jackson, Mississippi . . . is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does." ROA.1482. She

---

[5]     Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, CLARION-LEDGER (Jan. 29, 2016), https://www.clarionledger.com/story/news/local/2016/01/29/small-amount-lead-some-jackson-residents-water/79510298, cited at ROA.1482.

[6]     *Id.*

[7]     *Id.*

[8]     Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016), https://m.jacksonfreepress.com/news/2016/mar/16/water-turns-city-wrestles-over-corrosion-study/, cited at ROA.1475; Anna Wolfe, *6 Things to Know About the Lead Water in Jackson*, CLARION-LEDGER (Mar. 25, 2016), https://www.clarionledger.com/story/news/local/2016/03/17/5-things-know-lead-water-jackson/81830278/, cited at ROA.1490.

#110553244v12

acknowledged, however, the corrosion-control "systems need to be improved and upgraded . . . ." ROA.1482.[9]

On February 12, 2016, MSDH provided a Compliance Plan to the City. ROA.1492, 1571-1578. To meet the Compliance Plan, the City selected Trilogy Engineering to design a corrosion control study and plan for optimizing the City's water treatment. ROA.1493. The City did so because "lime treatment [would] likely not be all that [needed to be change[d]]." ROA.1475.[10] Powell offered a rationale for proceeding with the Compliance Plan's mandated corrosion control study. ROA.1475.[11] Trilogy ultimately recommended soda ash for corrosion control. ROA.1462.[12] *See also* ROA.1495.

---

[9]    Anna Wolfe, *Jackson City Counsel Talks Lead Water*, CLARION-LEDGER (Feb. 19, 2016), https://www.clarionledger.com/story/news/local/2016/02/17/jackson-city-council-talks-lead-water/80538910/, cited at ROA.1482.

[10]    Wolfe, *supra* note 2.

[11]    *Id.*

[12]    Anna Wolfe, *Jackson Water System Contains Lead Joints*, Clarion-Ledger (May 10, 2016), https://www.clarionledger.com/story/news/local/2016/03/15/city-water-system-has-some-lead-joints/81780766/, cited at ROA.1462.

#110553244v12

The City's remedial actions improved the system's corrosion control. ROA.1490,[13] ROA.1494.[14]  The City's public water system has not exceeded action levels since December 2016.  ROA.1583.

## ARGUMENT AND AUTHORITIES

I.     **The Panel opinion's departure from precedent should be reviewed en banc.**

The Supreme Court has not adopted the state-created-danger doctrine. Before the Panel opinion, neither had this Court. *See Fisher v. Moore*, 73 F.4th 367, 369 (5th Cir. 2023). Under "binding[] caselaw", this Court "repeatedly declined to recognize the state-created danger doctrine." *Id.* at 372. The Panel decision concocts a new legal theory by recognizing the First Circuit's formulation of the state-created-danger claim. In addition to introducing a new claim, the majority outlines contours of the claim the Court has never recognized. The Panel opinion conflicts with established precedent, necessitating en banc review. *Cf. id.* at 372 n.15 ("Some might reasonably contend . . . that if the theory is to be

---

13      Anna Wolfe, *A Year Later, Jackson's Lead-Water Issue Not Solved*, HATTIESBURG AMERICAN (Dec. 13, 2016), https://www.hattiesburgamerican.com/story/news/local/2016/12/13/year-later-jackson-lead-water-issue-solved/95401880/, cited at ROA.1490.

14      Anna Wolfe, *Jackson Water Issues Persist, Lead Levels Down*, CLARION-LEDGER (July 2, 2017), https://www.clarionledger.com/story/news/local/2017/07/03/jackson-water-issues-persist-lead-levels-down/437239001/, cited at ROA.1494.

squarely engaged, its once-and-for-all adoption or rejection should come from the en banc court rather than a panel.").

A. The Panel opinion adopts the state-created-danger doctrine without passing the "reinvigorated test".

The Panel decision does not show the state-created-danger doctrine is deeply rooted in our history and traditions or implicit in the concept of ordered liberty. (The First Circuit's test is clearly not deeply rooted in this Nation's history or traditions; the First Circuit did not adopt it until 2020. *Irish v. Fowler*, 979 F.3d 65, 74 (1st Cir. 2020)).  Instead, the Panel adopts this theory because other Circuits have. *See Sterling*, 2025 U.S. App. LEXIS 30006, at *46-*48. However, as this Court has noted, those Circuits adopted the state-created-danger doctrine because "(1) the Supreme Court left open the question in *DeShaney*, and (2) other courts have adopted the doctrine." *Fisher*, 73 F.4th at 373-74. Neither reason justifies adopting the doctrine. What is needed is a thorough evaluation of whether the state-created-danger doctrine satisfies the reinvigorated test. *See Sterling*, 2025 U.S. App. LEXIS 30006, at *125 ("Because the theory is unmoored from history and lacks uniformity among the adopting courts, it cannot meet the 'reinvigorated test' necessary for adoption.") (Englehardt, J., dissenting). The Panel decision fails on that front.

8

B.  Accepting the First Circuit's test contradicts Fifth Circuit jurisprudence.

The state-created-danger doctrine varies across Circuits. Each Circuit has its own criteria. For example, the Second Circuit requires two elements; the Third, four; and the Tenth, six. *See Okin v. Vill. Of Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428, 431 (2d Cir. 2009); *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 717 (3d Cir. 2018); *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014). Some Circuits mandate conduct by a private actor, while others require plaintiffs to belong to an identifiable group. *See Sterling*, 2025 U.S. App. LEXIS 30006, at *124-*25 (Englehardt, J., dissenting). The doctrine lacks a clear definition, and its application can be inconsistent and unpredictable. *See id.* at 124.

Although the Court has not adopted the state-created-danger doctrine, it has formulated elements for a claim: "(1) the defendants used their authority to create a dangerous environment for the plaintiff and (2) that the defendants acted with deliberate indifference to the plight of the plaintiff." *Doe v. Covington County Sch. Dist.*, 675 F.3d 849, 865 (5th Cir. 2012) (en banc). The second element is divided into three parts, which incorporate the first element. Therefore, to state a claim for state-created danger in the Fifth Circuit, plaintiffs must allege "the environment created by the state actors must be dangerous; they must know it is dangerous; and they must have used their authority to create an opportunity that would not

9

otherwise have existed for the third party's crime to occur." *Doe*, 675 F.3d at 865 (internal quotations omitted). *See also Fisher*, 73 F.4th at 372.

Plaintiffs asked the Panel to adopt the Tenth Circuit's test. Appellant Br. [Doc. 59], at 62-63. The Panel disregarded that request and Fifth Circuit precedent by choosing the First Circuit's approach. *Sterling*, 2025 U.S. App. LEXIS 30006, at *48. The Panel does not explain this decision. *See id*. It does not demonstrate why the practical aspects and application of the First Circuit's test are suitable for the Fifth Circuit. The Panel cannot discard prior Fifth Circuit precedent and adopt a different test without justification. *See Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 394 (5th Cir. 2014) ("Absent a clear contrary statement from the Supreme Court or en banc consideration, [Panels] are bound by our own precedent.").

The differences in the two tests are not merely academic.[15] For example, under the Fifth Circuit's test, the state actor must know of the dangerous environment he created, and, to state a claim, plaintiffs must allege the state actor created an opportunity for third-party violence that would not otherwise exist. The First Circuit does not require those showings.

---

[15] Under the First Circuit's test, plaintiffs must plead facts showing "(1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiffs; (2) that the act or acts created or enhanced a danger specific to the plaintiffs and distinct from the danger to the general public; (3) that the act or acts caused the plaintiffs' harm; and (4) that the state actor's conduct, when viewed in total, shocks the conscience." *Sterling*, 2025 U.S. App. LEXIS 30006, at *48.

#110553244v12

C.      Plaintiffs do not allege facts sufficient to state a cognizable claim.

The Panel remanded the question of whether Plaintiffs have established a

state-created-danger claim to the District Court. *Sterling*, 2025 U.S. App. LEXIS

30006, at *48. But, the Supreme Court has warned Circuits not to adopt new

theories if doing so would not affect the case's outcome. *See Ashcroft v. al-Kidd*,

563 U.S. 731, 735 (2011) ("Courts should think carefully before expending scarce

judicial resources to resolve difficult and novel questions . . . that will have no

effect on the outcome of the case."). Adopting the state-created-danger doctrine

does not influence the result here; Plaintiffs fail to plead critical elements of a

claim. Because Plaintiffs have not pleaded a claim, the Court should have refrained

from adopting the doctrine here. *See Fisher*, 73 F.4th at 374.

*1.      Plaintiffs cannot satisfy the Fifth Circuit test.*

Plaintiffs' pleadings fail to identify a third-party, non-state actor who is

responsible for their injuries, *see* ROA. 1530-1533, which is fatal to a state-

created-danger claim under the framework acknowledged by this Court.  *See*

*Kinzie v. Dallas Cty. Hosp. Dist.*, 106 F. App'x 192, 195 (5th Cir. 2003)

(unpublished). Plaintiffs concede that deficiency, stating the City Defendants'

"actions harmed Plaintiffs independently of any actions by a third party."

11

Appellant Br. [Doc. 59], at 52. They also admit "third-party harms are not the focus of the instant case." *Id.* at 62.

Further, the state-created-danger doctrine "is inapposite without a known victim." *Doe*, 675 F.3d at 865. Identifying a known victim requires more than singling out a segment of the general public at large that may be affected by state action; the test articulated by this Court requires plaintiffs to plead the state actor was aware of an immediate danger to a specific and identifiable individual. *See id.* at 865-66; *see also Dixon v. Alcorn Cnty. Sch. Dist.*, 499 F. App'x 364, 368 n.3 (5th Cir. 2012) (unpublished) (finding potential harm to students in general is inadequate to satisfy the known-victim requirement). Plaintiffs alleged each is a "Jackson water user." *See* ROA. 1532. That allegation is insufficient. *See Cancino v. Cameron Cnty.*, 794 F. App'x 414, 417 (5th Cir. 2019); *Rios v. City of Del Rio*, 444 F.3d 417, 424 n.7 (5th Cir. 2006).

### 2. *Plaintiffs cannot satisfy the First Circuit test.*

First Circuit state-created-danger law also requires specific allegations of third-party violence. *Irish*, 979 F.3d at 74. Additionally, the First Circuit's version of the state-created-danger claim demands allegations the state actor "created or enhanced a danger specific to the plaintiffs and distinct from the danger to the general public." *Sterling*, 2025 U.S. App. LEXIS 30006, at *48. The dissent rightly points out Plaintiffs' allegations do not satisfy either element. *Id.* at *125-*26

12

(Englehardt, J., dissenting). These pleading deficiencies should have ended the Panel's analysis on adopting the state-created-danger doctrine. *See Fisher*, 73 F.4th at 374 (refusing to adopt the state-created-danger doctrine where the plaintiff failed to plead its elements). But it didn't.

The Panel decision goes well beyond established precedent on many fronts, warranting en banc review.

## II. The Panel opinion's constitutionalization of the provision of municipal water services should be reviewed en banc.

Substantive due process is not a tool for courts to "usurp authority the Constitution entrusts to the people's elected representatives." *Dobbs*, 597 U.S. at 239-40. Guardrails must be maintained to prevent courts from substituting their judgment for that of elected officials. The expansion of substantive due process must be considered against the backdrop of the Supreme Court's guidance to "exercise the utmost care whenever . . . asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges]." *See id.* at 240. The Court has recognized that the Supreme Court "has reiterated—with gusto—that rights protected by substantive due process must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Fisher*, 73 F.4th at 373 (quotations omitted).

13

The Panel opinion slights Supreme Court guidance—establishing a new constitutional right to water services—which finds no footing in this Nation's history or traditions. Whether the Panel's expansion of substantive due process is appropriate is a question best considered en banc.

As an initial point, "[i]n substantive due process cases, the Supreme Court requires a careful description of the asserted right." *Sterling*, 2025 U.S. App. LEXIS 30006, at 110 (Englehardt, J., dissenting) (quotations omitted). The right must be described precisely. *See id.* When parties provide a broad description, courts must "focus on the allegations in the complaint to determine how plaintiffs describe the constitutional right at stake and what the defendants allegedly did to deprive them of that right." *Id.* As the dissent points out, Plaintiffs' first allegation is, in no uncertain terms, that "[a]ccess to clean, poison-free water is a fundamental human right." However, as the majority acknowledges, "under the Constitution, the City had no obligation to provide clean water." *Sterling*, 2025 U.S. App. LEXIS 30006, at 23.

Rather, "[a]t issue in this case is whether conduct in the administration of municipal services which failed to provide clean water violates the Fourteenth Amendment." *Id.* at *88 (Englehardt, J., dissenting). Before the Panel opinion, the provision of municipal services might have provided a basis for a tort or statutory liability, or for voting out elected officials. *See Sterling*, 2025 U.S. App. LEXIS

14

30006 at *88 (Englehardt, J., dissenting). But, it did "*not* a substantive due process claim make. *Id.* (emphasis added).

Although disavowing doing so, the Panel opinion constitutionalizes the provision of municipal services, specifically guaranteeing a right to competent municipal water services. The Panel held—without legal citations—"while the City had no constitutional obligation to provide water, once it did, it was required to do so within the confines of the Due Process Clause." *Sterling*, 2025 U.S. App. LEXIS 30006, at *24. Neither the Fifth Circuit nor the Supreme Court has held that, once water is provided, its provision subjects a municipality or its officials to strict scrutiny regarding the manner of its provision. The Panel opinion's acknowledgment of a due process violation under this set of facts marks an unprecedented broadening of the bodily integrity doctrine beyond its traditional scope. *See generally Bickford v. Boerne Indep. Sch. Dist.*, 2016 U.S. Dist. LEXIS 69101, *11 n.4 (W.D. Tex. May 26, 2016) (noting the right to bodily integrity "appears to arise almost exclusively in the context of sexual abuse"). *See, e.g.*, *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 365 (5th Cir. 2020) (sexual abuse of students); *U.S. v. Guidry*, 456 F.3d 493 (5th Cir. 2006) (sexual assault of arrestees).

The Panel decision exemplifies the type of judicial policymaking the Supreme Court has condemned. As the dissent notes, the Panel opinion's approach

15

aims to "convert the comforts and conveniences of modern life into constitutional rights" without basis. *Sterling*, 2025 U.S. App. LEXIS 30006, at *84 (Englehardt, J., dissenting). This endangers the proper distribution of governmental functions by allowing judges to second-guess policy choices that elected officials should make. *Id.* at *87.

The Panel's attempt to limit the impact of its decision is unavailing. *See generally Sterling*, 2025 U.S. App. LEXIS 30006, at *36. By recognizing constitutional liability for the provision of water, coupled with alleged misrepresentations about safety, the Panel opinion establishes new standards for municipal constitutional accountability without precedential support. Moreover, the decision has broad implications that go beyond water provision to include any municipal service where alleged safety misrepresentations could cause harm.

The broad scope of potential liability resulting from this decision justifies en banc review.

## CONCLUSION

The Panel decision warrants en banc review for multiple reasons. The expansion of substantive due process, the adoption of the state-created-danger doctrine, and the exceptional public importance of municipal constitutional liability justify en banc consideration. It is essential to promote uniformity within

#110553244v12

the Fifth Circuit, align with Supreme Court precedent, and address the significant policy consequences of this landmark decision.

Respectfully submitted, this 1st day of December, 2025.

*/s/ Clarence Webster, III*
Clarence Webster, III (MSB No. 102111)
Kaytie M. Pickett (MSB No. 103202)
Adam Stone (MSB No. 10412)
Abbey A. Reeves (MSB No. 105720)
Dakota J. Stephens (MSB No. 106695)
3100 North State Street, Ste. 300 (39216)
P.O. Box 427
Jackson, MS 39205-0427
Tel: (601) 949-4900
cwebster@joneswalker.com
kpickett@joneswalker.com
astone@joneswalker.com
areeves@joneswalker.com
dstephens@joneswalker.com

Drew M. Martin (MSB No. 101045)
City Attorney
P.O. Box 2779
Jackson, MS  39207
Tel: (601) 960-1799
dmartin@city.jackson.ms.us

John F. Hawkins (MSB No. 9556)
Hawkins Law, P.C.
226 North President Street (39201)
P.O. Box 24627
Jackson, MS 39225-4627
Tel: (601) 969-9692
john@hgattorneys.com

*Counsel for the City of Jackson*

#110553244v12

*/s/ John F. Hawkins*
John F. Hawkins (MSB No. 9556)
Hawkins Law, P.C.
226 North President Street (39201)
P.O. Box 24627
Jackson, MS 39225-4627
Tel: (601) 969-9692
john@hgattorneys.com

*Counsel for Chokwe A. Lumumba and
Robert Miller*

*/s/ Terris C. Harris*
Terris C. Harris (MSB No. 99433)
The Cochran Firm-Jackson, LLC
197 Charmant Place, Suite 2
Ridgeland, MS 39157
Tel: (601) 790-7600
tharris@cochranfirm.com

*Counsel for Tony Yarber, Kishia Powell
and Jerriot Smash*

18

## CERTIFICATE OF SERVICE

I, Clarence Webster, III, attorney for Appellees hereby certify that I have this day caused to be delivered the foregoing document via the ECF electronic system to all counsel of record.

So certified, this the 1st day of December, 2025.

*/s/ Clarence Webster, III*
Clarence Webster, III

#110553244v12

**CERTIFICATE OF COMPLIANCE**

1.     This brief complies with the word limit of Federal Rule of Appellate Procedure 32, because it contains 3,820 words as determined by the word-count function of M365.

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using M365 in 14-point Times New Roman font.

*/s/ Clarence Webster, III*
Clarence Webster, III

#110553244v12

**CERTIFICATE OF ELECTRONIC COMPLIANCE**

I hereby certify that, in the foregoing brief filed using the Fifth Circuit CM/ECF document filing system, (1) the privacy redactions required by Fifth Circuit Rule 25.2.13 have been made, (2) the electronic submission is an exact copy of the paper document, and (3) the document has been scanned for viruses with the most recent version of SentinelOne and is free of viruses.

*/s/ Clarence Webster, III*
Clarence Webster, III

#110553244v12

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 17, 2025

Lyle W. Cayce
Clerk

No. 24-60370

———

PRISCILLA STERLING, *individually and on behalf of all others similarly situated*; RAINE BECKER, *individually and on behalf of all others similarly situated*; SHAWN MILLER, *individually and on behalf of all others similarly situated*; JOHN BENNETT,

*Plaintiffs—Appellants*,

*versus*

THE CITY OF JACKSON, MISSISSIPPI; CHOKWE A. LUMUMBA; TONY YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH; TRILOGY ENGINEERING SERVICES, L.L.C.,

*Defendants—Appellees*.

———————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:22-CV-531

———————————————

Before DENNIS, HAYNES, and ENGELHARDT, *Circuit Judges*.[1]

———————————

[1] Judge Haynes writes the majority opinion in full. Judge Dennis concurs with the entire opinion except the qualified immunity analysis at Section III.A.3. Judge Engelhardt dissents from the entire opinion except the qualified immunity analysis at Section III.A.3, where he concurs. We therefore refer to Judge Haynes's opinion as the majority opinion, and Judge Engelhardt's opinion as the dissenting opinion. Because Judge Dennis' opinion is only a dissent from the qualified immunity, the majority opinion refers to it as the QI dissenting opinion.

No. 24-60370

Haynes, *Circuit Judge*:

The alleged facts of this case mirror one of the greatest public health emergencies in the United States in the last decade—the Flint water crisis. Instead of Flint, Michigan, these events take place in Jackson, Mississippi. Here, Plaintiffs allege that the City introduced lead into the drinking water, pumped the toxic water into people's homes, and lied about the safety of the water. In reliance on those lies, residents drank, cooked with, and bathed in toxic water. They now face tragic, lifelong health effects. Because the alleged facts plausibly state that the City violated Plaintiffs' Fourteenth Amendment right to bodily autonomy, the lawsuit may proceed. We REVERSE in part, AFFIRM in part, and REMAND.

## I.     Factual Background

In short, Plaintiffs allege that the City knowingly contaminated drinking water with lead and then encouraged residents to drink the toxic water. We detail the facts in three parts: the City's aging public water system, the City's creation and exacerbation of the water crisis, and the resulting health effects. Because the district court dismissed the case based on the pleadings, we accept the well-pleaded facts in the complaint as true. *See Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018).

### A. Aging Water System

The City transmits drinking water to its residents. *See* Jackson, Miss., Code of Ordinances § 2-336(4) (2024) ("The public works department shall perform the functions of water and sewer engineering and maintenance . . . [and] management of water treatment and distribution facilities."). Unless a resident has another water source (such as a well), residents must take and pay for the City's water. *See id.* § 122-268 (rates prescribed); *id.* § 122-270 (delinquent bills and penalties).

No. 24-60370

Aging pipes deliver water and remove wastewater. Most of the City's service lines likely contain lead, and the vast majority of homes have lead pipes and fixtures. Lead in the pipes and water system is not necessarily a problem—the problem arises when lead leaches into the water.

Lead leaches when the water becomes too acidic. Acidity is measured on the pH scale. The pH scale ranges from 0 to 14; the lower the pH, the higher the acidity. To prevent lead from leaching into the water, the Mississippi State Department of Health ("MSDH") recommends a pH of 8.5. A high-pH environment of 8.5 allows the pipes to develop an oxide layer, which prevents leaching. Acidic water erodes the oxide layer, causing lead contamination.

The City's water sources are far more acidic than MSDH recommends. The City's water system includes two treatment plants—the O.B. Curtis and J.H. Fewell plants—which take water from the Ross Barnett Reservoir and Pearl River, respectively. The pH of both water sources is below 6.5, meaning they are at least 100 times[2] more acidic than MSDH recommends for source water.[3]

Acidic water can be treated at treatment plants with a substance such as lime to decrease the water's acidity and avoid any danger of lead leaching.

---

[2] The complaint alleges that a pH of 6.5 is 20 times more acidic than a pH of 8.5. However, the pH scale is logarithmic, meaning that a difference of 1 on the pH scale is 10 times more acidic; a difference of 2 is 100 times more acidic; a difference of 3 is 1,000 times more acidic, etc. *See What Is pH?*, EPA, https://perma.cc/4DA9-X3HU (Nov. 4, 2024) ("Each whole pH value is ten times stronger than the next outer or more extreme value.").

[3] A potential cause of the low pH in the City's water sources is water runoff from the City's surface mining industry. Acid mine drainage is highly acidic and causes disastrous long-term environmental problems, including the pollution of drinking water and destruction of infrastructure.

However, on top of failing to treat the water, the City actively made matters worse and covered up the dangerousness of the situation to the public.

## B. The Water Crisis

By 2013, the City knew it had a problem with its water system. In 2011, MSDH said the City was at "high-risk for lead poisoning," and testing from 2010 through 2013 showed that the concentration of lead in the water was increasing at an alarming rate.

To put the problem in context, because consuming water with any amount of lead is dangerous, EPA's maximum contaminant level goal for lead in drinking water is zero parts per billion ("ppb"). Meanwhile, the EPA action level is 15 ppb. In 2009, the 95th percentile of testing in Jackson showed 8.8 ppb lead—meaning that 95 percent of results were at or below 8.8 ppb, and 5 percent were above 8.8 ppb. By 2013, that number had jumped to 33.5 ppb.

In 2013, Interim Director of Public Works Willie Bell, the head of the City department responsible for managing the public water system, raised concerns. Director Bell informed the Mayor about the acidity of the water, the lead in the water, and a defective lime treatment pump at the O.B. Curtis plant.

As Director Bell explained, the lime treatment pump was clogged, meaning water was not being treated to decrease its acidity. The lime injection system was designed for liquid lime, but the City used lime powder that clogged the pipes. The lime treatment pump had been clogged for years, making post-treatment water highly acidic and corrosive. The clogged injection system meant that the low-pH source water was effectively not being treated. Director Bell estimated that $400,000 would fix the defective lime treatment pump and warned against shocking the system in the interim.

No. 24-60370

The Mayor was receptive to Director Bell's concerns and approved Director Bell's proposal. However, soon after, the Mayor passed away, and Mayor Tony Yarber replaced him. Although Mayor Yarber was aware of the water system issues and Director Bell's proposal, he scrapped the plan and replaced Bell with Kishia Powell.

In addition to scrapping the proposed solution, Mayor Yarber and Director Powell affirmatively made the situation worse. While the City's lead levels were rising, the City switched a section of the City's water source from high-pH well water to low-pH surface water. The well water had a pH of over 8, which protected service lines from corrosion and exposure to lead. This decision was not only disastrous for the people in that section of the City who were now receiving high-pH water; it was also disastrous for all people receiving water from the water treatment plants because the plants were not prepared to handle the increased flow associated with 16,000 new connections.

This decision proved catastrophic—it shocked the system and caused an increase in lead levels that would not be detected until June 2015. The June 2015 results showed that drinking water exceeded the 15-ppb regulatory limit in 22 percent of homes—more than Flint at 16.7 percent. The 90th percentile testing was 28 ppb, nearly double the regulatory limit.

The City's dereliction did not stop there. The City sat on the June test results for six months. MSDH finally notified residents on January 29, 2016. Even after informing the public, the City falsely assured residents that the water was safe to drink:

- Director Powell said, "This is not a situation where you have to stop drinking the water. This is not a widespread issue, although we are treating it very similarly." She also said the 2015 findings

did "not mean that the City has violated the Safe Drinking Water Act, and our water is safe."

- Mayor Yarber said, "I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint."

- Robert Miller, who eventually replaced Powell as Director of Public Works, said, "there's been no detecting of lead or copper in the water supply." He also assured residents that the "water is still safe to drink."

- Other officials, with the permission and at the direction of Mayor Yarber and Director Powell, told the public that the water is "not unsafe" to drink.

The City eventually issued boil notices. But far from mitigating the lead crisis, the City's boil notices exacerbated it. Although boiling water can neutralize biological threats such as E. coli and Giardia, it increases the concentration of lead by reducing water volume while leaving lead behind.

Around the same time, Director Powell continued to encourage residents to drink the City's water and downplayed the severity and extent of the contamination. For example, she told Jackson residents that "the problem with the lead was happening at specific homes with lead pipes, and that the water leaving the treatment plant was not contaminated." She further claimed that "there [were] no records showing whether there [were] any lead lines underground."

An attempt to set the record straight was met with impunity. A City official working as an engineer in the Jackson Public Works Department spoke out against this claim, explaining that the lines had solid lead bands every twenty feet. Director Powell swiftly fired that employee for "possibly creating unwarranted public fear."

Meanwhile, the lead problem continued to get worse. MSDH issued a February 2016 compliance plan, which the City immediately and repeatedly failed to comply with—by March, the City requested extensions because it had not fulfilled its obligations under the plan.

The crisis deepened. Later that year, the City switched to using soda ash to raise the pH of the water at the O.B. Curtis plant with the faulty lime treatment pump. Due to clumping, the soda ash system did not work. In March 2020, the EPA issued an Emergency Administrative Order identifying multiple Safe Water Drinking Act violations and noting that the water system "present[ed] an imminent and substantial endangerment to the persons served by the system." Jackson did not publicly acknowledge the order for a year. By 2021, the City's water had failed to meet the EPA's minimum quality requirements for four of the five previous years.

The water system continued to be plagued by failures, with burst pipes and mains in 2021 and failed water pumps in 2022. Residents have been unable to access running water at certain times and have been subject to repeated boil advisories at others.

### C. Impact of Lead on Health

As has become clear through repeated public health crises associated with lead exposure,[4] ingesting lead causes severe health effects.

Lead has particularly devastating effects on children. Children may experience seizures, coma, and even death at far lower exposure levels than those at which an adult might experience the same symptoms. Lead affects

---

[4] *E.g.*, *Roberts v. Hamer*, 655 F.3d 578, 581–82 (6th Cir. 2011) (lead-based paint); *Guertin v. State*, 912 F.3d 907, 915 (6th Cir. 2019) (Flint water crisis); *see also* Jane S. Lin-Fu, *Modern History of Lead Poisoning: A Century of Discovery and Rediscovery*, *in* Herbert L. Needleman, Human Lead Exposure 23 (1992).

brain development, lowers IQ, and causes behavioral changes. The latter may include an increased likelihood of ADHD; delinquent behaviors; and arrests, including arrests involving violent offenses. These neurological and behavioral effects are believed to be irreversible.

Lead is also harmful to adults. Adults may suffer from cardiovascular issues, increased blood pressure, decreased kidney function, and reproductive problems. Pregnant women who ingest lead risk exposure to the developing fetus.

Plaintiffs suffer the effects of lead contamination. For example, several of Plaintiff Priscilla Sterling's children have been diagnosed with lead poisoning. One has a learning disability and reoccurring yeast infections from the lead exposure. The entire Sterling household experiences frequent, unexplained itching.

Plaintiff Raine Becker is a single mother who works three jobs to provide for her terminally ill seven-year-old son. Her son requires clean water to flush his feeding tube. Further, the City's actions have harmed her main source of income at a laundromat because the laundromat needs clean water to wash customers' clothes.

Plaintiff Shawn Miller and his two children drank, bathed in, and cooked with Jackson's toxic water. They now exhibit the effects of lead poisoning.

Because of the lead exposure, Plaintiffs and their family members now require special educational, medical, sociological, occupational, and disability services.

### D. Procedural History

Plaintiffs, as representatives of residents of the City, filed a class action asserting two substantive due process claims—bodily integrity and

state-created danger—and three state-law claims. The substantive due process claims are brought against the City, Mayor Chokwe Lumumba, former Mayor Tony Yarber, former Public Works Directors Kishia Powell and Robert Miller, and Interim Public Works Director Jerriot Smash.

The district court granted Defendants' motion for judgment on the pleadings. As to the substantive due process claims, the district court reasoned that Plaintiffs failed to state a claim against the City and that City officials are entitled to qualified immunity. As to the state-law claims, the district court declined to exercise supplemental jurisdiction. Plaintiffs appealed.

## II.    Jurisdiction & Standard of Review

The district court had federal question jurisdiction over the constitutional claims, *see* 28 U.S.C. § 1331, and declined to exercise supplemental jurisdiction over the state-law claims, *see* 28 U.S.C. § 1367. We have jurisdiction to review the district court's final judgment. *See* 28 U.S.C. § 1291.

The district court dismissed the complaint under Federal Rule of Civil Procedure 12(c). We review such dismissals de novo. *Gentilello v. Rege*, 627 F.3d 540, 543 (5th Cir. 2010). We apply the same standard to Rule 12(b)(6) and Rule 12(c) motions. *Q Clothier New Orleans, L.L.C. v. Twin City Fire Ins. Co.*, 29 F.4th 252, 256 (5th Cir. 2022). We accept all well-pleaded facts as true and view those facts in the light most favorable to Plaintiffs. *Meador*, 911 F.3d at 264. To survive a motion for judgment on the pleadings, those factual allegations must allow us to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* Dismissal is appropriate *if* the pleaded facts are not enough to state a facially *plausible* claim for relief. *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013). Plausibility "asks for more than a sheer possibility that a defendant has acted unlawfully." *Walker v.*

No. 24-60370

*Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). We must resolve "any ambiguities in the current controlling substantive law . . . in the plaintiff's favor." *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001); *see Anokwuru v. City of Hous.*, 990 F.3d 956, 965 (5th Cir. 2021).

## III.    Discussion

Under the Due Process Clause, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause protects "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation modified); *see Hurtado v. California*, 110 U.S. 516, 536 (1884) (explaining that due process "refers to certain fundamental rights which that system of jurisprudence, of which ours is a derivative, has always recognized" and that "[i]f any of these are disregarded in the proceedings by which a person is condemned to the loss of life, liberty, or property, then the deprivation has not been by due process of law" (citation modified)).

The core of the Due Process Clause protects against arbitrary governmental action. *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). To state a substantive due process claim in this context, Plaintiffs must establish that "they were deprived of a cognizable constitutional right," *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018), and that the government actor acted with deliberate indifference to the protected

No. 24-60370

right, *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regul. Servs.*, 380 F. 3d 872, 880 (5th Cir. 2004).[5]

At issue here is whether one's substantive due process rights are infringed when a City introduces toxins into the water, the City pumps the water into people's homes, the City lies to citizens about the safety of the water, and citizens rely on that guarantee in drinking the water, suffering irreparable physical harm. Plaintiffs urge that the answer is yes under two substantive due process rights—the right to bodily integrity, and the right to be free from state-created danger.

### A. Bodily Integrity

This part of the analysis proceeds in three parts. First, we explain that the right to bodily autonomy has long been a cognizable right under the Fourteenth Amendment, and the pleaded facts adequately allege that Defendants violated that right. Second, we conclude that Plaintiffs have

---

[5] The dissenting opinion contends that we improperly invert the analysis by first asking whether Plaintiffs were deprived of a cognizable constitutional right and only then considering whether the actor was deliberately indifferent. It cites a footnote in *Lewis*, 523 U.S. at 847 n.8, for this critique. However, it does not appear that a majority of justices share the dissenting opinion's interpretation of *Lewis*. *Lewis*, 523 U.S. at 857 (1998) (Kennedy, J., concurring) ("[T]he [shocks the conscience] test *can* be used to mark the beginning point in asking whether or not the objective character of certain conduct is consistent with our traditions, precedents, and historical understanding of the Constitution and its meaning." (emphasis added)); *id.* ("[H]istory and tradition are the starting point, but not in all cases the ending point of the substantive due process inquiry."). Nevertheless, we simply follow a long line of Fifth Circuit precedent by first analyzing whether Plaintiff was deprived of a cognizable constitutional right. *E.g.*, *Stukenberg*, 907 F.3d at 248–51 (first answering whether plaintiffs possessed a substantive due process right and then asking if the state was deliberately indifferent). But we would reach the same result regardless of how we ordered the inquiry.

plausibly alleged that Defendants[6] acted with deliberate indifference. Third, although the allegations plausibly state a violation of Plaintiffs' constitutional rights, we hold that the City officials are protected by qualified immunity because the right was not clearly established in this context.

### 1. Cognizable Constitutional Right

"No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891); *see also id.* ("The right to one's person may be said to be a right of complete immunity; to be let alone." (citation omitted)). This right, termed the right to bodily integrity, has long been guaranteed by the Due Process Clause. *Ingraham v. Wright*, 430 U.S. 651, 673–74 (1977) ("Among the historic liberties so protected [by the Due Process Clause] was a right to be free from . . . unjustified intrusions on personal security.").

At the outset, *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 290, 295 (2022), did not disturb the recognition or historical pedigree of the right to bodily integrity, as we already observed. *See Tyson v. Sabine*, 42 F.4th 508, 517 & n.4 (5th Cir. 2022) (stating that "[t]he substantive component of the Due Process Clause . . . secures the right to be free of state-occasioned damage to a person's bodily integrity" and noting that *Dobbs* did not impact this precedent (citation modified)); *see also Doe v. Jewell*, No. 24-50480, 2025 WL 2374899, at *7 (5th Cir. Aug. 15, 2025) (reaffirming the right to bodily integrity). The Seventh Circuit has too, noting that *Dobbs* "did not

---

[6] Plaintiffs assert claims against Interim Public Works Director Jerriot Smash. However, Plaintiffs make no factual allegation as to Smash, so the district court properly dismissed all claims against him. Any subsequent reference to Defendants excludes Smash.

mention or undermine the right to bodily integrity." *Hess v. Garcia*, 72 F.4th 753, 765 (7th Cir. 2023).

To the contrary, the Supreme Court emphasized that "[n]othing in this opinion should be understood to cast doubt on precedents that do not concern abortion . . . . It is hard to see how we could be clearer." *Dobbs*, 597 U.S. at 290, 295. Accordingly, *Dobbs* left intact the substantive due process jurisprudence governing bodily integrity. Still, *Dobbs* reaffirmed that identifying a due process right requires an inquiry into history and tradition. *Id.* at 240.

The right to bodily integrity, as recognized by the Supreme Court, is rooted in a long and rich history. "The Supreme Court has long recognized the right to bodily integrity as an essential component of our liberty protected by the Fourteenth Amendment's due process clause." *Hess*, 72 F.4th at 765 n.8. As discussed by the Supreme Court, Article 39 of the Magna Carta declared that "an individual could not be deprived of th[e] right of personal security except by the legal judgment of his peers or by the law of the land." *Ingraham*, 430 U.S. at 673 n.41. (citation modified). "By subsequent enactments of Parliament during the time of Edward III, the right was protected from deprivation except 'by due process of law.'" *Id.* (citation omitted).

Among the first cases implicating this right was *Union Pacific Railway Company v. Botsford*, 141 U.S. 250 (1891), which held that a court could not compel a plaintiff to undergo a nonconsensual surgical examination. *Id.* at 257. "No right," the Court declared, is "more carefully guarded by the common law" than an individual's right to be "free from all restraint or interference of others." *Id.* To compel someone "to lay bare the body, or to submit it to the touch of a stranger, without lawful authority," the Court

explained, "is an indignity, an assault, and a trespass"—one that "no order of process" could remedy. *Id.* at 252.

Although "the contours of this historic liberty interest [in bodily integrity] . . . have not been defined precisely," *Ingraham*, 430 U.S. at 673, the right has been recognized to cover many fact patterns. *E.g.*, *Rochin v. California*, 342 U.S. 165 (1952) (inducing vomit to obtain evidence); *Ingraham*, 430 U.S. 651 (corporal punishment in public school); *Washington v. Harper*, 494 U.S. 210 (1990) (unwanted medical treatment); *see also United States v. Guidry*, 456 F.3d 493 (5th Cir. 2006) (sexual assault by law enforcement officer).

The consistent throughline of these cases is consent: when a person does not consent to an intrusion, that intrusion is subject to judicial scrutiny, regardless of if the intrusion is beneficial or even necessary. Cases involving the involuntary administration of medication are particularly illuminating here. *See, e.g.*, *Riggins v. Nevada*, 504 U.S. 127, 135–37 (1992) (nonconsensual administration of antipsychotic medication violated Due Process Clause); *Vitek v. Jones*, 445 U.S. 480, 494 (1980) (liberty interests implicated by transfer to mental hospital and behavior modification treatment); *see also Parham v. J. R.*, 442 U.S. 584, 600 (1979) ("[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment . . . ."); *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977) (explaining that the Constitution protects personal autonomy "in making certain kinds of important decisions"); *Schmerber v. California*, 384 U.S. 757, 772 (1966) ("The integrity of an individual's person is a cherished value of our society.").

Plaintiffs' factual allegations implicate this same right. Indeed, the right to bodily integrity arguably carries greater weight here than in the cases that have reached the Supreme Court. The Court has made clear that

No. 24-60370

involuntary administration of even *therapeutic* substances can trigger the right to bodily integrity's protections—particularly when those substances carry unwanted side effects. *Washington*, 494 U.S. at 221, 229 (expressing "no doubt" that the inmate "possess[ed] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment," especially given "serious, even fatal, side effects"). Here, the state is alleged to have knowingly introduced a *toxin* to residents' bodies, without any intended therapeutic benefit, and then told people that it was safe. *See Guertin v. Michigan*, 912 F.3d 907, 917–932 (6th Cir. 2019).

Especially relevant here, eight Justices in *Cruzan ex rel. Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990), recognized that our "notions of liberty are inextricably entwined with our idea of physical freedom and self-determination," *id.* at 292 (O'Connor, J., concurring), including the right to refuse lifesaving hydration and nutrition. *See id.* at 279 (majority opinion); *id.* at 302 (Brennan, J., dissenting); *id.* at 331–32, 343 (Stevens, J., dissenting). If the Constitution protects a person's right to refuse potable water necessary for life, then it certainly protects the right to refuse toxic water. The government violates that right when it, as the provider, lies to and gaslights the public, depriving individuals of the ability to give informed consent and exposing them to harm without their knowledge.

Applying the Supreme Court's bodily autonomy precedents, the Sixth Circuit came to the same conclusion. *See Guertin*, 912 F.3d at 917–932. The *Guertin* court concluded that Flint's mishandling of the city's water crisis infringed residents' due process rights. The court explained that "[i]nvoluntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic

example of invading the core of the bodily integrity protection." *Id.* at 920–21; *see also id.* at 926 ("[M]isleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River—is no different than the forced, involuntary invasions of bodily integrity that the Supreme Court has deemed unconstitutional." (citation omitted)); *Waid v. Earley* (*In re Flint Water Cases*), 960 F.3d 303, 327–30 (6th Cir. 2020); *Braziel v. Whitmer*, No. 23-1954, 2024 WL 3966238, at *5 (6th Cir. Aug. 28, 2024) ("Even on their own, public statements by government officials misleading and lying to the public about the safety of the water supply can suffice to establish a constitutional violation."). The same is true here.

We note "that not every state law tort becomes a federally cognizable constitutional tort under § 1983 simply because it is committed by a state official," *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980) (citation modified). Still, part and parcel of every recognized due process right is the principle that governmental action may become so severe that it acquires constitutional dimension. That the conduct here concerns water provision—rather than, say, law enforcement—does not place it beyond the reach of the Fourteenth Amendment.

Consider the excessive force context. A police officer's actions cross the constitutional line not merely when they resemble assault or battery, but when "the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* Analogously, the availability of a medical malpractice claim does not foreclose an Eighth Amendment claim when a prisoner's treatment amounted to a deliberate indifference that would offend the standard of

decency. "Not every violation of state tort and criminal assault laws will be a violation of [a] constitutional right, but some of course may." *Id.*

So too here. As we explain further in the next section, the alleged conduct—knowingly distributing toxic water and misrepresenting its safety—is so severe and depraved that it plausibly states a violation of Plaintiffs' constitutional rights.

A few arguments advanced by the dissenting opinion and Defendants warrant a response. First, Defendants' assertion that the right to bodily integrity protects only compelled, forcible intrusions into the body is unconvincing. As we have recognized, "[p]hysical force is not a requirement of a violation of the right to bodily integrity." *Tyson v. County of Sabine*, 42 F.4th 508, 518 (5th Cir. 2022). Instead, a governmental actor can violate the Fourteenth Amendment through mental coercion alone. *See Leyra v. Denno*, 347 U.S. 556, 558 (1954); *see generally Petta v. Rivera*, 143 F.3d 895, 903 (5th Cir. 1998) (per curiam) (recognizing violations of plaintiffs' substantive due process rights where officers never touched plaintiffs and plaintiffs suffered only psychological harm); *Tyson*, 42 F.4th at 519 ("The use of mental coercion rather than physical coercion to [violate bodily integrity and] effectuate sexual abuse is a distinction without a difference."). Although Defendants did not force water down Plaintiffs' throats, the City required the public to buy water supplied by the City, stamped that water with approval, and told them it was safe to drink while knowing it was not. This plausibly alleges a violation of the right to bodily integrity.

Next, Defendants and the dissenting opinion argue that there is no constitutional right to clean water. That is true in a narrow sense: under the Constitution, the City had no obligation to provide clean water. But the argument falls short. Although the government is not required to provide certain services, once it elects to do so, it must provide that service in

compliance with the Constitution. *See, e.g.*, *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 342, 349–52 (1938) (explaining that state must comply with Fourteenth Amendment in law school admissions even though a state has no duty to supply legal training). For example, there is no constitutional requirement that police officers be present or available to protect the public, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989), but, if they are present and available, officers must respect constitutional rights. *Cf. M.L.B. v. S.L.J.*, 519 U.S. 102, 110 (1996) ("Although the Federal Constitution guarantees no right to appellate review, once a State affords that right . . . the State may not bolt the door to equal justice." (citation modified)); *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 487 (2020) ("A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."). This basic principle pervades constitutional law—there is generally no constitutional duty to act, but any action must comply with the Constitution. Thus, while the City had no constitutional obligation to provide water, once it did, it was required to do so within the confines of the Due Process Clause.

The dissenting opinion's contrary reasoning—that Defendants had no obligation to provide water, so their provision of water cannot violate the Fourteenth Amendment—when taken to its logical conclusion, would insulate plainly egregious conduct from constitutional scrutiny. It would permit a police officer to conduct a welfare check, sexually assault the homeowner, and then evade liability by asserting, "I had no constitutional duty to conduct the welfare check in the first place." Likewise, it would allow a teacher to molest a student and avoid a bodily integrity claim by arguing, "I had no constitutional obligation to be a teacher." These are not abstract hypotheticals. Our court has faced both scenarios—and found constitutional

violations. *Tyson*, 42 F.4th at 518; *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 446–47, 451 (5th Cir. 1994) (en banc).

The dissenting opinion attempts to reframe our holding as one based on the City's omissions rather than its affirmative actions. To do this, the dissenting opinion invokes *Deshaney*. But that case is inapposite. There, the plaintiff asserted that state social workers and other local officials violated the Due Process Clause by failing to appropriately respond to reports that the plaintiff's father was abusing him. 489 U.S. at 193. Put another way, state actors failed to prevent private abuse they knew about. The Court explained that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by *private actors*." *Id.* at 195 (emphasis added). Instead, "[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* The Court then explained that although the state may have known about the dangers the plaintiff faced, it "played *no* part in their creation, *nor did it do anything to render him any more vulnerable to them*." *Id.* at 201 (emphases added). The situation here presents the opposite scenario. Plaintiffs do not assert that the City had a general duty to provide water, nor do they claim that Defendants failed to protect them from third parties. Rather, they allege that the City, through its own affirmative conduct, knowingly introduced contaminated water into residents' homes, misrepresented its safety, and thereby deprived them of their bodily integrity. The Due Process Clause squarely prohibits such conduct.

In sum, we conclude that Plaintiffs have adequately alleged that Defendants' conduct violated their constitutional right to bodily autonomy, so we turn to the next element: deliberate indifference.

### 2. Deliberate Indifference

To state a plausible due process claim against Defendants, Plaintiffs must establish that Defendants' actions shocked the conscience in a constitutional sense.[7] *Lewis*, 523 U.S. at 846–47 ("[F]or half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience."). The "shock the conscience standard is satisfied where the conduct was intended to injure in some way unjustifiable by any government interest, or in some circumstances if it resulted from deliberate indifference." *Rosales-Mireles v. United States*, 585 U.S. 129, 138 (2018) (citation modified). Plaintiffs do not assert an intent to injure; they rely on deliberate indifference.

"To act with deliberate indifference, a state actor must know of and disregard an excessive risk to the victim's health or safety." *McClendon v. City of Columbia*, 305 F.3d 314, 326 n.8 (5th Cir. 2002) (en banc) (per curiam) (citation modified). Deliberate indifference is "beyond mere negligence or even gross negligence; it must amount to an intentional choice, not merely an unintentionally negligent oversight." *James v. Harris County*, 577 F.3d 612, 617–18 (5th Cir. 2009) (citation modified). A deliberately indifferent state of mind can be inferred "from the fact that the risk of harm is obvious." *Hope*

---

[7] The dissenting opinion contends that "what shocks '[a judge's] unelected conscience' should not determine the quality of governmental services administered by an official in whom voters have placed confidence." Respectfully, that misunderstands the legal standard. The Supreme Court has instructed that courts must determine whether government conduct "shocks the conscience"—not in a subjective or idiosyncratic sense, but in a constitutional sense. *See Lewis*, 523 U.S. at 847 n.8 (describing conduct that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience"). This is an objective legal inquiry grounded in precedent and principle, not personal preference. As inferior court judges, we are bound to apply the law as the Supreme Court has defined it, even when that requires constitutional review of decisions made by elected officials.

No. 24-60370

*v. Pelzer*, 536 U.S. 730, 738 (2002); *see also Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

The well-pleaded facts in the complaint allow us to draw a reasonable inference that Defendants were deliberately indifferent. The allegations plausibly support the conclusion that Defendants' actions posed an excessive risk to Plaintiffs' health, that Defendants had actual or constructive knowledge of those risks, and that Defendants nevertheless consciously disregarded them. *See McClendon*, 305 F.3d at 326 n.8.

The excessive risk to Plaintiffs' health is quite obvious—lead is life threatening and has disastrous effects on human health.

That takes us to Defendants' disregard of the known risk to public health. Plaintiffs plausibly allege that Defendants knew of the risk of drinking lead-contaminated water, along with the vulnerabilities of the City's water system. The City knew of these vulnerabilities since 2013 at the latest. By then, the City knew lead was leaching from its pipes and fixtures; knew the lead was contaminating the City's drinking water; and knew the cause, the risks, and the cost to repair the system. Indeed, in 2013, Director Bell spelled out the problem. He explained that the water was too acidic, causing lead from the pipes to leach into the water, and treatment was failing because of a clogged lime injection system. He proposed a simple solution—replace the lime treatment pump.

Armed with knowledge of Bell's recommendation, Mayor Yarber and Director Powell declined to fix the problem. Rather than take the steps necessary to stop lead from leaching further into the water, the City ignored warnings. Indeed, the only action the City took—switching a section of the City's water source from groundwater to surface water they knew to be corrosive—shocked the system, causing disastrous effects.

No. 24-60370

Despite knowing the severity of the problem by June 2015, Defendants didn't notify the public until at least seven months later. Because one can't see or taste lead in water, Plaintiffs couldn't have known the City was providing lead-contaminated water to their homes during this time.

Even more shockingly, instead of warning residents about the unsafe levels of lead, Defendants repeatedly lied to the public. Defendants falsely assured residents of the safety of the lead-ridden water, told residents it was safe to drink, and denied the existence of a crisis. In fact, the recommendation the City eventually made to residents—the boil notices—*exacerbated* the lead problem by increasing the concentration of lead left after boiling.

City residents trusted Defendants to provide complete and accurate information about their water. Defendants had complete control over the public water system, and many had experience and expertise in the field. Had Plaintiffs known that the water contained lead, they would have stopped consuming the water. Instead, they now suffer injuries including dehydration, malnutrition, lead poisoning, hair loss, skin rashes, digestive problems, brain injuries, and mental anguish.

These allegations are conscience shocking. For years, the City, based on the advice, expertise, and decision-making of the public servant Defendants, knowingly contaminated otherwise clean water with lead, pumped the toxic water to its residents' taps, and told them it was safe to drink. This is not a case where the government had to make a split-second response to an unforeseen event; instead, this crisis was "a predictable harm set into motion by alleged decisions that took place over a series of days, weeks, months, and years," *In re Flint Water Cases*, 960 F.3d at 324 (citation modified), leaving Defendants "ample opportunity for cool reflection," *Brown v. NationsBank Corp.*, 188 F.3d 579, 592 (5th Cir. 1999). "When such

No. 24-60370

extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Lewis*, 523 U.S. at 853.

Further, based on the pleadings, we find no legitimate governmental purpose that takes Defendants' actions outside the realm of a plausible due process claim. Indeed, we cannot think of (and the City has not asserted) any governmental interest in furnishing toxic water and lying about the toxicity with knowledge of the long-term health effects that residents faced. *Mitchell v. City of Benton Harbor*, 137 F.4th 420, 437 (6th Cir. 2025) ("There is rarely a justification for misleading the public about the extent of a lead-water crisis . . . ."); *id.* at 438 (holding deliberately indifferent officials' statements that the lead crisis was isolated to individual homes, people could drink the water, and downplaying the severity of the problem); *Guertin*, 912 F.3d at 926 ("[J]ealously guarding the public's purse cannot, under any circumstances, justify the yearlong contamination of an entire community."). Defendants' assurances of the safety of the water "turn[ed] residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination." *Guertin*, 912 F.3d at 925–26. We thus conclude that Defendants' alleged actions shock the conscience.

The dissenting opinion has a different interpretation of the alleged facts. But by combing through articles cited by the complaint, selectively excerpting facts, and then viewing them in the light most favorable to Defendants, the dissenting opinion clearly errs. The motion to dismiss standard does not ask us to read the complaint in the light most favorable to news articles cited by the complaint—and for good reason. At this stage, we are supposed to "accept the well-pleaded facts as true and view them in the light most favorable to the plaintiff," not the defendant, and we are generally wary of crediting facts found in materials outside of the complaint. *Q Clothier New Orleans*, 29 F.4th at 256.

No. 24-60370

Of course, there are exceptions to this general rule. If a complaint is premised on a document attached to the complaint, and the attachment contradicts an allegation in the complaint, the exhibit controls. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016). So, if an allegation in a breach of contract complaint contradicts the plain language of the contract, the contract controls.

Defendants and the dissenting opinion take this exhibit-prevails rule too far. Here, the complaint cites newspaper articles and reports for specific propositions. Defendants and the dissenting opinion assert that we should take judicial notice of every fact in those articles and reports, even if the complaint cites the articles and reports for a different proposition, even though the articles and reports are not central to the claims, and despite the parties disputing the factual accuracy of the articles and reports.

We will not blindly accept the factual contents of articles and reports in these circumstances and in this posture. Defendants and the dissenting opinion improperly conclude that by citing an article for a single proposition, Plaintiffs endorse accuracy of the entire article. *Contra Goines*, 822 F.3d at 167 ("[I]f a plaintiff attaches or references a report prepared by a third-party to show how he learned of certain facts alleged in his complaint, he does not automatically adopt all of the factual conclusions contained in the report."); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015) ("Banneker referred to some of the report's recitations to show how it learned some facts in the complaint, but it did not purport to and was not required to adopt the factual contents of the report wholesale."). However, the notion that "*all* facts contained in *any* attachments to a complaint are automatically deemed facts alleged as part of the complaint" is "fantastic." *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004) (citation modified). "Plaintiffs attach exhibits to their complaints for all sorts of reasons, and it is not always appropriate to conclude that the plaintiff has adopted the contents

of an attached document." *Goines*, 822 F.3d at 167 (citation omitted); *see N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 454-56 (7th Cir. 1998) (explaining that Rule 10(c) "does not require a plaintiff to adopt every word within the exhibits as true for purposes of pleading simply because the documents were attached to the complaint to support an alleged fact"); *see also Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008); *West-Anderson v. Missouri Gaming Co.*, 557 F. App'x 620, 622 (8th Cir. 2014) (per curiam); *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013).

We even review *video evidence* at *summary judgment* with a more critical eye than the dissenting opinion reviews the newspaper articles. In those cases, we accept the plaintiff's version of the facts unless it is "blatantly contradicted and utterly discredited by video recordings." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017). The dissenting opinion does not even inquire into whether the news articles blatantly contradict or utterly discredit Plaintiffs' allegations—the dissenting opinion simply accepts the facts in the newspaper articles as true. But newspaper articles, unlike video evidence, are not even competent summary judgment evidence when admitted for the truth of the matter asserted. *James v. Tex. Collin Cty.*, 535 F.3d 365, 378 (5th Cir. 2008). Even putting aside admissibility and the motion to dismiss standard, these articles may be operating based on limited or incomplete information—Plaintiffs' complaint, written later, is not so limited. While we defer to contracts for breach of contract claims, and video evidence for police brutality claims, we never have deferred to news articles over the allegations of the complaint, and we will not start doing so here. At bottom, the dissenting opinion's attempt to litigate the facts demonstrates that this case should proceed to discovery. *See Guertin v. Michigan*, 924 F.3d 309, 311 (6th Cir. 2019) (Thapar, J., concurring in denial of en banc) ("At this early stage of the case, we must give the benefit of the doubt to the plaintiffs' preferred

theory of the case and allow the discovery process to determine whether plausible allegations in their complaint mature into fact-supported allegations.").

Further, contrary to the pleading standard, the dissenting opinion focuses on everything Defendants did right while glossing over everything Defendants did wrong. *Cf. United States v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004) ("At this preliminary stage, the district court should dismiss only if it appears *beyond doubt* that Plaintiff can prove no set of facts in support of her claim." (emphasis added)); *Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012) ("Rule 12(b)(6) does not permit us to affirm the district court's dismissal of this claim unless we determine it is beyond doubt that Wilson cannot prove a plausible set of facts to support his allegations." (citation modified)).

Regardless, none of the facts the dissenting opinion finds in articles cited by the complaint contravene the basic allegations here—the City introduced toxins into the water, knew that the water was toxic for months, and when it broke the news, it continued to tell people the water was safe to drink.

The dissenting opinion also misinterprets our holding as imposing a constitutional duty to provide quality or competent services. Not so. That misinterpretation understates the severity of the alleged facts, which go far beyond a failure to provide competent services. We assume that the dissenting opinion would not equate a holding that a police officer violated an individual's right to bodily integrity with the recognition of a right to "competent" policing. Although recasting our holding as one concerning the adequacy of city services may create an easier target for critique, it bears no resemblance to what we actually say here. To the extent there is any confusion, let us be clear: our holding is fact-specific and does not recognize

No. 24-60370

a generalized constitutional right to high-quality municipal services. Rather, Plaintiffs allege a violation of the well-established right to bodily integrity, and those allegations, taken as true, plausibly state a claim under the Due Process Clause.

The dissenting opinion invokes three cases in an attempt to argue that Defendants' actions were not conscience shocking. Those cases fail to change our opinion.

First, the dissenting opinion cites *Collins v. City of Harker Heights*, 503 U.S. 115 (1992). There, a city sanitation worker died in a manhole. *Id.* at 117. The plaintiff submitted that "the city violated a federal constitutional obligation to provide its employees with certain minimal levels of safety and security." *Id.* at 127. The Supreme Court rejected the notion that the government had a constitutional duty to tell employees about dangerous work conditions as "unprecedented." *Id.* at 127–28. The Court's analysis, which distinguished prior due process cases, rested in large part on the nature of the employer-employee relationship, which is generally governed by state tort law: "The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship." *Id.* The Court also explained that the Due Process Clause limits a state's power to act; it does not guarantee certain minimal levels of safety. *Id.* at 127. The general principles espoused in *Collins* "have no applicability here—this is not a workplace injury case, [and] plaintiffs do not allege [the City] was required to provide them with 'certain minimal levels of safety and security.'" *Guertin*, 912 F.3d at 925 n.6 (quoting *Collins*, 503 U.S. at 127).

*Collins* also explained the "presumption that the administration of government programs is based on a rational decisionmaking process that

takes account of competing social, political, and economic forces." 503 U.S. at 128. Here, the City's allegedly purposeful misrepresentations and intentional switch to water known to be corrosive rebuts any such presumption, so the burden shifts to Defendants, and Defendants fail to explain that their decisionmaking was rational. In sum, *Collins* is entirely distinguishable—the government here *caused* the problem and *lied* about the danger to the public. While the facts in *Collins* were not actionable, the facts presented in this case are.

Next, Defendants and the dissenting opinion portray two Second Circuit decisions as holding that misrepresentations alone, absent an intent to injure, categorically cannot constitute conscience-shocking conduct. (first citing *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008), and then citing *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007)). That portrayal is incorrect.

*Lombardi* and *Benzman* involved false statements by federal officials about air quality in lower Manhattan following the September 11 terrorist attacks. *Benzman*, 523 F.3d at 123; *Lombardi*, 485 F.3d at 74. At the outset, the Second Circuit recognized "some support for the idea that a substantive due process violation can be made out when a private individual derives a false sense of security from an intentional misrepresentation by an executive official if foreseeable bodily harm directly results and if the official's conduct shocks the conscience." *Lombardi*, 485 F.3d at 81; *see also Benzman*, 523 F.3d at 127.

In both cases, however, the Second Circuit affirmed the dismissal of bodily integrity claims because the plaintiffs' allegations did not shock the conscience. The Second Circuit invoked *Lewis*, 523 U.S. at 853–54, which held that the standard for conscience-shocking conduct varies with context: when officials are forced to act quickly, only an intent to harm will do; but

where there is time for reflection and deliberation, deliberate indifference may suffice.

The plaintiffs in *Lombardi* and *Benzman* alleged that the officials' decisions were made over weeks and months and thus they had time to deliberate. *Lombardi*, 485 F.3d at 82–83; *Benzman*, 523 F.3d at 123. But the Second Circuit rejected that characterization, not because time to deliberate is irrelevant, but because the officials were responding to an unprecedented national disaster in real time, under extraordinary uncertainty and pressure:

> The decisions alleged were made by the defendants over a period of time rather than in the rush of a car chase [as in *Lewis*]; but the decisions cannot on that account be fairly characterized as 'unhurried' or leisured . . . . [T]he defendants were required to make decisions using *rapidly changing* information about the ramifications of *unprecedented events* in coordination with multiple federal agencies and local agencies and governments.

*Lombardi*, 485 F.3d at 82 (emphases added). That context raised the bar for constitutional liability, consistent with *Lewis*.

Here, the contrast could not be starker. A catastrophe was not thrusted upon Jackson; it created one. This was neither a high-speed car chase (*Lewis*) nor a terrorist attack (*Lombardi* and *Benzman*). The decisions at issue unfolded over years, and not in the face of informational chaos. As alleged, the City had time to reflect, time to deliberate, and time to change course. The prolonged nature of the misconduct places this case squarely within the *Lewis* framework for deliberate indifference.

As the Sixth Circuit explained in *Guertin*, that distinction matters: time to deliberate lowers the bar from intent to injure to deliberate indifference, especially when information is not rapidly changing. 912 F.3d at 923–24. *Guertin* rightly distinguished *Lombardi* and *Benzman* on that basis,

as did the Eastern District of New York in *Stewart v. MTA*, 566 F. Supp. 3d 197 (E.D.N.Y. 2019). In *Stewart*, the court sustained a bodily integrity substantive due process claim brought by people living and working near a train line with peeling lead paint. *Id.* at 210. "Th[at] [wa]s not an instance," the court reasoned, "where knowledge of the grave risk associated with lead poisoning and efforts to falsely represent that risk c[ould] be excused on the basis of split-second decision making." *Id.* at 210 (citation modified). Nor can the City of Jackson's years-long pattern of deliberate misrepresentation and exposure to contaminated water be excused on that basis.

Relatedly, the dissenting opinion emphasizes that the provision of city services involves competing policy objectives and thus rarely, if ever, meets the high bar of deliberate indifference. It cites a host of generalized concerns such as limited resources and difficult policy tradeoffs to support that proposition. But the dissenting opinion's arguments falter in two respects. First, the cases it relies upon concern government inaction, rather than affirmative action such as the conduct at issue here. *See, e.g.*, *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 53 (1st Cir. 2006) (failure to maintain sewer and highway system). As the Supreme Court has made clear, § 1983 typically attaches to actions rather than failures to act. *See Deshaney*, 489 U.S. at 197. Second, the dissenting opinion suggests speculative policy rationales that even the Defendants do not assert. We are reluctant to presume, particularly at this stage, that Defendants' actions are constitutional simply because they might have been faced with competing policy objectives thought up by the dissenting opinion, especially in the face of conduct alleged to involve prolonged deception about a serious public health hazard. Indeed, presuming as much would contravene the applicable pleading standard, which requires us to accept all allegations as true and resolve all reasonable inferences in Plaintiffs' favor. The seriousness of the allegations demands more than hypothesized justifications.

No. 24-60370

The dissenting opinion closes with a warning that our opinion could cause problems on "our constitutional and federalist order." For support, the dissenting opinion proposes a series of hypotheticals that bear no resemblance to our holding today. In reality, our holding is narrow and fact specific. We conclude that a city may not introduce toxins into the water, pump the water to people's homes, and lie about the water's safety. Our analysis further relies on the specific facts at issue—the City's actions occurred over a significant amount of time and by the time the Defendants shared information about the water's safety, they knew it to be false.[8]

In brief, people generally trust that their tap water is safe until told otherwise. The City introduced toxins into the tap water and pumped it to people's homes. People drank, cooked, and bathed in that water. The City and its officials then lied about the safety of the water, deceiving residents into consuming the contaminated water. Based on this alleged conduct, we conclude that Plaintiffs state a plausible claim that Defendants violated Plaintiffs' right to bodily integrity. Thus, as to the City, the lawsuit may

---

[8] That sharply contrasts with the dissenting opinion's hypothetical examples. First, the dissenting opinion posits a scenario in which a local government assures the public that a pothole-ridden road is safe despite knowing otherwise. But that example bears little resemblance to the facts here. Unlike in this case—where the government is alleged to have affirmatively and knowingly introduced toxins into the water supply—the road example involves a failure to repair existing hazards, not an act of governmental creation. As we have emphasized, our holding does not impose an affirmative duty to act; it is rooted in the City's affirmative conduct. The dissenting opinion next imagines a government-promoted vaccine later found to have negative side effects. In the posited scenario, the government quickly responded to a "hypothetical" pandemic and was unaware that its assurances of the vaccine's safety were false. Further, the scenario involves a vaccine with demonstrable therapeutic benefits (even if it also has known negative effects), distinguishing it from lead-contaminated water. These essential facts would keep this hypothetical conduct out of the realm of conscience-shocking behavior. Many people willingly took the COVID-19 vaccine knowing there might be negative effects. The Plaintiffs here, by contrast, did not knowingly choose to ingest lead.

proceed. *See Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 690 (1978) (explaining municipalities may be liable under § 1983 for the actions of their official policymakers). However, as to the City officials, the inquiry is not over—we must decide whether City officials are entitled to qualified immunity.

### 3. *Qualified Immunity*

Qualified immunity shields officials from civil liability if their conduct does not violate clearly established rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation modified). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (citation modified). To be clearly established, the officer's conduct must be "so clearly and unambiguously prohibited . . . that *every* reasonable official would understand that what he is doing violates the law." *Wyatt v. Fletcher*, 718 F.3d 496, 503 (5th Cir. 2013). That requires controlling authority or "a robust consensus of cases of persuasive authority" outlining the contours of the particular right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (citation modified). "This requirement establishes a high bar." *Wyatt*, 718 F.3d at 503.

We find neither controlling authority nor a robust consensus of persuasive authority that meets this high bar. Although the above-cited Supreme Court cases show that, under the facts alleged here, Defendants plausibly violated the Constitution, we cannot say that the law "so clearly and unambiguously prohibited" the alleged conduct that "*every* reasonable official would [have] underst[ood]" that such conduct "violates the law." *Wyatt*, 718 F.3d at 503. Accordingly, those Supreme Court cases are not sufficient to make the asserted right clearly established in this context.

No. 24-60370

Plaintiffs and the QI dissenting opinion rely on *Guertin*, 912 F.3d at 932–35, in which the Sixth Circuit held that Flint officials violated a clearly established due process right in their handling of that city's water crisis. *Guertin* cannot supply the robust consensus of persuasive, nonbinding authority that Plaintiffs need. *Ashcroft*, 563 U.S. at 742. Aside from being a single case from another circuit, rather than a robust consensus, *Guertin* was decided in 2019, long after the bulk of the alleged misconduct in this case, meaning *Guertin* could not render the right clearly established at the time of the asserted violation.

Thus, the City official Defendants are entitled to qualified immunity, and the bodily integrity claim against them must be dismissed.

## B. State-Created Danger

Plaintiffs' second Due Process Clause claim asserts Defendants violated Plaintiffs' right to be free from state-created danger. Generally, states do not have a constitutional duty to protect people from harm inflicted by private parties. *Fisher v. Moore*, 73 F.4th 367, 368–69 (5th Cir. 2023). However, under the state-created-danger theory, when a state actor creates or exacerbates the danger, the state may be held liable. *Id.*

This right is distinct from the right to bodily integrity. State created danger focuses on the increased risk of harm, while bodily integrity focuses on invading a person's personal autonomy, regardless of whether the invasion is harmful. *See Cruzan*, 497 U.S. at 277 (discussing "right of a competent individual to refuse medical treatment"). So, Plaintiffs appropriately plead a violation of both rights.[9]

---

[9] We take no position on the dissenting opinion's proposed litigation strategy for the City of Jackson on remand with respect to the state-created danger claim. *See Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 939 n.12 (5th Cir. 2022).

We have not yet adopted the theory, but "circuits that recognize the doctrine uniformly require that the defendant affirmatively acted to create or exacerbate a danger to a specific individual or class of people." *Irish v. Fowler*, 979 F.3d 65, 73–74 (1st Cir. 2020). Circuits also require "that the defendant's acts be highly culpable and go beyond mere negligence," with most circuits requiring that the actions shock the conscience. *Id.* at 74; *see id.* at 74 n.4. The phrase "state-created danger" comes from *DeShaney*, 489 U.S. at 201. In *DeShaney*, discussed above, the Court explained that the state was not liable under § 1983 because "when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all." *DeShaney*, 489 U.S. at 201. Further, "[w]hile the State may have been aware of the dangers that [he] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* Accordingly, when the government or its officials, through their affirmative acts, create the danger, there may be § 1983 liability.

However, courts began recognizing the theory before *DeShaney*. *White v. Rochford*, 592 F.2d 381, 384 (7th Cir. 1979) ("The complaint sufficiently alleged a deprivation of rights secured by the Constitution sufficient to state a claim under § 1983 . . . . It is sufficient that the defendants left helpless minor children subject to inclement weather and great physical danger without any apparent justification."); *Bowers v. De Vito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."); *Jones v. Phyfer*, 761 F.2d 642, 644–46 (11th Cir. 1985) (surveying relevant caselaw); *Wells v. Walker*, 852 F.2d 368, 370–71 (8th Cir. 1988) ("Circuit court decisions examining whether a particular individual, as distinguished from the general public, is entitled to protection by the state from third-party harm generally recognize that the due process

clause may be implicated in the following situation[] . . . when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in."). In this context, *DeShaney* is "more reasonably understood as an acknowledgment and preservation of the doctrine, rather than its source." *Kennedy v. Ridgefield City*, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006).

Based on this foundation, the vast majority of our sister circuits have recognized the theory, and applied it to many fact patterns. *Irish*, 979 F.3d at 73–75; *see Dwares v. City of N.Y.*, 985 F.2d 94 (2d Cir. 1993) (applying the theory where officer told skinheads they would not stop them from beating up protesters in the park). We have also applied the state created danger doctrine, although, confusingly, we later asserted that we had not adopted the doctrine. *See Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 538–39 (5th Cir. 2003) (reversing dismissal because plaintiff plausibly alleged state created danger); *see also Morris v. Dearborne*, 181 F.3d 657, 672–73 (5th Cir. 1999) (concluding that a teacher who falsified a report that caused a child to be wrongfully removed from her parents' custody could be subject to § 1983 liability).

Today, we end decades of confusion and delay and adopt state-created danger as a viable theory in our circuit. A state-created danger claim requires:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff[s];
>
> (2) that the act or acts created or enhanced a danger specific to the plaintiff[s] and distinct from the danger to the general public;
>
> (3) that the act or acts caused the plaintiff[s'] harm; and
>
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.

No. 24-60370

*Irish*, 979 F.3d at 75.

We thus reverse the district court's dismissal of the claim and remand for the district court to assess whether Plaintiffs' allegations against the City state a plausible state-created danger claim. However, a never-established right cannot be clearly established, *Fisher*, 73 F.4th at 375, so we affirm on qualified immunity grounds the dismissal of the state-created-danger claim as to the City official Defendants.[10]

## C. State-Law Claims

After dismissing the federal-law claims, the district court declined to exercise supplemental jurisdiction over the remaining state-law claims. Because we reverse the dismissal of the federal-law claims, we vacate the dismissal of the state-law claims over which the district court may exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(a); *Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 320 (5th Cir. 2019).

---

[10] We leave the application of the doctrine in the able hands of the district court. However, we must address a few of the dissenting opinion's contentions. First, the dissenting opinion asserts that Plaintiffs do not state a plausible claim because they do not allege private violence. But the dissenting opinion interprets either the state-created danger theory or Plaintiffs' complaint too narrowly. Here, Defendants' conduct increased the risk that Plaintiffs drank toxic water that causes severe health effects, which is all the theory requires. *See Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000) (holding plaintiff's state-created danger claim viable even though nature rather than a private actor directly caused the harm). Second, the dissenting opinion asserts that the claim is not viable because the danger was not specific to an individual. The dissenting opinion is correct that dangers to the general public would not meet the strictures of a state-created danger claim. *Martinez v. California*, 444 U.S. 277, 285 (1980). But a danger to a discrete class of people is not a danger to the general public. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 913 (3d Cir. 1997) ("[D]epending on the facts of a particular case, a 'discrete plaintiff' may mean a specific person or a specific class of persons.") "The primary focus when making this determination is foreseeability." *Id.* Plaintiffs' allegations—that Defendants pumped the toxic water directly into Plaintiffs' home—meet the foreseeability test.

No. 24-60370

## IV.    Conclusion

For the reasons above, we REVERSE as to the due process claims against the City, AFFIRM as to the due process claims against the City official Defendants, VACATE the dismissal of the state-law claims, and REMAND.

No. 24-60370

James L. Dennis, *Circuit Judge*, concurring in part and dissenting in part:

I concur in the majority opinion except insofar as it affirms the district court's ruling that the City of Jackson officials are entitled to qualified immunity from Plaintiffs' bodily-integrity claim. In my view—and in the view of the Sixth Circuit in *Guertin v. Michigan*, 912 F.3d 907 (6th Cir.), *reh'g denied*, 924 F.3d 309 (6th Cir. 2019), *cert. denied*, 589 U.S. 1167 (2020)—the Supreme Court clearly established the substantive due process right to bodily integrity in *Washington v. Harper*, 494 U.S. 210 (1990), and *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990). The attempts to distinguish this case from that jurisprudence are feckless. I write separately to elaborate on the bodily integrity precedents and to rebut the false stylized alarm raised by the dissent.

I

"Public officials are entitled to qualified immunity unless the plaintiff can plead specific allegations" at the motion-to-dismiss or judgment-on-the-pleadings stage "demonstrating (1) the [official's] violation of a constitutional right that (2) was clearly established at the time of the alleged misconduct." *Linicomn v. Hill*, 902 F.3d 529, 533 (5th Cir. 2018). The district court assumed *arguendo* that Plaintiffs plausibly alleged a constitutional violation against the individual City officials but nevertheless granted the officials qualified immunity from the Plaintiffs' bodily-integrity substantive due process claim, reasoning that the right at issue was not clearly established at the time of the alleged conduct. The majority opinion agrees.[1] *Ante*, at 32–

---

[1] Putting aside its error on clearly established law, the majority correctly articulates the framework for determining a constitutional violation. First, Plaintiffs have demonstrated that Defendants violated their right to bodily integrity by supplying lead-leaching water, concealing the attendant risks, and falsely assuring residents of their safety. *Ante*, at 12–19. Second, Plaintiffs have shown that Defendants' conduct "shocked the

No. 24-60370

33. But *Guertin v. Michigan*—a case that the majority opinion otherwise correctly relies upon—illustrates why that conclusion is mistaken. 912 F.3d 907 (6th Cir. 2019).

*Guertin* arose out of the infamous state and local government-created environmental disaster commonly known as the Flint, Michigan Water Crisis. *Id.* at 915. Flint residents brought a 42 U.S.C. § 1983 suit against state and local officials, alleging personal injuries from drinking, cooking with, and bathing in lead-contaminated water that the government had knowingly supplied. To save money, officials had switched the municipal water supply to the Flint River, processed by a mothballed and outdated treatment plant. *Id.* Officials began dispensing the water without adding chemicals to reduce its known corrosivity. The result: lead leached from aging pipes into homes at alarming rates. *Id.*

The only claim before the Sixth Circuit was that officials violated plaintiffs' right to bodily integrity under the Fourteenth Amendment's Due Process Clause—the same type of claim at issue here. *Id.* On the issue of qualified immunity specifically, *Guertin* relied on the Supreme Court's "vast bodily integrity jurisprudence" to find the right clearly established. *Id.* at 919, 932–35. That jurisprudence centers on "balancing an individual's common law right to informed consent with tenable state interests," regardless of the precise form of government intrusion. *Id.* at 919.

That same body of law clearly establishes the right here. In *Washington v. Harper*, the state administered antipsychotic drugs to an inmate against his will and without a hearing. 494 U.S. 210, 213–17 (1990). The Supreme Court

_____

conscience" within the meaning of substantive due process. Because Defendants had ample time for deliberation, prevention, and warning, the applicable standard is deliberate indifference. *Id.* at 20–32.

had "no doubt" that the inmate "possess[ed] a significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Id.* at 221–22. *Harper*'s "interest in avoiding the unwarranted administration of antipsychotic drugs [wa]s not insubstantial. The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." *Id.* at 229. This "is especially so when the foreign substance 'can have serious, even fatal, side effects' despite some therapeutic benefits." *Guertin*, 912 F.3d at 919 (quoting *Harper*, 494 U.S. at 229).

*Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261 (1990)—the Supreme Court's seminal "right to die" case—further elaborates the doctrine. *Guertin*, 912 F.3d at 920. *Cruzan* dealt with "whether the parents of an individual in a persistent vegetative state could insist that a hospital withdraw life-sustaining care based on her right to bodily integrity." *Id.* (citing *Cruzan*, 497 U.S. at 265–69). Chief Justice Rehnquist, writing for the *Cruzan* majority, charted the relationship between common-law principles of informed consent and the broader constitutional guarantee of bodily autonomy. "This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment," *Cruzan*, 497 U.S. at 269, "generally encompass[es] the right of a competent individual to refuse medical treatment," *id.* at 277, and is a right that "may be inferred from our prior decisions," *id.* at 278–79 (first citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); then citing *Breithaupt v. Abram*, 352 U.S. 432 (1957); then citing *Harper*, 494 U.S. at 210; then citing *Vitek v. Jones*, 445 U.S. 480 (1980); and then citing *Parham v. J.R.*, 442 U.S. 584 (1979)). "[T]he logic of [precedent] would embrace . . . a liberty interest . . . [in refusing] artificially delivered food

and water essential to life." *Id.* at 279; *see also id.* at 287 (O'CONNOR, J., concurring) (similar).

In light of the Supreme Court's "vast bodily integrity jurisprudence," the Sixth Circuit held that "taking affirmative steps to systemically contaminate a community through its public water supply with deliberate indifference is a government invasion of [bodily integrity] of the highest magnitude. Any reasonable official should have known that doing so constitutes conscience-shocking conduct prohibited by the substantive due process clause." *Guertin*, 912 F.3d at 919, 933. "Put differently, plaintiffs' bodily integrity claim implicates a clearly established right that 'may be inferred from [the Supreme Court's] prior decisions.'" *Id.* at 934 (quoting *Cruzan*, 497 U.S. at 278); *see also Crittindon v. LeBlanc*, 37 F.4th 177, 186 (5th Cir. 2022) (instructing that we must "first look[] to Supreme Court precedent" to "determin[e] what constitutes clearly established law"). *Harper* and *Cruzan* "build on each other from one foundation: an individual's right to bodily integrity is sacred, founded upon informed consent, and may be invaded only upon a showing of a [compelling] government interest." *Guertin*, 912 F.3d at 933–34; *cf.* ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES & POLICIES § 10.1.2 (7th ed. 2023) (describing strict scrutiny standard of review applicable to fundamental rights). "The [Supreme] Court could not have been clearer in *Harper* when it state[d] that '[t]he forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.'" *Guertin*, 912 F.3d at 934 (quoting *Harper*, 494 U.S. at 229). And *Guertin* explained that the "invasion" before it was "more dramatic" than that in *Harper* because at least in *Harper* "the state forced medication—something needed to improve or sustain life—into its citizens," whereas the government officials in Flint "caused . . . residents to

No. 24-60370

consume a toxin with no known benefit, did so without telling them, and made affirmative representations that the water was safe to drink." *Id.*

"The same can be gleaned from *Cruzan* [because] if the common law right to informed consent is to mean anything, . . . it must include 'the right of a competent individual to refuse medical treatment.'" *Id.* (quoting *Cruzan*, 497 U.S. at 277). "If an individual has a right to refuse to ingest medication, then surely she has a right to refuse to ingest a life necessity." *Id.* "*Cruzan* instructs as much, recognizing that the 'logic' of its bodily integrity cases—i.e., the reasoning—encompasses an individual's liberty interest to refuse 'food and water essential to life.'" *Id.* (quoting *Cruzan*, 497 U.S. at 279). "[I]f an individual has a right to refuse the consumption of beneficial water, then certainly any reasonable official would understand that an individual has a right to refuse the consumption of water known to be lead-contaminated, especially when those individuals involved in tainting the water simultaneously vouched for its safety." *Id.*

The majority responds, in substance, that *Harper* and *Cruzan* involved forced surgery or injection of medication, which are not analogous enough to the provision of toxic drinking water to have given City officials notice that their conduct was unlawful. *Ante*, at 32. But *Guertin* specifically rejected the argument that *Harper* and *Cruzan* are not factually similar enough to clearly establish the at-issue right to bodily integrity. 912 F.3d at 934. "[S]weeping statements about constitutional rights do not provide officials with the requisite notice," but the *Guertin* court rightly observed that "the deficiencies of a too-general clearly established test have no bearing on the specifics of this case." *Id.* The right recognized by *Harper* and *Cruzan* is "neither a 'general proposition' nor one 'lurking in the broad history and purposes of the substantive due process clause.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "Any other result would allow [the Supreme Court]'s fear of 'rigid, overreliance on factual similarity' in analyzing the

'clearly established' prong of the qualified immunity standard to be realized." *Id.* at 934–35 (quoting *Hope v. Pelzer*, 536 U.S. 730, 742 (2002)) (citation modified).

Our circuit's precedent confirms that "[t]he law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (quoting *Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013)). The focus of the inquiry, after all, is whether the official had fair notice that his conduct was unlawful. *Morgan v. Swanson*, 659 F.3d 359, 372 (5th Cir. 2011) (en banc) ("The *sine qua non* of the clearly-established inquiry is 'fair warning.'") (citing *Hope*, 536 U.S. at 741). Thus, "a case directly on point" is not required for a right to be clearly established. *al-Kidd*, 563 U.S. at 741.

Rather than fixating on factual distinctions and collapsing the clearly established inquiry into a demand for identical precedent, I would follow the Sixth Circuit's approach and conclude that the Supreme Court's decisions in *Harper* and *Cruzan* clearly established the at-issue right to refuse consent to invasions of bodily integrity. The district court's grant of qualified immunity to the Jackson officials from Plaintiffs' bodily-integrity claims should therefore be reversed.

II

That leaves the arguments from the dissenting opinion, which is framed around the "basic premise" that if a "substantive due process claim sounds primarily in tort," a plaintiff necessarily fails to state a claim. *Post*, at 67–68. Of course, that is not the law.

The Supreme Court has squarely rejected the notion that the availability of a state tort remedy precludes a federal constitutional claim. In

No. 24-60370

*Zinermon v. Burch*, the Court reaffirmed *Monroe v. Pape*'s holding that "[a] plaintiff . . . may invoke § 1983 regardless of any state-tort remedy that might be available to compensate him for the deprivation of these rights." 494 U.S. 113, 125 (1990) (citing *Monroe v. Pape*, 365 U.S. 167, 183 (1961) ("It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.")). JUSTICE HARLAN put the point directly: "[A] deprivation of a constitutional right is significantly different from and more serious than a violation of a state right and therefore deserves a different remedy even though the same act may constitute both." *Monroe*, 365 U.S. at 196 (HARLAN, J., concurring); *see also Parratt v. Taylor*, 451 U.S. 527, 552–53 (1981) (POWELL, J., concurring in the result) ("The Due Process Clause imposes substantive limitations on state action and under proper circumstances these limitations may extend to intentional and malicious deprivations of liberty and property, even where compensation is available under state law."); *id.* at 545 (BLACKMUN, J., concurring) ("[T]here are certain governmental actions that, even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to fundamental notions of due process."). The dissent's view would erase the concurrent jurisdiction Congress created by allowing plaintiffs to pursue both state and federal remedies. The Supreme Court has consistently declined to endorse that contrary position.

Against this backdrop, the dissent's charge that *we* are "breaki[ng] new ground," making up law to reach a "desirable result," becoming "judicial policymakers," exercising "fictitious power," "eschew[ing] the [Supreme] Court's limits," and indulging in "judicial caprice" is difficult to square with the law. *Post*, at 66–67. The dissent's claims rest largely on its passing citation to *Dobbs* and a secondary source on constitutional interpretation, neither of which supports the dissent's position. *Dobbs v.*

No. 24-60370

*Jackson Women's Health Org.*, 597 U.S. 215, 295 (2022) ("[W]e have stated unequivocally that nothing in this opinion should be understood to cast doubt on precedents that do not concern abortion. . . . It is hard to see how we could be clearer."); *Hess v. Garcia*, 72 F.4th 753, 765 (7th Cir. 2023) ("*Dobbs* . . . did not mention or undermine the right to bodily integrity."); *Tyson v. Sabine*, 42 F.4th 508, 517 & n.4 (5th Cir. 2022) (acknowledging that *Dobbs* left undisturbed the right to bodily integrity).

Far from "breaking new ground," our decision follows the Sixth Circuit's *Guertin* bodily-integrity analysis, an approach firmly grounded in multiple Supreme Court decisions, including *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998), *Harper*, and *Cruzan*. No court until the district court in this case has rejected *Guertin*. And several of our sister circuits have embraced it. *See, e.g.*, *Washington v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 178 (4th Cir. 2023); *Ablordeppey v. Walsh*, 85 F.4th 27, 34 (1st Cir. 2023).

To overcome *Guertin et al.*, the dissent resorts primarily to trivialization. Its film-noir portrayal of the Jackson 2014 water source switch—as if "villains cloaked in the dark of night dumped lead directly into Jackson's water system"—misstates the complaint. *Post*, at 75. Plaintiffs do not claim that Defendants poured toxins into the water. Instead, they allege affirmative and knowing acts that altered the chemical composition of the City's water by switching from higher-pH well water to lower-pH surface water without applying required corrosion control. This destabilized protective pipe scale and predictably leached lead into homes, a fact confirmed by the very extra-complaint sources the dissent cites. The allegations describe a series of deliberate choices: initiating the 2014 source switch, failing to implement mandated corrosion control during and after the switch, repeatedly switching between sources despite known consequences, and issuing public announcements of assurances of water safety while

No. 24-60370

internal data revealed ongoing lead contamination. Taken together, these allegations describe affirmative acts that foreseeably increased the risk of serious harm and plausibly state a substantive due process claim under *Guertin et al*. This is not a case of mere government inaction, but a case of deliberate acts, which exposed Plaintiffs to lead toxicity and deprived them of their bodily integrity. *See* Shannon Roesler, *State-Created Dangers & Substantive Due Process*, 73 Fla. L. Rev. 685, 716 (2021).[2]

Although the dissent invokes *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), and *Collins v. City of*

---

[2] The dissent also asserts that "Jackson was *not* Flint," so *Guertin* is distinguishable. *Post*, at 92–93 n.20. The dissent does so by arguing that the complaint's allegation—that a City official's 2016 statement to that effect was false—is refuted by the record. Specifically, the dissent points to a newspaper article about a September 2015 study on Jackson's water quality, cited in the complaint at paragraph 48, ROA.1463, as disproving the complaint's allegation at paragraph 154 that a City representative lied when she said, "We are nowhere near the levels seen in Flint." ROA.1482. According to the dissent, that study shows the official's statement was true because Flint's lead levels reached 1,000 ppb while Jackson's did not exceed 476 ppb. *Post*, at 92–93 n.20.

But Plaintiffs did not allege that Jackson's *maximum* lead levels exceeded Flint's; they alleged that the *scope* of contamination was worse. Their allegation was that the official's statement "was false" because "there were a larger proportion of homes that had shown elevated lead levels above 15 ppb." ROA.1482 at ¶ 154. The news article describing the September 2015 study does not refute that claim. Indeed, not even the dissent disputes that a June 2015 report revealed that lead in Jackson's drinking water exceeded 15 ppb in 22% of the sample of homes tested—5.3% more than in Flint at about the same time. ROA.1480 at ¶¶ 142, 143. Far from contradicting Plaintiffs' allegation, that report supports it.

When examined, the news article on which the dissent relies does not negate the plausibility of Plaintiffs' allegation that the official's statement was false. Nor, notably, do Defendants themselves make the argument the dissent advances. In doing so, the dissent departs from the proper judicial role by raising and resolving a factual defense that the parties never asserted. Courts may not construct or credit such arguments on a defendant's behalf—particularly when, as here, the argument rests on a misreading of the complaint. This category of error dominates the dissent, as explained more in this opinion.

No. 24-60370

*Harker Heights, Texas*, 503 U.S. 115 (1992), to suggest that non-custodial plaintiffs may never state a claim for bodily intrusion, those cases are inapposite. *Post*, at 67–71, 73. *DeShaney* addressed a state's failure to protect a child from private harm, and *Collins* addressed the availability of a substantive due process claim involving municipal employees' working conditions. Both involved inaction or discretionary decisions about how to deliver public services, not direct state intrusion upon bodily integrity. By contrast, Plaintiffs here allege that the City actively caused bodily harm by providing lead-contaminated water, a direct interference with bodily integrity. When the government itself inflicts the harm,[3] the absence of a custodial relationship is irrelevant; the "no duty to protect from private harm" principle in *DeShaney* does not bar claims for harms that the state itself causes. *See Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 724–25 (3d Cir. 1989) (distinguishing *DeShaney* because, unlike in *DeShaney*, the injury in *Stoneking* was inflicted by a state employee).

Having explained why Plaintiffs' allegations plausibly state a claim under established law, I turn to the dissent's contrary account and its attempt to rewrite the facts. The dissent constructs an alternative factual narrative — one more fitting for defense counsel than for an appellate court—largely by

---

[3] This also explains why the dissent's reliance on *White v. Lemacks*, 183 F.3d 1253 (11th Cir. 1999), is wholly misplaced. *Post*, at 68, 71, 78. That case—concerning the state-created danger doctrine—involved private medical contractors who alleged injuries inflicted by a third-party inmate while performing duties at a county jail; there was no direct state-inflicted harm. *Id.* at 1254; *see also White v. Lemacks*, 24 F.Supp.2d 1373, 1379 (N.D. Ga. 1998) (ruling that the plaintiffs "failed to allege any facts showing any affirmative action or culpable conduct by the Defendants"). This distinction is important. When harm comes from private actors, liability arises only if the State's own affirmative actions create or exacerbate the risk of that harm. That is the premise of the state-created danger doctrine, which, like direct bodily integrity claims, operates under the Fourteenth Amendment's substantive due process guarantee but addresses a different factual mechanism of violation, as explored later in this opinion at page 61.

No. 24-60370

relying on materials neither incorporated into nor attached to the complaint. That approach is improper at the pleadings stage: had the Defendants done the same below (they didn't), the district court would have been required to either exclude the evidence or treat the motion for judgment on the pleadings as one for summary judgment. *See* FED. R. CIV. P. 12(d). In any event, as explained below, not one of the dissent's theories finds support in the record or the law.

The dissent's criticisms center on three areas: (A) the 2014 water switch; (B) Jackson's boil notices; and (C) the officials' belated warnings to the public.

## A

The dissent first targets Plaintiffs' well-pleaded allegations that the City's 2014 switch from high-pH well water to low-pH surface water caused lead to leach from pipes and enter residents' homes. These nearly forty paragraphs, rich with detailed allegations, speak for themselves:

> **34.** Jackson owns . . . a public water system (. . . "PWS") which serves the vast majority of water users in the City and in surrounding communities.
>
> . . .
>
> **37.** Jackson's PWS . . . consists of two water treatment plants, known as the O.B. Curtis Water Treatment Plant ("Curtis WTP") and J.H. Fewell Water Treatment Plant ("Fewell WTP"), as well as a number of groundwater wells and . . . facilities.
>
> **38.** The Curtis WTP was initially constructed in or around 1992.
>
> **39.** The Fewell WTP was initially constructed in or around 1909.
>
> **40.** The Curtis WTP and the Fewell WTP have consistently

No. 24-60370

drawn water from the [Ross Barnett] Reservoir and the Pearl River[, respectively,] to provide water to the City's residents and water users.

...

**43.** Jackson has an aging network of pipes to deliver drinking water and remove wastewater. This includes approximately 1,500 miles of water mains, some of which are over 100 years old.

**44.** Due to antiquated and inadequate equipment, lack of repairs and maintenance, understaffing, and other failure to operate a proper PWS, Jackson has not provided adequate and safe water to its citizens. . . .

**45.** Jackson's PWS and its pipes contain significant amounts of lead.

**46.** There is a solid band of lead every 20 feet in the older cast-iron piping under Jackson's city streets.

. . .

**56.** "A water supply with a lower than recommended pH can strip the oxide lining and associated scale in service lines and increase lead levels in the water."

**57.** When the pH of a water supply drops, the solubility of lead minerals on the surfaces of pipes increases, leading to higher concentrations of lead in the water supply.

**58.** Jackson has previously struggled with low pH in its water, which makes the water corrosive and therefore more likely to leach lead and other contaminants from pipes into drinking water.

**59.** Testing of Jackson's water and water sources has consistently exhibited low pH levels over time.

. . .

**75.** Between 2010 and 2013, triennial testing showed an alarming increase of lead [in] Jackson's drinking water.

. . .

**82.** By late 2013 or early 2014, Jackson was aware that its low-pH water (which was not being treated due to [a] malfunctioning lime pump) was causing lead to leach from pipes into the City's drinking water.

. . .

**119.** In addition to the fact that no action was taken to combat the rapidly rising lead levels, former Mayor Yarber, former Public Works Director Powell, and the City of Jackson did not warn Jackson's citizens and water users of rising lead levels, the corrosive state of Jackson's water, or the associated health risks.

**120.** Simultaneously with rising lead levels, [in 2014,] Jackson switched a section of the city's water source from well water to surface water—which significantly impacted drinking water quality and safety for the entirety of water users.

**121.** The City of Jackson unitized the surface water system and the well water system and switched the well water users to surface water drawn from the Pearl River and the Reservoir.

**122.** Specifically, "the City of Jackson, Mississippi, took the city's Maddox Road Well System (serving much of south Jackson, with 6 groundwater wells along the Highway 18 corridor, and the City of Byram) off the well system and onto surface water."

**123.** Jackson . . . switched water sources for a portion of its water users from the high-pH well water to the low-pH surface water drawn from the Pearl River and the Reservoir.

**124.** The decision was a catastrophic one for thousands of Jackson water customers given the fragile balance of pH then in place in Jackson's PWS.

**125.** The well water used by the Maddox Road Well Water System in a portion of the Jackson metro area had a high pH (over 8), which "protected service lines connected to the

No. 24-60370

Maddox Road Well system from corrosion and exposure to lead contamination from lead pipes."

**126.** The O.B. Curtis and J.H. Fewell Water Treatment Plants were not prepared to handle the increased flow associated with a sudden addition of 16,000 new connections.

**127.** The surface water "had a pH of just over 6" and this portion of the City's PWS was not prepared for the drastic change in acidic water due to malfunctioning and nonfunctioning corrosion control methods and water treatment.

**128.** These increased stresses also contributed to the problems at the Curtis and Fewell WTPs and failure of the PWS.

**129.** As a public water system professional, Defendant Powell knew that several segments of the Pearl River had been identified as impaired due to low pH levels and shared this information with former Mayor Yarber.

**130.** Indeed, as a public water system professional, Director of Public Works Powell in fact knew of the seriously low pH of the surface waters Jackson was switching to, as well as the fact that certain segments had previously been designated impaired for low pH pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

**131.** Further, in her capacity as a public water system professional, Powell knew of the seriously impaired, malfunctioning and nonfunctioning corrosion control methods within the City's water treatment plants.

**132.** Powell shared this information with former Mayor Yarber.

**133.** Both of these public servants chose to direct their staff to carry out the most harmful and neglectful options for the well-water switch as well as the corrosion control methods.

**134.** Ultimately, former Mayor Yarber's, former Public Works Director Powell's, and Jackson's decision proved catastrophic. As described below, it caused a serious increase in lead levels

that would not be detected until June 2015 and would not be reported until January 2016. Jackson would not even begin to address those levels until later in the spring of 2016. Even to this day, in the late spring of 2021, Jackson is not fully in compliance with federal law.

**135.** To this day, Jackson has not identified any materials, studies, reports, documents, treatises, or other information that was relied upon in good faith by former Mayor Yarber, former Public Works Director Powell, or Jackson in making the decision to switch water sources for nearly a quarter of its water users.

**136.** There was no information or studies that supported the advisability of the switch or suggested that it would be safe under the circumstances.

**137.** No studies regarding the cost of a switch were conducted and no information or analysis supported later claims that the switch was taken as a cost-saving measure.

**138.** No internal materials were created or reviewed by former Mayor Yarber's office, the Jackson City Council, or the Department of Public Works that supported the switch, suggested it would be safe, indicated it would be a valid cost-saving measure, or showed that it was advisable in any way.

**139.** No other actions were taken to ensure that a switch in Jackson's drinking water source would be safe and would not result in the injury and poisoning of Jackson's citizens and water users.

**140.** Jackson's citizens and water users were not warned or informed of the associated risks from rising lead levels in drinking water while the City continued to ignore alarms regarding malfunctioning and nonfunctioning corrosion control treatment methods.

No. 24-60370

ROA.1460–79 at ¶¶ 34, 37–40, 43–46, 56–59, 75, 82, 119–40 (footnotes omitted).

The dissent tries to rebut Plaintiffs' allegations that the City acted without any justification by pointing to a single, preliminary 2020 EPA report (Exhibit 7)—a non-final compliance investigation based on interviews with City officials. The dissent interprets the report to suggest that the City "made the switch in water sources" following the completion of a booster station to improve pressure and flow, which "evinces a decision made in the face of competing concerns, including the need to repair aging infrastructure," not deliberate indifference. *Post*, at 76–77. This selective reading cannot overcome the well-pleaded allegations and is faulty for multiple, independent reasons.

*First*, the City itself never makes this argument. To raise it *sua sponte* violates the principle of party presentation. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation."); *see also Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 474 (5th Cir. 2020) (en banc) ("Just because we have discretion to address a forfeited argument that is later asserted doesn't mean that we can (or should) make a party's argument for it in the first place."). Indeed, a reasonable inference to draw from Plaintiffs' allegations is that the City's own attempted justification for the water switch was a purported cost-saving measure, not the booster station rationale now advanced by the dissent. ROA. 1479 at ¶ 137.

*Second*, although the complaint states that Exhibit 7 is "attached and incorporated as if fully stated herein," Plaintiffs do not cite the report to support their allegation that the 2014 switch lacked justification. The complaint cites Exhibit 7 at paragraphs 265 and 266 solely to chronologically note that the EPA conducted a compliance investigation in 2020 and met

with City officials. ROA.1507. As the majority opinion explains, *ante*, at 23–26, incorporating a report or other document—or attaching it as an exhibit—for one purpose does not mean a plaintiff adopts all of its factual allegations. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015); *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004); *Hymer v. Kross*, No. 23-3026781, 2024 WL 3026781, at *2 (3d Cir. June 17, 2024). Plaintiffs, like the plaintiffs in those cases, are not bound by every statement in a report incorporated for a limited purpose.

That principle applies strongly here. The EPA report is preliminary and based on interviews with City officials. It expressly states that "[t]hese observations are not final compliance determinations." ROA.1599. As the Fourth Circuit explained, exhibits may reflect a defendant's version of contested events or contain self-serving, exculpatory statements that a plaintiff has not adopted. *Goines*, 822 F.3d at 167–68. Treating such documents as true simply because they were attached to or incorporated in a complaint would undermine notice pleading and allow parties to hide behind untested assertions. *Id.*; *see also Hymer*, 2024 WL 3026781, at * 2 ("While courts may consider exhibits attached to a complaint when considering whether dismissal is appropriate, a plaintiff does not automatically incorporate into her complaint every fact asserted in such attachments."). Here, Plaintiffs relied on the EPA report solely for chronology, not for its substantive conclusions.

*Third*, even on its own terms, the preliminary report does not contradict the complaint. It highlights the absence of documentation or studies regarding the water switch and associated disinfection differences—facts that support, rather than undermine, Plaintiffs' allegation that the switch was undertaken without supporting analysis or information. The report also notes that Jackson "failed to provide documentation regarding

the change in source from groundwater to surface water, and associated disinfection differences, in October 2014." ROA.1602. And it reports that the City "did not [even] make a formal request to [the state health department] to change its source from groundwater to surface water." ROA.1603. Nowhere does the report state that the booster station was intended "to assist water pressure and flow" or that it justified the switch. ROA.1603. The dissent has no response. Its attempt to litigate the facts prematurely—based on a non-final report—demonstrates why the case must proceed to discovery.

## B

Next, the dissent argues that "the boil notices cannot shock the conscience," but its view rests on an incomplete reading of the complaint and a premature assumption about the reasonableness of Defendants' actions. *Post*, at 78. Plaintiffs allege not that Defendants made a good-faith choice between competing dangers, but that they knowingly issued misleading boil notices while aware that the City's water supply was contaminated with leaching lead. The complaint avers that City officials had received testing data confirming lead exceedances and that corrosion control was not functioning. *See, e.g.*, ROA.1472 at ¶ 104 (alleging that, in 2014, "the City continued to ignore alarms regarding malfunctioning and nonfunctioning corrosion control treatment methods"); ROA.1479 at ¶ 140 ("Jackson's citizens and water users were not warned or informed of the associated risks from rising lead levels in drinking water while the City continued to ignore alarms regarding malfunctioning and nonfunctioning corrosion control treatment methods."); ROA.1480–81 at ¶ 148 (alleging that "[d]espite knowing of [June 2015 test results revealing] high levels of lead in Jackson's water, Jackson did not take action to protect Jackson's citizens and water users"). Yet the City continued to advise residents that boiling would make the water safe to consume—when, in fact, boiling does not remove lead but

increases its concentration. ROA.1491–92 at ¶¶ 195–96. At this stage, we must credit those allegations.

To be sure, if subsequent discovery ultimately yields undisputed evidence that Defendants lacked contemporaneous knowledge of leaching lead contamination and issued boil notices solely to mitigate acute bacterial threats, the dissent's policy-tradeoff argument might carry weight. But that is not the record before us. The question now is not whether the City could have reasonably believed it was acting prudently, but whether Plaintiffs plausibly allege that Defendants' actions affirmatively increased the risk of serious bodily harm. At this stage, they apparently do.

Nor does labeling the boil notices a "policy choice" insulate them from scrutiny. The Due Process Clause does not forbid policymaking—it forbids deliberate indifference to known and grave risks of bodily harm caused by state action. If Defendants knowingly issued assurances that predictably worsened lead exposure, that conduct cannot be dismissed as a mere "choice between two risks." Whether it ultimately shocks the conscience is a question for a developed factual record, not a motion for judgment on the pleadings.

## C

The dissent disputes that the City lied about the water's safety and failed to warn its citizenry of known danger. *Post*, at 79. Yet Plaintiffs allege that the City knew of the water system's lead-leaching problem since at least late 2013 or early 2014, ROA.1469 at ¶ 82, specifically received test results in June 2015 showing that drinking water exceeded the regulatory lead limit in 22% of homes tested, ROA.1480 at ¶ 146, and failed to notify residents of

No. 24-60370

danger until January 2016, ROA.1468 at ¶ 74 n.25.[4] The complaint further recounts that, after belatedly notifying the public, City officials falsely

_____

[4] The dissent claims that only the Mississippi State Department of Health knew about the 2015 test results and did not inform the City of them until January 2016. *Post*, at 80 & n.7. But the complaint expressly alleges that "[a]lthough MSDH officials did not inform the City of Jackson's residents and water users at that time [June 2015], upon information and belief, Defendants and their employees were made aware of these test results." ROA.1480 at ¶ 146. The dissent attempts to sidestep that allegation by deeming it "speculative," relying on a news article cited in the complaint for an entirely different purpose. *Post*, at 80 & n.7 (citing R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, Jackson Free Press (Feb. 3, 2016), https://perma.cc/CDV9-65T3). For the umpteenth time, the Defendants have not made the dissent's argument. *Sineneng-Smith*, 590 U.S. at 375; *Green Valley Special Util. Dist.*, 969 F.3d at 474.

At any rate, the news article is not properly before the court merely because it was cited in the complaint. It was neither incorporated by reference nor attached as an exhibit. The complaint cited the article only at paragraphs 48 and 150, and only to allege that, in 2011, MSDH "tagged Hinds County as 'high-risk for lead poisoning,'" and that a City official told the public in January 2016 that "[t]his is not a situation where you have to stop drinking the water." ROA.1463 at ¶ 48; ROA.1481 at ¶ 150. "On a motion to dismiss, the . . . court must limit itself to a consideration of the facts alleged on the face of the complaint, and to any documents attached as exhibits or incorporated by reference. Here, the news article was not attached as an exhibit to the amended complaint nor was it incorporated by reference. The amended complaint merely discussed this document and presented short quotations from it. Limited quotation does not constitute incorporation by reference." *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (citation modified); *cf. Nat'l Ass'n of Pharmaceutical Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 910 n.3 (2d Cir. 1988) (magistrate judge was authorized to treat letter as incorporated by reference into complaint when, *inter alia*, plaintiffs quoted entire text of letter in a memorandum of law). The news article thus cannot be considered without necessitating the need to convert the Rule 12(c) motion for judgment on the pleadings into a Rule 56 motion for summary judgment. *See* Fed. R. Civ. P. 12(d). And *even if* the article were properly before the court, it is fantastical to suggest it could refute the well-pleaded allegations: a news article is inadmissible hearsay. *See Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005).

The dissent also offers a throwaway suggestion that courts may take judicial notice of news articles even if they are neither incorporated by reference in nor attached as exhibits to the complaint. That purported rule statement hacks away so much nuance that it collapses under scrutiny. Federal Rule of Evidence 201 permits a court to "judicially notice a fact that is not subject to reasonable dispute." As the advisory committee notes

No. 24-60370

assured residents in January and February 2016 that the water was safe to drink.

For example, on January 29, 2016, a City official told the public that the June 2015 findings of lead in Jackson's drinking water do "not mean that the city has violated the Safe Drinking Water Act, and our water is safe." ROA.1481–82 at ¶ 152. On February 3, 2016, another City official told the press that "[t]his is not a situation where you have to stop drinking the water." ROA.1481 at ¶ 150. The complaint alleges that the same official "made repeated statements reassuring the City of Jackson's citizens and water users that Jackson's water was safe to drink even though it was not." ROA.1481 at ¶ 151. By mid-February, officials sought to persuade Jackson's citizens and water users that Jackson's water crisis was unlike Flint's drinking water crisis. "A major difference between Flint, Mich., and Jackson, Miss., Powell said, is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does." ROA.1482 at ¶ 153. "[T]his claim was false: the City of Jackson did not have properly operating corrosion control measures." ROA.1482 at ¶ 153 n.43.

The dissent responds by invoking notices issued on February 25, 2016, and in subsequent years—June 2016, June 2017, July 2018, and 2021— warning of the water's danger. *Post*, at 80–83. Those later communications

---

emphasize, "[a] high degree of indisputability is the essential prerequisite." Accordingly, "[c]ourts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (quoting *Premier Growth Fund v. All. Cap. Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006)); *accord Heliotrope Gen. Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.118 (9th Cir. 1999) (taking judicial notice "that the market was aware of the information contained in news articles submitted by the defendants"). Using news articles to prove the truth of contested facts would fail Rule 201's "not subject to reasonable dispute" requirement and is impermissible.

cannot retroactively sanitize the City's earlier concealment and false statements to the public. Even setting aside their inadequacy, they do nothing to refute the specific allegations that City officials falsely assured residents that the water was safe.

The dissent also points to a 2011 MSDH news release labeling Hinds County "high-risk for lead poisoning" and insists Plaintiffs should have divined that their water contained lead before January 2016. *Post*, at 87; ROA.1463 at ¶ 48 & n.10 (referencing the 2011 press release but providing no weblink). The record does not reveal what that news release actually said, and there is no indication it communicated any information about contamination in residents' own water. Broad, county-level warnings of this sort do not give residents actionable knowledge of specific hazards. Actionable knowledge arises only when residents learn of particular risks, such as the June 2015 test results showing that 22% of homes exceeded regulatory lead limits, which the City failed to disclose. Even if a county is labeled "high-risk," most residents will reasonably continue drinking water when officials repeatedly assure them it is safe. The complaint alleges exactly that—the City misled its residents about the water's safety—demonstrating that generalized warnings are meaningless without truthful, specific disclosures.

In sum, the dissent's attempts to refute Plaintiffs' allegations fail at every turn.

\*    \*    \*

Plaintiffs also plead that the City of Jackson's own actions created or increased the danger that culminated in their harm at the hands of a private contractor. That claim could plausibly implicate the state-created danger doctrine, which, though long recognized elsewhere, this court has neither adopted nor rejected. The district court erred in concluding that this court

had rejected the doctrine and was therefore powerless to recognize it. Because the question is presented here in the first instance, we address the doctrine only to the extent necessary to our remand for the district court to consider and assess the sufficiency of Plaintiffs' allegations.

The dissent critiques the doctrine as historically and legally unfounded, and as an impermissible gloss of *DeShaney*. *Post*, at 95–99. Yet long before *DeShaney*, several courts of appeals recognized that the Constitution's guarantee of due process may reach a state actor who affirmatively exposes an individual to danger. *See, e.g.*, *White v. Rochford*, 592 F.2d 381, 384 (7th Cir. 1979) ("[T]he complaint sufficiently alleged a deprivation of rights secured by the Constitution sufficient to state a claim under § 1983. . . . [I]t is sufficient that the defendants left helpless minor children subject to inclement weather and great physical danger without any apparent justification."); *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit."); *Wells v. Walker*, 852 F.2d 368, 370–71 (8th Cir. 1988) ("Circuit court decisions examining whether a particular individual, as distinguished from the general public, is entitled to protection by the state from third-party harm generally recognize that the due process clause may be implicated in the following situation[] . . . when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have been in." (citations omitted)). These decisions suggest that "[t]he oft-cited language of *DeShaney*, 489 U.S. at 201, is . . . more reasonably understood as an acknowledgment and preservation of the doctrine, rather than its source." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 n.1 (9th Cir. 2006); Stephen H. Steinglass, Section 1983 Litigation in State & Federal Courts § 3.17 (2025).

The dissent complains that no Founding-era history or tradition supports the state-created danger doctrine. *Post*, at 97. That may be relevant if the doctrine were a freestanding constitutional right. But it is not. Rather, it is a particular mode of applying the Fourteenth Amendment through the remedial framework Congress created in § 1983. The Ninth Circuit has recognized as much. *Kennedy*, 439 F.3d at 1061 n.1 (citing David Pruessner, *The Forgotten Foundation of State–Created Danger Claims*, 20 Rev. Litig. 357 (2001)). As Pruessner explains, the doctrine's modern expression traces not to the Founding, but to Reconstruction—to Congress's effort, through the Ku Klux Klan Act of 1871, to impose liability on state officials who "cause [a person] to be subjected" to constitutional injury by private third persons such as klansmen. *See* 42 U.S.C. § 1983.

In that sense, § 1983 may be understood as extending constitutional tort liability to state actors further up the causal chain—those whose affirmative conduct facilitates private violence. Congress designed that remedy to confront precisely the problem of state-aided terror the Ku Klux Klan epitomized. The state-created danger doctrine, as later developed by the courts of appeals, carries forward that principle. It holds state officials accountable under § 1983 when their own affirmative acts so substantially assist private wrongdoing that the resulting harm or its exacerbation becomes, in constitutional contemplation, that of the State's own actor. *See Kennedy*, 439 F.3d at 1061; *Doe v. Rosa*, 795 F.3d 429, 438 n.6 (4th Cir. 2015);

No. 24-60370

*Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 871, 873 (5th Cir. 2012) (Higginson, J., concurring in judgment).[5]

The state-created danger theory is now well settled in ten of our sister circuits. *See Irish v. Fowler*, 979 F.3d 65, 75 (1st Cir. 2020); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009); *Sanford v. Stiles*, 456 F.3d 298, 304–05 (3d Cir. 2006); *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015); *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 932 (6th Cir. 2020); *D.S. v. E. Porter Cnty. Sch. Corp.*, 799 F.3d 793, 798 (7th Cir. 2015); *Fields v. Abbott*, 652 F.3d 886, 891 (8th Cir. 2011); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1066 (9th Cir. 2006); *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013); *Butera v. District of Columbia*, 235 F.3d 637, 652 (D.C. Cir. 2001).[6] Over more than four decades, these circuits—covering forty-four states, the District of Columbia, Puerto Rico, Guam, and the Northern Mariana Islands—have applied the doctrine without, as the dissent fears, "our constitutional and federalist order" crumbling. *Post*, at

---

[5] The majority opinion rightly exposes the dissent's increasingly absurd hypotheticals, which bear no connection to the record or the legal issues here. *Ante*, at 31 n.8. Many are so plainly frivolous that they fail at the threshold. For example, the dissent imagines a victim of assault suing the federal government after being attacked by Tren de Aragua gang members, or an injured patient suing a presidential administration for the development of a vaccine. *Post*, at 102–04. Presumably, someone finds these persuasive. Reality, however, is less fanciful: the Plaintiffs' *state*-created danger claim is brought against *state* actors under 42 U.S.C. § 1983, which applies "only when 'the claimed deprivation has resulted from the exercise of a right or privilege having its source in *state* authority.'" *Lindke v. Freed*, 601 U.S. 187, 198 (2024) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)) (emphasis added). That much is black-letter law.

[6] At this juncture, I concur in the majority opinion's grant of qualified immunity to the City officials on the state-created-danger claim because the Plaintiffs do not brief the clearly established law prong. Nonetheless, I acknowledge and agree with the First Circuit's reasoning in *Irish*, which adopted the state-created danger doctrine for the first time yet still found the law clearly established, observing that "[t]he Supreme Court has stated that clearly established law can be dictated by . . . a robust consensus of persuasive authority." 979 F.3d at 77 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

105. And the Supreme Court has repeatedly declined invitations to unsettle that consensus. *See, e.g.*, *Reilly v. Ottawa County*, 142 S. Ct. 900 (2022); *First Midwest Bank v. City of Chicago*, 142 S. Ct. 389 (2021); *Robinson v. Webster County*, 141 S. Ct. 1450 (2021); *Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 141 S. Ct. 895 (2020); *Anderson v. City of Minneapolis*, 141 S. Ct. 110 (2020); *Cook v. Hopkins*, 140 S. Ct. 2643 (2020); *Est. of Her v. Hoeppner*, 140 S. Ct. 1121 (2020); *Cancino v. Cameron County*, 140 S. Ct. 2752 (2020); *Robinson v. Lioi*, 140 S. Ct. 1118 (2020); *Turner v. Thomas*, 140 S. Ct. 905 (2020); *Long v. County of Armstrong*, 582 U.S. 932 (2017); *Est. of Reat v. Rodriguez*, 581 U.S. 904 (2017); *Doe 2 v. Rosa*, 577 U.S. 1065 (2016); *Crockett v. Se. Pa. Transp. Auth.*, 577 U.S. 820 (2015); *Lioi v. Robinson*, 572 U.S. 1002 (2014); *Campbell v. Wash. Dep't of Soc. & Health Servs.*, 568 U.S. 883 (2012); *Repking v. Lokey*, 562 U.S. 1221 (2011); *Cravens v. City of La Marque*, 552 U.S. 822 (2007); *Jones v. Kish*, 549 U.S. 1166 (2007); *Rios v. City of Del Rio*, 549 U.S. 825 (2006); *Vaughn v. City of Athens*, 549 U.S. 955 (2006); *Piotrowski v. City of Houston*, 534 U.S. 820 (2001); *Est. of Henderson v. City of Philadelphia*, 531 U.S. 1015 (2000); *Kirk v. Del. Cnty. Sheriff's Dep't*, 522 U.S. 1116 (1998); *Settles v. Penilla*, 524 U.S. 904 (1998); *White-Page v. Harris County*, 522 U.S. 913 (1997).

The dissent cautions that adopting the doctrine is impractical, citing an alleged lack of uniformity among the circuits. *Post*, at 99. The experience of those courts suggests otherwise. Each enforces similar guardrails: the defendant must (1) affirmatively act to create or exacerbate a danger; (2) be highly culpable; and (3) bear a causal connection between the action and the injury. *Irish*, 979 F.3d at 73–74. These standards are exacting, ensuring only truly egregious conduct triggers liability. *See, e.g.*, *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008) (requiring "egregious" conduct to "screen[] out all but the most significant constitutional violations"); *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019) ("quite narrow and

reserved for 'egregious' conduct"); *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006) ("narrow exception").

The only anomaly in the federal reporters remains our own circuit. *See Fisher v. Moore*, 73 F.4th 367, 376 (5th Cir. 2023) (HIGGINSON, J., and DOUGLAS, J., dissenting from the denial of rehearing en banc) ("For over a decade, our court has refused to answer [the state-created danger question]."). It seems to me that, after more than a decade of uncertainty, the majority opinion today rightly recognizes the doctrine and remands for the district court to consider the sufficiency of the Plaintiffs' claim in the first instance—consistent with our role as a court "of review, not first view." *Stringer v. Town of Jonesboro*, 986 F.3d 502, 509 (5th Cir. 2021) (quoting *Cruson v. Nat'l Life Ins. Co.*, 954 F.3d 240, 249 n.7 (5th Cir. 2020)).

The dissent resorts to a last-ditch claim that "[c]ounsel for Plaintiffs *effectively* disclaimed this theory at oral argument." *Post*, at 95 (emphasis added). But "effectively" does too much work. The parties fully briefed the issue, and Plaintiffs' counsel expressly invoked the doctrine during oral argument, stating that he "took this court's invitation in the *Fisher v. Moore* case . . . [to] ask[] this court to decide the state-created danger issue." Oral Argument at 8:30–8:40; *see also Fisher*, 73 F.4th at 376 (HIGGINSON, J., and DOUGLAS, J., dissenting from the denial of rehearing en banc) ("Litigants should continue asking this court to decide the state-created danger issue, confident that we will act as a 'responsible agent[] in the process of development of national law.'" (quoting *California v. Carney*, 417 U.S. 386, 400 n.11 (1985) (STEVENS, J., dissenting))). Nothing discussed thereafter amended the pleadings or disclaimed the theory.

## III

The dissent's doctrinal and factual critiques fail to rebut Plaintiffs' well-pleaded allegations, which state a plausible claim under established law.

No. 24-60370

Except for my dissent regarding the City officials' qualified immunity, I join the majority opinion.

No. 24-60370

Kᴜʀᴛ D. Eɴɢᴇʟʜᴀʀᴅᴛ, *Circuit Judge*, dissenting.

For decades, the Supreme Court has admonished courts to "exercise the utmost care when[] asked to break new ground" in the realm of substantive due process, hewing to "[a]ppropriate limits" imposed by history and tradition. *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022) (citations omitted). When those limits lose force, courts fall into "freewheeling judicial policymaking," transforming the Due Process Clause "into the policy preferences" of an unelected judiciary. *Id.* Unable to achieve "the *desirable* result for the case at hand" within established constraints, judges are tempted to draw from the void of substantive due process the power of judicial invention, "smuggl[ing]" in "new rights" and self-perceived righteous outcomes. Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A Mᴀᴛᴛᴇʀ ᴏꜰ Iɴᴛᴇʀᴘʀᴇᴛᴀᴛɪᴏɴ 3, 39 (Amy Gutmann ed., 2d ed. 2018).

Today's decision channels that fictitious power. It eschews the Court's limits, using the long-recognized fundamental right to bodily integrity and an unbridled "conscience-shocking" analysis as a subterfuge to recognize a new fundamental right both parties agree has no home in history or tradition—a right to the competent provision of municipal water services. The decision goes even further, endorsing the novel theory that a constitutional violation occurs whenever an elected official's "lies" about the quality of governmental services negatively impact his constituents. And though Plaintiffs disclaimed it at oral argument, the majority adopts the state-created danger theory without a single mention of history or tradition. This breathtaking expansion of substantive due process aims to convert the comforts and conveniences of modern life into constitutional rights. Because

No. 24-60370

the Constitution does not secure the rights the majority creates and provides no haven for such judicial caprice, I dissent.[1]

## I

The Fourteenth Amendment prohibits the state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has determined that this clause includes a substantive component, which "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). This substantive component, referred to as "substantive due process," prevents executive action that "shocks the conscience" of federal judges and violates unenumerated, so-called fundamental rights. *United States v. Salerno*, 481 U.S. 739, 746 (1987) (cleaned up); *SO Apartments, L.L.C. v. City of San Antonio, Tex.*, 109 F.4th 343, 352 (5th Cir. 2024). It is no surprise that a constitutional theory based on unenumerated rights and the subjective reactions of judges' consciences has frequently devolved into "freewheeling judicial policymaking." The Court, aware of this tendency, has erected limits.

First, as a basic premise, because the Fourteenth Amendment is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States," the due process clause does not create "a right to be free of injury wherever the State may be characterized as the

---

[1] For purposes of distinguishing the three opinions in this case, the "concurrence" refers to Judge Dennis's opinion concurring in part and dissenting in part, and the "dissent" refers to this opinion. To the extent the majority grants relief in the form of qualified immunity, I concur in that conclusion, but for different reasons. Because there was no conscience-shocking misconduct or violation of a fundamental right, the individual Defendants are entitled to qualified immunity without regard to any "clearly established" analysis.

tortfeasor." *Paul v. Davis*, 424 U.S. 693, 701 (1976). So, "any attempt to derive from congressional civil rights statutes a body of general federal tort law" must be met with skepticism and restraint. *Id.* If the purported substantive due process claim sounds primarily in tort and is recoverable there, we have little basis to expand the reaches of the Fourteenth Amendment to redress the harm.

Second, context matters. When it comes to governmental services, "a State is under no constitutional duty to provide substantive services for those within its border" absent a custodial setting or a special relationship. *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982). It is only "when the State takes a person into its custody and holds him there against his will," that "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989) (citing *id.*). But even when a person is held in custody, the state "has considerable discretion in determining the nature and scope of its responsibilities," and it need not "choose between attacking every aspect of a problem or *not attacking the problem at all*." *Youngberg*, 457 U.S. at 317 (emphasis added) (quotation omitted); *see also DeShaney*, 489 U.S. at 200 n.7 (reiterating state discretion even in custodial circumstances). While a state may impose upon itself certain obligations in the provision of governmental services, that choice does not itself "constitutionalize[]" self-imposed duties. *DeShaney*, 489 U.S. at 202 (quotation omitted). And it certainly does not create a *constitutional* duty to provide them "in a reasonably competent fashion." *Id.* at 197–98. For this reason, "when governmental action or inaction reflects policy decisions about resource allocation (as is often the case)," harm resulting from those choices "will seldom, if ever, be cognizable under the Due Process Clause." *White v. Lemacks*, 183 F.3d 1253, 1258 (11th Cir. 1999).

No. 24-60370

This is not to say that officials can *never* violate the Constitution when administering city services.[2] But any court reviewing allegations that an executive's decision "shocked the conscience" in this context must account for the "presumption[s]" that (1) "the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces," and (2) "the allocation of resources to individual programs, such as sewer"—or *water*—"maintenance . . . involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Collins*, 503 U.S. at 128–29. As the Supreme Court has continued to reiterate, "[t]he Due Process Clause is not a guarantee against incorrect or ill-advised personnel decisions." *Id.* at 129 (quotation omitted).

---

[2] The majority takes a reductivist view of this dissent, incorrectly suggesting that I advocate a rule precluding constitutional liability in the administration of any elective service. *Ante*, at 18. That simplistic formulation dodges the point of the Supreme Court's decisions in *Collins* and *DeShaney*. Claims that call into question the adequacy or competent administration of city services in a non-custodial, non-special relationship, non-coercive context must be met with scrutiny. *See Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 127 (1992) (calling "unprecedented" the assertion that "the city violated a federal constitutional obligation to provide its employees with certain minimal levels of safety and security"); *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003) ("[B]ecause the Due Process Clause does not require the State to provide rescue services, . . . we cannot interpret that clause" as placing "an affirmative obligation on the State to provide competent rescue services if it chooses to provide them."). But scrutiny does not doom every claim. Where an official clearly violates a fundamental right, such as an officer directly invading the established right to bodily integrity by *sexually assaulting* an individual during a welfare check, there is no argument that the officer was weighing policy concerns as he executed his duties or was otherwise simply incompetent when he intentionally chose to violate her body. *Ante*, at 18. That kind of claim clears the hurdles the Supreme Court has put in place to establishing a substantive due process claim. What is at issue today is several deviations away from a sexual assault-based bodily integrity claim.

No. 24-60370

The majority does not account for these presumptions or seriously grapple with the bulwarks against the expansion of substantive due process claims. It sidesteps them altogether, suggesting that *DeShaney* and *Collins* are "inapposite" because the former arose in the private harm context and the latter in employment relations.[3] *Ante*, at 19. But these rules against the expansion of substantive due process cannot be dismissed on factual distinctions. That a state has no duty to provide services beyond the custodial context and that it may determine whether and how to address problems within the services it chooses to provide are "established principles" of constitutional law. *Youngberg*, 457 U.S. at 317. *Collins* builds on those principles, suggesting that a *non-custodial* individual's claim that municipal services failed to meet constitutional standards should be met with

---

[3] The majority dismisses *Collins* as inapplicable because it "rested in large part on the nature of the employer-employee relationship." *Ante*, at 27. This is a distinction without a difference that proves the point. That *Collins* dealt with a city employee who voluntarily associated with the city via an employment relationship demonstrates the *non-custodial, non-special relationship* context in which most city services are delivered. Moreover, to the extent the majority attempts to distinguish *Collins* because "state law, rather than the Federal Constitution, generally governs the substance of the employment relationship," that too only serves to bolster *Collins*' applicability. *Ante*, at 27 (citing *Collins*, 503 U.S. at 128). State law and enforcement mechanisms, guided by federal statutes—not the Constitution—primarily govern the distribution of municipal water services. *See* Miss. Code Ann. § 41-26-2 (Under the Mississippi Safe Drinking Water Act of 1997, "[i]t is in the public interest of the state to assume primary enforcement responsibility under the federal Safe Drinking Water Act," and "[t]o establish a state program to assure provision of safe drinking water to the public by establishing drinking water standards consistent with the federal act and developing a state program to implement and enforce the standards."). That the *Guertin* majority—over the forceful dissent of a panel member and analysis of other circuits—unilaterally declared *Collins* inapplicable beyond the workplace context does not alter this conclusion. *Compare ante*, at 27 (citing *Guertin v. State*, 912 F.3d 907, 925 n.6 (6th Cir. 2019)), *with Guertin*, 912 F.3d at 947–50 (McKeague, J., concurring in part and dissenting in part), *and Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 53–54 (1st Cir. 2006) (applying *Collins* beyond the employment context).

skepticism—if not dismissal. *Lemacks*, 183 F.3d at 1259 ("The law on substantive due process when a citizen who is not in custody claims that a governmental unit, agency, or official has caused her harm is supplied by the *Collins* decision."). So too here.

At issue in this case is whether conduct in the administration of municipal services which failed to provide clean water violates the Fourteenth Amendment. That conduct may substantiate a tort claim, a Safe Water Drinking Act claim,[4] or even a recall vote, but the incompetent administration of municipal water services—particularly when Plaintiffs admit they could have accessed clean water elsewhere—does not a substantive due process claim make. These allegations neither shock the conscience nor implicate a fundamental right.

## II

At the outset, the majority inverts the substantive due process analysis, first concluding that the conduct violated a fundamental right and then finding that the infringement of that right necessarily shocks the conscience. Supreme Court precedent suggests we do just the opposite. When, as here, executive action is at issue, "the threshold question" is not whether there exists a cognizable fundamental right, but "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). "Only if the necessary condition of egregious behavior [is] satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive

---

[4] Indeed, the United States is currently pursuing various Safe Water Drinking Act claims against the City of Jackson for its administration of municipal water services during the same time period for which Plaintiffs complain. *See United States v. City of Jackson*, No. 3:22-CV-006868 (S.D. Miss. Nov. 29, 2022).

action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways." *Id.*; *see also Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) (citing *id.*); *DePoutot v. Raffaelly*, 424 F.3d 112, 118–19 (1st Cir. 2005); *Littlejohn v. Sch. Bd. of Leon Cnty., Fla.*, 132 F.4th 1232, 1240–41 (11th Cir. 2025). Because the conscience-shocking analysis must come first, I begin there.

## A

Constitutional liability may arise only when official conduct "shocks the conscience." Negligently inflicted harm will not do, and "decisions by officials that are merely inept, erroneous, [or] ineffective" cannot shock the conscience. *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999). Conduct must move "beyond mere negligence or even gross negligence" and "amount to an intentional choice, not merely an unintentionally negligent oversight." *James v. Harris County*, 577 F.3d 612, 617–18 (5th Cir. 2009) (citations omitted).

At a minimum, the official must have acted with "deliberate indifference." *Rosales-Mireles v. United States*, 585 U.S. 129, 138 (2018). That standard represents a "significantly high burden for plaintiffs to overcome." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 251–52 (5th Cir. 2018) (citation omitted); *Alton*, 168 F.3d at 201. The "state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Stukenberg*, 907 F.3d at 252 (citation omitted). But, once again, context matters. "Deliberate indifference that shocks in one environment may not be so patently egregious in another." *Lewis*, 523 U.S. at 850.

To ensure what "shocks the conscience" does not devolve into the subjective reactions of federal judges, the same two bulwarks already discussed must guide what the majority insists is an "objective" analysis.

*Ante*, at 20 n.7. To reiterate, the due process clause does not "supplant traditional tort law," so claims imposing "federal duties . . . analogous to those traditionally imposed by state tort law" are not constitutionally cognizable. *Collins*, 503 U.S. at 128 (citations omitted). And because a state is under no *constitutional* duty to provide substantive services, courts must be reticent to second-guess the state's prioritization of problems and resources in the administration of those services—even when those choices are plainly erroneous. *See Youngberg*, 457 U.S. at 317. The remedy for incompetence is not found in the Constitution but at the ballot box or in state tort law.

Finally, when undertaking the fact-specific inquiry whether allegations in a complaint shock the conscience, the applicable pleading standard provides additional guardrails. At the pleading stage, we consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (citation omitted). It is beyond dispute that we accept well-pleaded allegations as true and draw "all *reasonable* inferences" in Plaintiffs' favor. *Doe v. Ferguson*, 128 F.4th 727, 733 (5th Cir. 2025) (emphasis added). But there is "[o]ne relevant exception to this default rule"—"if an allegation is qualified by the contents of an exhibit attached to the pleadings, but the exhibit instead contradicts the allegation, the exhibit and not the allegation controls." *Degenhardt v. Bintliff*, 117 F.4th 747, 754 n.5 (5th Cir. 2024) (cleaned up) (quoting *Sligh v. City of Conroe*, 87 F.4th 290, 298 (5th Cir. 2023)); *see also In re GenOn Mid-Atl. Dev., L.L.C.*, 42 F.4th 523, 548 & n.36 (5th Cir. 2022) (refusing to credit assertions of mutual mistake where "the Agreement contradicts that allegation").

Contrary to the majority's blind acceptance of Plaintiffs' allegations, courts are required to sift the allegations, dispense conclusory and contradicted allegations, and asses the reasonable inferences from what

remains. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009); *Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 224 (1st Cir. 2012) ("[A]n inquiring court first must separate wheat from chaff."). When all that remains is a "possibility of misconduct," we must dismiss. *Iqbal*, 556 U.S. at 679. That is precisely what is required here.

## B

The majority points to four categories of conduct that purportedly shock the conscience: (1) failing to maintain the water system, (2) switching a section of the City's water from high-pH well water to low-pH surface water, (3) issuing boil notices, and (4) "lying" about the toxicity of the water. According to the majority, "Defendants' actions posed an excessive risk to Plaintiffs' health," and Defendants "had actual or constructive knowledge of those risks," but they "consciously disregarded them." *Ante*, at 21. This, the majority contends, amounts to deliberate indifference that shocks the conscience. But the majority fails to account for the context in which these allegations arise—city services—and the well-pleaded facts which demonstrate that the City's conduct is not *constitutionally* conscience-shocking.

## 1

First, as the majority puts it, Defendants were aware that lead was leaching into the water, but they "declined to fix the problem." *Ante*, at 21. Though they could have treated the water with "a substance such as lime to decrease the water's acidity and avoid any danger of lead leaching," Defendants failed to fix the clogged lime at the water treatment plant and made matters worse. *Id.* at 4. In sum, Defendants failed to properly manage the water system.

But a failure to properly manage city services does not amount to a deprivation of liberty. Despite repeated references to Defendants' failures to

No. 24-60370

act, the majority concedes as much. Inaction cannot form the basis of Plaintiffs' claim because "the Supreme Court has made clear" that "§ 1983 typically attaches to actions rather than failures to act." *Ante*, at 30. Because "[e]ven knowingly *permitting* unreasonable risks to continue does not necessarily rise to the level of conscience shocking," Defendants' failures are not actionable. *DeAnzona v. City & County of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000) (emphasis added).

2

Defendants' failures to fix the issues cannot suffice, so the majority points to conduct it characterizes as affirmative acts. The majority insists that Defendants engaged in "depraved" conduct when they willfully "introduced" lead into the water. *Ante*, at 2, 15, 17, 19, 26, 31, & n.8. This language ignores clear contradictions in Plaintiffs' allegations and conjures something out of a film noir: Defendants like villains cloaked in the dark of night dumping lead directly into Jackson's water system, "contaminat[ing] otherwise clean water," and "pump[ing] the toxic water to its residents' taps." *Id.* at 22. In the light of day, Defendant-villains changed their weapon of choice from toxins to deceit, hiding the results of their actions and, without reservation, telling the public that the water they just poisoned is "safe to drink." *Id.* That is a damning tale, to be sure. But Plaintiffs' complaint, when properly sifted by the very documents on which it relies, reveal it for what it is: fiction.

The majority's only support for asserting that Defendants actively "introduced" toxins into the water supply is the Defendants' "disastrous" decision to switch a section of the City's water source from high-pH well water to low-pH surface water. *Ante*, at 5. Plaintiffs plead this as a one-time, life-altering switch that lacked any justification whatsoever. And the majority accepts this assertion without regard to any of the articles on which the

complaint expressly relies and incorporates, declaring that there was "no legitimate governmental purpose" for the switch that would "take[] Defendants' actions outside the realm of a plausible due process claim." *Id.* at 23.

But the documents on which Plaintiffs rely tell a different story altogether. The findings of a report incorporated by reference into the complaint explain that one factor "contributing to the elevated lead levels may have been changes in water chemistry that resulted from the city's *multiple switches* between well water and surface water during *infrastructure repairs*." Stephanie Otts & Catherine Janasie, *How Safe is the Water?: An Analysis of the Lead Contamination Risks of Public Water Supplies in the Mississippi Delta*, Nati'l Sea Grant L. Ctr. 13 (Dec. 2017), https://nsglc.olemiss.edu/projects/lead-contamination/files/ howsafeiswater.pdf (emphasis added) (cited at 2d Am. Compl. ¶¶ 49, 62, 69, 78, 174).

To the extent the complaint references a single switch in 2014, an exhibit which Plaintiffs "attached" to the complaint and "incorporated as if fully stated [t]herein," explains the rationale. Ex. 7 at 2d Am. Compl. ¶ 265 & n.94 (U.S. Environmental Protection Agency, *NEIC Civil Investigation Report City of Jackson Water System* (Mar. 30, 2020)). In anticipation of a "long-term change," the City made the switch in water sources "following the completion of the 5 million-gallon (MG) booster station" to assist water pressure and flow. Ex. 7 at 14.[5] These sources

---

[5] While the City may have "failed to provide [*regulatory*] documentation regarding the change in source from groundwater to surface water," and indeed, the EPA observed that regulatory failure during its Safe Water Drinking Act inspection, Ex. 7 at 13–14, a regulatory failure does not amount to conscience-shocking conduct. *See Ford v. Anderson County, Tex.*, 102 F.4th 292, 324 n.17 (5th Cir. 2024) (Violations of state or federal

No. 24-60370

contradict the assertion that the switch in water sources was a single arbitrary decision or merely a cost-saving measure taken in disregard of human health. Quite the opposite, it evinces a decision made in the face of competing concerns, including the need to repair aging infrastructure that Plaintiffs assert created the crisis in the first place.[6]

The concurrence would require us to defy Plaintiffs' express directive to consider the EPA report as "fully stated" in the complaint and rather, to consider it "solely for chronology." *Ante*, at 54. The court does not get to choose which of the "fully" "incorporated" allegations it considers. Nor do any out-of-circuit cases on which the concurrence relies provide a reason to deviate from the well-settled rule that when an exhibit attached to the pleadings contradicts an allegation, the exhibit controls. *See infra* note 16; *Degenhardt*, 117 F.4th at 754 n.5. While courts may refuse to "automatically adopt" a defendant's self-serving statements in an exhibit, *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016), the EPA report contains the findings of the EPA—not a Defendant. As in any investigation, the EPA interviewed the Defendants, but the report reflects the EPA's independent assessments. Ex. 7 at 10 ("NEIC [of the EPA] made the following observations . . ."). The EPA report is therefore wholly incorporated into the

---

regulations are not "relevant to our analysis of [Defendants'] alleged violation of [Plaintiffs'] constitutional rights.").

[6] Despite the concurrence's allegation that this dissent violates the party-presentation doctrine, *see ante* at 53, the City argued that it switched water sources following a multimillion-dollar infrastructure upgrade as "part of the regular administration of municipal government." Appellee Br. at 32–33. The City further distinguished the decision to switch water sources from the decision made by Flint officials and highlighted that "Plaintiffs have not alleged the City Defendants switched water sources to save money to the detriment of Plaintiffs' health." *Id.* at 33. The articles incorporated into the complaint and Defendants' arguments thus fairly presented the City's decision to switch water sources for our review.

complaint, and we must, as Plaintiffs instruct, consider it in assessing Defendants' decision to switch water sources.

Defendants' choice to switch water sources may have been "inept, erroneous, [or] ineffective," but that "do[es] not amount to deliberate indifference." *Alton*, 168 F.3d at 201; *see Lemacks*, 183 F.3d at 1258. Officials were aware of "specific dangers"—lead, E. Coli, and other bacteria in the water as well as aging infrastructure—and had to determine whether, when, and how to "triage" one danger over another. *See Ramos-Pinero*, 453 F.3d at 53–54. With the benefit of hindsight, Defendants' decision to switch the water source may have been "unwise or unreasonable," but that decision "does not 'shock the conscience' as that term is defined under the law." *Id.* at 54 (quoting *Lemacks*, 183 F.3d at 1258). These challenging choices must be reserved for "locally elected representatives"—not "federal judges interpreting the basic charter of Government for the entire country.'" *Id.* (quoting *Collins*, 503 U.S. at 129).

Because the Constitution does not safeguard against "incorrect or ill-advised" policymaking decisions, even when there is a demonstrably poor outcome, the majority's insistence that Defendants "introduced" toxins into the water through a choice to switch sources does not shock the conscience.

3

Next, the majority contends that Defendants' issuance of boil notices shocked the conscience because boiling water "exacerbate[s] the lead problem by increasing the concentration of lead left after boiling." *Ante*, at 7, 22. But the boil notices cannot shock the conscience for two reasons. First, Plaintiffs do not assert that Defendants were aware of the increased risk of lead exposure from boiling water or that they issued the notices without regard to that risk. To the contrary, they assert that this choice was "dangerously ignorant"—that is, Defendants were *unaware* of the risk. A

choice made while "ignorant" of its danger cannot amount to deliberate indifference. Second, even if Plaintiffs had pleaded that Defendants were aware of the risks attending the boil notices, the choice to issue the notices is emblematic of the policymaking function that the Court has shielded from constitutional liability. Officials had to determine whether to address lead in the water or prevent Jackson residents from ingesting *E. Coli* and other bacteria that have more immediate negative effects. Defendants' decision in the face of that choice does not shock the conscience.

4

Perhaps aware that neither the switch nor the boil notices suffice, the majority ups the ante. In its view, the real conscience-shocking scandal is not necessarily the ineptitude—it's the coverup and coercion. The City "sat on the June test results" showing that drinking water exceeded the regulatory limit in 22% of homes until early 2016 and "falsely assured residents that the water was safe to drink." *Ante*, at 5–6. "[I]nstead of warning residents about the unsafe levels of lead, Defendants repeatedly lied to the public" about the water's safety. *Id.* at 22. Plaintiffs purportedly relied on this information. Had they "known that the water contained lead, they would have stopped consuming the water" and procured clean water from another source. *Id.* According to the majority, the alleged "lies" and failures to warn rise to the level of deliberate indifference because they *coerced* an unassuming public to drink toxic water.

The majority's conclusions comport with neither the facts nor the law. Plaintiffs' own allegations and the articles on which the complaint relies demonstrate that officials regularly updated the public on the results of lead testing, *repeatedly warned* about the risks of drinking lead-laden water, and offered specific recommendations for addressing the possibility of lead in the water. According to Plaintiffs' allegations, the public has been on notice that

No. 24-60370

Jackson was at "high-risk for lead poisoning" since October 2011 due to a Mississippi State Department of Health News Release. 2d Am. Compl. ¶ 48. And, contrary to Plaintiffs' allegations of a cover-up, the very articles Plaintiffs incorporate into their complaint report that MSDH did not notify officials of the June 2015 test results until 2016 because regulations do not impose a timeline for that report.[7]

Finally—in direct contradiction of Plaintiffs' allegations and the majority's assertions—the articles on which the complaint relies explicitly highlight officials' repeated warnings to the public. For example, in February 2016,

---

[7] Plaintiffs' paltry allegation on this point is implausible. Plaintiffs merely plead that "[a]lthough MSDH officials did not inform the City of Jackson's residents and water users at that time, *upon information and belief*, Defendants and their employees were made aware of these test results." 2d Am. Compl. ¶ 146 (emphasis added). While "[a] plaintiff may plead upon 'information and belief' when the facts alleged are peculiarly in the possession of an opposing party," the plaintiff must exercise "reasonable due diligence and provide[] some factual basis for his allegations that would raise a reasonable expectation that discovery will reveal evidence that defendants engaged in unlawful conduct." *Flores v. Amazing Grace Primary Home Care, L.L.C.*, No. 24-40434, 2025 WL 832795, at *5 (5th Cir. Mar. 17, 2025) (citation omitted).

Plaintiffs' purely speculative allegation is belied by articles on which it relies and do not provide the requisite factual basis for the allegation. For example, in February 2016, the Jackson Free Press explained that the EPA "requires testing for lead and copper in water systems every three years. Even though the state took the samples in July 2015, MSDH officials did not notify Jackson" until "Jan[uary] 28," 2016, "citing federal regulations that do not require immediate notification for high lead levels." R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, Jackson Free Press (Feb. 3, 2016), https://www.jacksonfreepress.com/news/2016/feb/03/jackson-has-long-been-high-risk-lead-poisoning/ (cited at 2d Am. Compl. ¶¶ 48, 150). That law provides that "if a public-health administrator takes any enforcement action related to water regulations, the administrator must notify a local elected official of that action, but does not spell out a timeline for doing so." *Id.* Without more of a factual basis, Plaintiffs' allegation based on "information and belief" does not meet the pleading standard and cannot be credited.

> Jackson officials announced . . . that pregnant women and children age 5 and younger should not drink unfiltered water from the tap, and everyone else should run their cold water for up to two minutes before consuming or cooking with it. . . . [H]ealth officials said all children 6 and younger should be tested for lead, which can cause serious developmental and physical problems.[8]

In June 2016, the City sent a notice to residents explaining that it had "violated a drinking water requirement by not maintaining optimization of the corrosion control treatment" and offering a warning in italics set off by asterisks: *Infants and children who drink water containing lead in excess of the action level could experience delays in their physical or mental development. . . . Adults who drink this water over many years could develop kidney problems or high blood pressure.* The letter proceeded to offer the following precautions:

> Although the majority of home lead testing performed identified no lead, or lead below the action level set by the EPA, MSDH has issued these recommendations as a special precaution, especially for households with young children or pregnant women. These precautions should remain in place at least six months while the City continues its efforts to make required changes to stabilize the pH levels in its water system that can cause corrosion.
>
> - Before using tap water for drinking or cooking, run your tap on cold for one to two minutes. For

---

[8] Lisa Riordan Seville et al., *'People Are Scared': Jackson, Mississippi, Copes with Lead Alarm*, NBC News (Feb. 25, 2016), https://www.nbcnews.com/news/us-news/people-are-scared-jackson-mississippi-copes-lead-alarm-n525961 (cited at 2d Am. Compl. ¶ 154).

No. 24-60370

details, see http://www.cdc.gov/nceh/lead/tips/water.htm
- Households should never use hot water for drinking or cooking.
- Residents should clean out their faucet aerators by unscrewing the aerator at the tip of the faucet, and removing any particles or sediment that has collected in the filter screen.
- Any child five years of age or younger and any pregnant woman should use filtered water http://info.nsf.org/Certified/DWTU/ or bottled water for drinking and cooking.
- Baby formula should be "ready-to-feed" or prepared using only filtered water or bottled water.
- Parents with children five years or younger should contact their child's pediatrician or primary care provider to make sure that adequate lead screening and blood testing have been performed.

The letter concluded with a request that residents share the information broadly:

> *Please share this information with all the other people who drink this water, especially those who may not have received this notice directly (for example, people in apartments, nursing homes, schools, and businesses). You can do this by posting this notice in a public place or distributing copies by hand or mail.*[9]

---

[9] Anna Wolfe, *Jackson Hit with Technical Violation for Water Treatment*, CLARION-LEDGER (June 9, 2016), https://www.clarionledger.com/story/news/local/2016/06/09/jackson-issued-technical-violation-water-treatment/85618558/ (cited at 2d Am. Compl. ¶¶ 74, 116).

No. 24-60370

Even after the May 2017 testing cycle, when the City's efforts began to show progress with "testing pass[ing] muster under . . . current federal guidelines for lead testing," the City *still* "urge[d] pregnant women and children not to drink unfiltered tap water."[10] A year later, in July 2018, while officials "emphasized that the water is safe to drink," they "asked that residents . . . continue to use precautions."[11] These precautions largely mirrored those previously given and continued through 2021. A 2021 notice from the City, which was attached to the complaint and "incorporated as if fully stated [t]herein" contained the same warnings and reiterated that "[t]hese precautions should remain in place until further notice while the City continues its efforts to make required changes to stabilize the pH levels in its water system that can cause corrosion." Ex. 4 at 2d Am. Compl. ¶ 280, n.109.

The articles on which the complaint relies confirm that the City notified residents of testing results that continued to show that the vast majority of homes tested did not reach actionable levels. The City nonetheless repeatedly warned *all* residents to take precautions. Further, Plaintiffs clearly state that they could have purchased clean water elsewhere. In other words, the City recommended alternative sources of water, and Plaintiffs concede they could have procured those sources without government interference. Plaintiffs' assertion that officials *covered up* and

---

[10] Anna Wolfe, *Jackson Water Issues Persist, Lead Levels Down*, Clarion-Ledger (July 2, 2017), https://www.clarionledger.com/story/news/local/2017/07/03/jackson-water-issues-persist-lead-levels-down/437239001/ (cited at 2d Am. Compl. ¶¶ 210, 229).

[11] Marie Weidmayer, *City Violated Water Treatment Procedure, Still Safe to Drink*, Jackson Free Press (July 19, 2018), http://www.jacksonfreepress.com/news/2018/jul/19/city-violated-water-treatment-procedure-still-safe/ (cited at 2d Am. Compl. ¶¶ 173, 186).

No. 24-60370

*coerced* residents into drinking poisoned water about which they repeatedly gave reports and urged caution is implausible and belied by the complaint itself.

The *well-pleaded*, *uncontroverted* allegations offer very little in the way of misconduct that could "shock the conscience." In hindsight, officials may not have provided all of the information Plaintiffs would have preferred, but the suggestion that they *lied*[12] about lead in the water (when they announced findings of the reports), *lied* about the risks of ingesting lead (when they detailed those risks in repeated warnings to the public), and *lied* about whether residents should take action to mitigate the potentiality of lead in their own homes (when they provided clear recommendations, especially for vulnerable groups) is blatantly contradicted by Plaintiffs' own attachments to the complaint.

---

[12] It is not clear that the *Constitution*—as opposed to tort law—contemplates claims based on elected officials' misrepresentations regarding city services, particularly those made as the facts of an ongoing crisis evolve. The majority's inability to cite a single case beyond *Guertin* supporting this kind of liability demonstrates the paltry historical and legal precedent for such a novel theory. Instead, they offer two Second Circuit cases in which the court *rejected* bodily integrity claims based on officials' alleged misrepresentations. *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008); *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007). Though the court affirmed dismissal of these claims, the majority points to *Lombardi*'s assertion that certain "cases furnish some support for the idea that a substantive due process violation can be made out when a private individual derives a false sense of security from an intentional misrepresentation by an executive official if foreseeable bodily harm directly results and if the official's conduct shocks the conscience." 485 F.3d at 81 (citing *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062–63 (9th Cir. 2006) and *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065–66 (6th Cir. 1994)). But the majority does not acknowledge that the cases which offer such thin support addressed *state-created danger* claims in factually distinct circumstances, and only one was successful. Given that this Circuit has never—until today—recognized such a claim and even then, the support for a misrepresentation-based state-created danger claim is demonstrably weak, it remains unclear that the Constitution would countenance such a theory.

No. 24-60370

The majority has no answer for the clearly contradicted allegations. Instead, it ignores the articles, suggesting that to consider them at all would impermissibly construe the facts in Defendants' favor. *Ante*, at 23. That, of course, misconstrues the standard.[13] *See Degenhardt*, 117 F.4th at 754 n.5 (explaining that when an exhibit contradicts an allegation, the exhibit controls). Before today, we have never carved out a "news article" exception to the incorporation-by-reference doctrine. I struggle to see how the incorporation-by-reference doctrine can apply to any situation if it does not apply here, where Plaintiffs' 103-page complaint cites *forty-five articles* throughout 115 footnotes.

The majority and concurrence conflate the standards for Rule 12(b)(6) and admissibility of evidence. *See ante*, at 25, 57–58 n.4. Considering news articles a plaintiff incorporates into his complaint is hardly a novel idea.[14] And even if Plaintiffs did not go far enough to  incorporate the articles, the court

---

[13] Because the articles incorporated by Plaintiffs' own reference contradict Plaintiffs' allegations, the majority asserts that considering them at all runs afoul of the standard and impermissibly gives the tie to the defense. But what the majority calls clear error is a basic premise of Rule 12(b)(6): we "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (citation omitted) (concluding district court properly relied on SEC filing in dismissing complaint).

[14] *See Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005) (considering web pages described in plaintiffs' complaint under the incorporation-by-reference doctrine); *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1004–05 (9th Cir. 2018) (holding that web articles and blog posts were incorporated into complaint); *Butowsky v. Folkenflik*, No. 4:18CV442, 2019 WL 2518833, at *2 n.5 (E.D. Tex. Apr. 17, 2019) (considering news publications attached to complaint); *Sinclair v. Krassenstein*, No. 5:23-CV-109, 2024 WL 4329137, at *4 n.3 (S.D. Tex. Aug. 20, 2024) ("The court may take judicial notice of newspaper and magazine articles and consider exhibits central to the claims if referenced in the complaint.").

may take judicial notice of the existence of the articles.[15] Plaintiffs' allegation they were unaware of lead in the water is refuted by the extensive news coverage alerting the public to the potential existence of lead in the water as early as 2011. Regardless of the accuracy of the articles or whether Plaintiffs and the rest of the public believed them, the *existence* of the articles—a fact that may be judicially noticed without regard to the articles' veracity—belies Plaintiffs' claimed lack of notice.

Nor have we ever, as the majority and concurrence do today, created an exception to the incorporation-by-reference doctrine requiring courts to assume plaintiffs only incorporate allegations that are helpful to them and to turn a blind eye to contradictory facts equally included.[16] Rather this court

---

[15] *In re Silver Lake Grp., LLC Secs. Litig.*, 108 F.4th 1178, 1185 n.3 (9th Cir. 2024) (court may take judicial notice of the existence of news articles "to establish public knowledge"); *Terrell v. Town of Woodworth*, No. 1:21-CV-04224, 2023 WL 4115769, at *3 n.3 (W.D. La. June 7, 2023) ("A court may take judicial notice of the coverage and existence of newspaper and magazine articles.").

[16] The majority and concurrence cite cases from other circuits with markedly different facts to cherry-pick the allegations they consider. Courts in those cases were not required to "automatically adopt" self-serving statements made by a defendant in documents incorporated into the complaint. *See Goines*, 822 F.3d at 167–68 (refusing to adopt statements by police officers regarding incident that formed the basis of plaintiff's § 1983 claim); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015) (refusing to adopt a document "commissioned by a defendant" to defeat plaintiff's claims); *Carroll v. Yates*, 362 F.3d 984, 986 (7th Cir. 2004) (refusing to adopt defendant-prison board's decision to defeat plaintiff's § 1983 claim); *Hymer v. Kross*, No. 23-2374, 2024 WL 3026781, at *2 (3d Cir. June 17, 2024) (same); *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998) (refusing to adopt "letters written by the opposition for what could be self-serving purposes"); *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008) (refusing to adopt statements made by defendant); *West-Anderson v. Mo. Gaming Co.*, 557 F. App'x 620, 622 (8th Cir. 2014) (same); *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 511 (9th Cir. 2013) (refusing to consider document not incorporated into complaint). Selectively quoting cases without applying their principles to the facts will not do. The articles here were written by neutral third parties—not a Defendant. And Plaintiffs endorse the credibility of the articles by repeatedly

has recognized that the pleader "may be defeated . . . by his own exhibits," rendering "the appellant . . . enmeshed in his own prolixity." *Simmons*, 113 F.2d at 813. Plaintiffs do not direct the court to consider the articles for only a limited purpose, and their quotations of the articles endorse the truth of the articles' statements. Neither the Plaintiffs nor the court may cherry-pick from the incorporated allegations. The majority's race to novel holdings should not include a "news article" exception to the incorporation-by-reference doctrine nor a requirement that courts ignore any allegation unhelpful to Plaintiffs. The majority's need to do so to find a constitutional violation highlights the judicial policymaking in which it engages.

After disregarding the contradicted allegations, what remains are plausible allegations that Defendants failed to properly manage the water system and "made matters worse." *Ante*, at 4. At best, this conduct amounts to negligence—a quintessential tort claim that cannot shock the conscience.

In any case, even if we disregarded all of Plaintiffs' cited news articles, as the majority says we must, the complaint itself contradicts the allegations that Plaintiffs lacked notice of lead in the water,[17] and the EPA report, which Plaintiffs attached to their complaint[18] and explicitly alleged was part of the pleading itself, contradicts the allegation that officials had no justification for switching the water beyond a post-hoc cost-savings measure. The court may

---

quoting their contents (for their truths) throughout the complaint. Absent here is the concern that a Defendant may avoid liability by hiding behind a self-serving document. Rather, this is a case "where [Plaintiffs] ha[ve] pleaded too much and ha[ve] refuted [their] own allegations by setting forth the evidence relied on to sustain them." *Simmons v. Peavy-Welsh Lumber Co.*, 113 F.2d 812, 813 (5th Cir. 1940).

[17] *See* 2d Am. Compl. ¶ 48 ("In 2011, the Mississippi State Department of Health ('MSDH') tagged Hinds County as 'high-risk for lead poisoning.'").

[18] *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

take judicial notice of these published Government documents, to allay any concerns about the Plaintiff-referenced news articles. The majority's holding is premised entirely on Plaintiffs' alleged lack of notice and officials' purportedly "arbitrary" decision to switch the water source. But because these allegations are controverted by the complaint itself, the majority's conclusion lacks foundation.

"If executive conduct does not shock the conscience, the plaintiff has failed to state a constitutional violation and the inquiry ends." *Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 346 (1st Cir. 2025). I would affirm dismissal on this ground alone.

## III

But there are other grounds for affirmance. Contrary to the majority's broad-sweeping characterization of the right to bodily integrity, that long-recognized fundamental right is not implicated by these facts. The majority collects the Supreme Court's bodily integrity jurisprudence and suggests that its mere recognition in the hall of most cherished fundamental rights demonstrates its applicability here. *Ante*, at 12–15. But Plaintiffs' allegations—which determine whether the right is implicated—do not.

## A

In substantive due process cases, the Supreme Court requires "a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (citing *Collins*, 503 U.S. at 125, 112); *Glucksberg*, 521 U.S. at 721. Where parties offer an overbroad description, the Court "ha[s] a tradition of carefully [re]formulating the interest at stake" with "more precis[ion]." *Glucksberg*, 521 U.S. at 722–23 (citing *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't*

*of Health*, 497 U.S. 261, 277, 279 (1990)).[19] In other words, it is not enough to claim a recognized right and hope the facts fit that right. We must "focus on the allegations in the complaint to determine how [plaintiffs] describe[] the constitutional right at stake and what the [defendants] allegedly did to deprive [them] of that right." *Collins*, 503 U.S. at 125. Once the right is defined with proper precision, we must determine whether the right is sufficiently "rooted in our Nation's history and tradition and whether it is an essential component of what we have described as 'ordered liberty.'" *Dobbs*, 597 U.S. at 234.

Despite Plaintiffs' insistence that the facts alleged implicate the right to bodily integrity, the complaint asserts something else entirely. The first allegation of the complaint asserts in no uncertain terms that "[a]ccess to clean, poison-free water is a fundamental human right." And the cascade of allegations from there suggests that because clean water is a fundamental right, elected officials must accommodate that right with competence. In Plaintiffs' view, had officials administered the water system competently, Plaintiffs would have had access to clean water with routine testing, immediate and accurate disclosure of those tests, prompt remediation whenever lead rose to actionable levels, the ability to make a different choice, and the avoidance of harm altogether. In other words, when defined with the requisite precision, Plaintiffs assert a right to the competent administration

---

[19] For example, though the parties referenced the "right to die" in *Cruzan*, the Supreme Court reformulated the interest more specifically as a "right to refuse lifesaving hydration and nutrition." 497 U.S. at 277, 279. In *Reno*, respondents asserted that alien juveniles suspected of being deportable had a fundamental right to "freedom from physical restraint." 507 U.S. at 299. The Court rejected this formulation in favor of the much more specific "alleged right of a child who has no available . . . legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution." *Id.* at 302.

of water services. As the majority concedes, the Constitution does not guarantee clean water or competence. This should suffice to end the inquiry.

The majority disagrees. It asserts that the thrust of the Supreme Court's bodily integrity cases "is consent: when a person does not consent to an intrusion," the right to bodily integrity is implicated. *Ante*, at 14. And "[t]he government" can "violate[] that right when it, as the provider, lies to and gaslights the public, depriving individuals of the ability to give informed consent and exposing them to harm without their knowledge." *Id.* at 15. But, of course, the majority can point to no Supreme Court case which holds that giving imperfect information to a non-custodial electorate in the provision of deficient city services amounts to a lack of informed consent which violates the right to bodily integrity. The cases on which the majority relies are simply inapposite. Medicating prisoners against their will, transferring prisoners to medical facilities against their will, confining children for medical treatment, recording the administration of Schedule II drugs, and compelling blood draws from suspected criminals are worlds apart from the provision of lead-laden municipal water to an electorate who were on notice of the issues, received both information and explicit warnings about the issues, and concede they were *free* to access clean water elsewhere. I fail to see how "Plaintiffs' factual allegations implicate th[e] same right." *Ante*, at 14.

To the contrary, the Supreme Court has concluded that "any *compelled* intrusion into the human body implicates significant, constitutionally protected . . . interests." *Missouri v. McNeely*, 569 U.S. 141, 159 (2013) (emphasis added). The majority attempts to find such compulsion here, extrapolating from inapposite cases to conclude the City's failures to maintain a water system and accurately describe all issues and risks implicates the fundamental right to bodily integrity. *Ante*, at 17–18. But these analogies similarly fail. This case does not involve a law enforcement officer using veiled threats of charges to induce an individual to engage in sexual

conduct nor does it involve claims of excessive force by an officer whose targeted misconduct imposed psychological harm. At most, Plaintiffs allege official equivocation: assertions that the water was safe accompanied by explicit warnings about the risks of ingesting lead and recommendations for mitigating those risks. That kind of equivocation cannot amount to constitutional "compulsion" or "coercion" of the ilk the Supreme Court and this court have recognized.

In a last line of defense, the majority erects a strawman, asserting that I misconstrue *Dobbs* as somehow limiting the right to bodily integrity. But I cite *Dobbs* for the same proposition that this court did just two years ago: *Dobbs* "reiterated—with gusto—that rights protected by substantive due process must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty" and that "substantive due process is a disfavored doctrine prone to judicial improvisation." *Fisher v. Moore*, 73 F.4th 367, 373–74 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 569 (2024) (citation omitted). While *Dobbs* did not disturb bodily integrity case law—and no one disputes the historical pedigree of such a right—it did not give us a license to conclude that the right to bodily integrity is implicated any time government action has some connection with bodily harm. Instead, *Dobbs* reaffirms what has always been true in this arena—specificity and caution are required. Both are absent from today's majority opinion.

B

Neither an analogous Supreme Court case nor a historical referent for the kind of violation alleged is on offer. Instead, *Guertin v. State*, 912 F.3d 907 (6th Cir. 2019), looms large over this case. The majority and concurrence rely to varying degrees on that split-panel decision to suggest that we must follow its analysis. But there are ample factual and legal reasons to reject the Sixth Circuit's broad expansion of substantive due process.

No. 24-60370

1

*Guertin* arose in the context of "the infamous government-created environmental disaster commonly known as the Flint Water Crisis." 912 F.3d at 915. There, the Sixth Circuit held that Flint residents plausibly stated a substantive due process claim for violation of their right to bodily integrity when the city "dispens[ed] drinking water to its customers without adding chemicals to counter the river water's known corrosivity." *Id.* Officials "authoriz[ed] Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications" and "falsely assured the public that the water was safe and attempted to refute assertions to the contrary." *Id.* at 927.

The majority asserts that there is no daylight between the facts of this case and *Guertin*. It opines from the outset that "[t]he alleged facts of this case mirror one of the greatest public health emergencies in the United States in the last decade—the Flint water crisis." *Ante*, at 2. Because two *Guertin* panel members applied the Supreme Court's bodily integrity precedent to "Flint's mishandling of the city's water crisis" and concluded that it "infringed residents' due process rights," this panel majority assumes "[t]he same is true here." *Id.* at 15–16. The facts do not support that assumption.

A detailed review of the facts suggest that Jackson was *not* Flint.[20] But even if the facts of this case "mirror[ed]" those of Flint in almost every way

---

[20] The majority points to the June 2015 water testing results and officials' 2016 statements that Jackson is "not Flint" to establish both this case's similarity to *Guertin* and the fact that officials lied. But according to the well-pleaded allegations, Jackson was *not* Flint. The June 2015 results "showed that drinking water exceeded the 15-ppb regulatory limit in 22 percent of homes—more than Flint at 16.7 percent." *Ante*, at 5. Notably, however, an article on which the complaint expressly relies states that a September 2015 study analyzing Flint's water quality found that "[s]everal samples exceeded 100 ppb, and

No. 24-60370

(they do not), they would nonetheless diverge in at least one dispositive way. The defendants in *Guertin* "provided [no] notice to Flint residents about the lead-laced water." 912 F.3d at 922. As explained in detail above, that is not the case here. Defendants delivered results to the public and warned about lead, its effects, and how to mitigate those effects, particularly in vulnerable populations. This alone suggests that the conduct which "shocked the conscience" in *Guertin* cannot guide our analysis here.

2

Setting aside the factual disparities, the split *Guertin* has generated on this panel with respect to qualified immunity further indicates that it is no lodestar. The majority appears to adopt *Guertin*'s substantive due process analysis without reservation but breaks from *Guertin*'s qualified immunity analysis for reasons that undermine its constitutional holdings. The majority contends it is beyond dispute that the right to bodily integrity is implicated by these facts and balks at the suggestion that *Guertin* could be read any other way. It then promptly concludes that a violation of bodily integrity on these facts is "a never-established right," and holds that officials are entitled to qualified immunity as a result. *Ante*, at 36. Despite contending throughout the opinion that Defendants' misconduct "is so severe and depraved" that

---

one sample collected after 45 seconds of flushing exceeded 1,000 ppb," whereas "Jackson samples tested between 17 and 20 parts per billion for lead contamination." *See* Nave, *supra* note 7. While "one Jackson home at that time tested positive for lead with 476 ppb," "[o]ther homes tested at 106 ppb, 62 ppb, 58 ppb, and 50 ppb." 2d Am. Compl. ¶ 168–69. In other words, by the time Jackson officials made comparisons to Flint in 2016, it was clear that no Jackson home had reached Flint's levels of 1,000 ppb. And, in any case, the reports consistently demonstrated that the lead content in the vast majority of homes tested did not reach actionable levels. In other words, the water was safe for most residents. The *Guertin* majority does not even discuss the details from reports of lead in Flint's water. Instead, it assumes without discussion that the water was generally unsafe for all. Given the explicit percentages discussed in the complaint, that is not an assumption this case permits.

No. 24-60370

it violated "Plaintiffs' constitutional rights," the majority departs from *Guertin* to conclude that such conduct is insufficiently severe and depraved to vitiate qualified immunity. *Compare ante*, at 17, *with Guertin*, 912 F.3d at 933 ("The obvious cruelty inherent in defendants' conduct should have been enough to forewarn defendants." (cleaned up)).

The majority's inconsistencies on qualified immunity are a tell that its substantive due process analysis has gone awry. Of course reasonable officers could not infer from current Supreme Court precedent, our Circuit's case law, or even their own quiet consciences that "mishandling" municipal water services would violate the *Constitution. Ante*, at 15. That is because "mishandling" city services simply does not shock the conscience in a constitutional sense. And contrary to assurances from the concurring opinion that today's opinion breaks no new ground,[21] it is precisely *because* the majority breaks new ground that officials are entitled to qualified immunity— no reasonable official could have known that their conduct was unconstitutional. Indeed, it was not.

―――――――――――――

[21] The concurrence asserts that the majority is "[f]ar from 'breaking new ground,'" in substantive due process because the majority "follows the Sixth Circuit's *Guertin* bodily-integrity analysis." *Ante*, at 45. But following a singular circuit decision that has, to put it charitably, gotten out over its skis, does not make today's decision any less groundbreaking. As the *Guertin* dissent put it, "[T]he majority extends the protections of substantive due process into new and uncharted territory," ignoring basic principles that "(1) a policymaker's or regulator's unwise decisions and statements or failures to protect the public are typically not considered conscience-shocking conduct, and (2) the Due Process Clause does not generally guarantee a bodily integrity right against exposure to contaminated water or other types of environmental harms." 912 F.3d at 942, 947 (McKeague, J., concurring in part and dissenting in part). This panel's decision to follow the Sixth Circuit into "new and uncharted territory" breaks new ground within this Circuit and goes further than *Guertin* in holding that purported "lies" can violate the Fourteenth Amendment even when coupled with notice, warnings, and recommendations.

No. 24-60370

This case involves the incompetent administration of governmental services to which citizens have no constitutional right. The imperfect updates coupled with clear warnings and Plaintiffs' admitted ability to procure clean water elsewhere do not amount to coercion. When examined at the appropriate level of specificity, the historical right to bodily integrity is not implicated on these facts. Plaintiffs' substantive due process claim necessarily fails. And because officials violated no constitutional right—much less one that was clearly established at the time—I agree that they are entitled to qualified immunity.

## IV

Plaintiffs originally offered another theory of recovery: state-created danger. Counsel for Plaintiffs effectively disclaimed this theory at oral argument, admitting that it would be challenging to delineate any distinction between their traditional substantive due process claim and the state-created danger claim. Indeed, counsel for Plaintiffs stated that we need not even address the state-created danger theory given the conduct at issue. The majority careens past these concessions and reflexively adopts a new substantive due process theory without any explanation of its history or contours. While most circuits have adopted some iteration of this theory, the theory itself is unmoored from history and tradition and lacks any uniformity in the adopting circuits. The circuits' inability to pin down coherent and consistent elements of the state-created danger claim is itself evidence that it is a byproduct of judicial invention we should not embrace.

"Under the state-created danger substantive due process doctrine, officers may be held liable for failing to protect plaintiffs from danger created or enhanced by their affirmative acts." *Irish v. Fowler*, 979 F.3d 65, 67 (1st Cir. 2020). The doctrine arises from a prominent case authored by Judge

No. 24-60370

Posner and two sentences in *DeShaney*.[22] In *Bowers v. DeVito*, Judge Posner opined that "[t]he Constitution is a charter of negative liberties; it tells the state to let people alone; it does not require the federal government or the state to provide services, even so elementary a service as maintaining law and order." 686 F.2d 616, 618 (7th Cir. 1982). Nonetheless, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, . . . it is as much an active tortfeasor as if it had thrown him into a snake pit." *Id.* Seven years later, in *DeShaney*, the Supreme Court held that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197. Though the State was *aware* of the dangers, it "played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201. From these "two sentences" in *DeShaney*, the state-created danger theory was born. *Murguia v. Langdon*, 73 F.4th 1103, 1103–04 (9th Cir. 2023) (Bumatay, J., dissenting from denial of reh'g en banc).

Following *DeShaney*, "a majority of our sister circuits . . . adopted the state-created danger theory of liability in one form or another." *Fisher*, 73 F.4th at 372–73. But we have "repeatedly declined" to adopt the theory, in part "because the Supreme Court has recently—and forcefully—underscored that substantive due process is a disfavored doctrine prone to judicial improvisation." *Id.* at 373 (citations omitted). We left open the possibility of adopting the theory when presented with "meticulous briefing on how state-created danger liability meets" *Dobbs*'s "reinvigorated test" for expanding substantive due process theories, which requires a demonstration that the theory is "deeply rooted in this Nation's history and tradition" and

---

[22] *See* Laura Oren, *Safari into the Snake Pit: The State-Created Danger Doctrine*, 13 Wm. & Mary Bill Rts. J. 1165, 1167 (2005).

"implicit in the concept of ordered liberty." *Id.* at 374 (quoting *Dobbs*, 597 U.S. at 231).

It seems evident that despite broad adoption by most circuits—all of which occurred before the instruction of *Dobbs*—the state-created danger theory lacks the requisite historical and traditional pedigree. *Murguia*, 73 F.4th at 1104 (Bumatay, J., dissenting) ("[T]he state-created danger exception finds no support in the text of the Constitution, the historical understanding of the 'due process of law,' or even Supreme Court precedent."). We recognized as much in *Fisher* when we explained that our sister circuits' adoption of the state-created danger theory relied not on history and tradition but on the fact that "(1) the Supreme Court left open the question in *DeShaney*, and (2) other courts have adopted the doctrine." 73 F.4th at 373–74 (footnotes omitted). Plaintiffs' briefing offers little else.

## A

Plaintiffs specifically contend that "our nation's history and traditions support the conclusion that the Constitution prohibits state-created dangers." Their best argument arises from the text and history of § 1983 itself: "Every person who, under color of [law], subjects, or *causes to be subjected*, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983 (emphasis added). This court has interpreted that italicized phrase to mean that state actors cannot "set in motion events that would foreseeably cause the deprivation of Plaintiffs' constitutional rights." *Morris*, 181 F.3d at 672 (holding that plaintiffs must establish a causal connection between the teacher's action and the deprivation of rights).

Plaintiffs and the concurrence take a broad read of this language, suggesting that it supports the state-created danger theory, which is allegedly

No. 24-60370

consistent with the statute's legislative history. They assert that § 1983 "is the codification of the Ku Klux Klan Act of 1871," which arose from Congress's concern that "local officials acted in complicity" with "a group of private actors" to "cause harm to Black Americans." Appellant Br. at 61 (citing CONG. GLOBE, 42nd Cong., 1st Sess. 377 (1871)); *see ante*, at 61; *see also* David Pruessner, *The Forgotten Foundation of State-Created Danger Claims*, 20 REV. LITIG. 357, 374–79 (2001). From these principles, Plaintiffs contend that the state-created danger doctrine traces its history to 1871, and the text of the statute itself suggests officials are liable for the dangers they create.

But the phrase "causes to be subjected" does not do the historical work Plaintiffs suggest. To the extent Plaintiffs contend that Congress hid the state-created danger elephant in the "causes" mousehole, Fifth Circuit and Supreme Court precedent indicate otherwise. *Murguia*, 73 F.4th at 1110 (Bumatay, J., dissenting). In *Morris*, the Fifth Circuit did not adopt or suggest support for the state-created danger theory. Instead, it set out the uncontroversial position that a § 1983 claim requires the plaintiff to prove causation, and an intermediary may break the chain of that causation. *Morris*, 181 F.3d at 672. And in *Monell*, the Supreme Court interpreted the causation prong of § 1983 to embrace a theory of secondary liability. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978) (The phrase "plainly imposes liability on a government that, under color of some official policy, 'causes' an *employee*"—not a private party—"to violate another's constitutional rights.").

The concurrence acknowledges that this reading of § 1983 "extend[s] constitutional tort liability to state actors further up the causal chain." *Ante*, at 61. Clean municipally-provided drinking water, while desirable, was not a constitutional right at the founding and has not been one since, until today, when my colleagues implicitly declared it so. The concurrence cannot find in

the Constitution, Bill of Rights, or any notion of the Founders one instance where clean water is elevated to the status of free speech, freedom of religion, the right to bear arms, freedom from unreasonable searches, the right to trial by jury, and confrontation of witnesses. This smacks of judicial "policymaking rather than neutral legal analysis," *United States v. Carlton*, 512 U.S. 26, 41 (1994) (Scalia, J., concurring), and the "divin[ation] [of] new rights in line with [the majority's] own, extraconstitutional value preferences," *Dobbs*, 597 U.S. at 334 (Thomas, J., concurring) (citation omitted). Regrettably, "the natural human tendency to confuse what [the Fourteenth] Amendment protects with our own ardent views about the liberty that Americans should enjoy" appears to have won the day. *Id.* at 239 (Alito, J., writing for the majority). Section 1983's causation prong simply does not give life to the state-created danger theory.

## B

Even if Plaintiffs could locate further support for the theory, there is a practical problem with the doctrine's adoption. It is ill-defined. "Because the Supreme Court has never explicitly or clearly addressed the theory, the federal circuits apply it unevenly and erratically." Note, Jeremy Daniel Kernodle, *Policing the Police: Clarifying the Test for Holding the Government Liable Under 42 U.S.C. § 1983 and the State-Created Danger Theory*, 54 Vand. L. Rev. 165, 169 (2001); *see also Murguia,* 73 F.4th at 1113 (Bumatay, J., dissenting) (delineating every circuit's formulation of the doctrine). For example, in several circuits, the state's conduct must shock the conscience and there must be some intervening non-state actor. *Murguia,* 73 F.4th at 1112–13 (Bumatay, J., dissenting). Others employ a "should have known" standard. *Id.* Still others require that the plaintiff be part of a limited and definable group or that the danger be "specific to [the] plaintiff." *Id.* The "Frankenstein" variations of the claim and the abstractions from due process that they might produce "are no surprise when you consider the legal

No. 24-60370

foundation on which they rest. A two-sentence aside in a single opinion is not a lot to go on." *Id.* at 1114. Because the theory is unmoored from history and lacks uniformity in the adopting courts, it cannot meet the "reinvigorated test" necessary for adoption. *Fisher*, 73 F.4th at 374.

## C

If the lack of history, tradition, and uniformity were not enough to caution against adoption of the state-created danger theory, the facts of this case should suffice. Plaintiffs cannot satisfy the iteration of the state-created danger claim they urge us to adopt (or any other for that matter). *See Fisher*, 73 F.4th at 374 (declining to adopt the state-created danger where "it is not clear that the facts alleged here would state a plausible [state-created danger] due process claim"). Plaintiffs advocate adoption of the Tenth Circuit's formulation of the claim. But the majority, of its own volition and without explanation, adopts the First Circuit's formulation. *See ante*, at 35–36 (citing *Irish*, 979 F.3d at 75).

As a threshold matter, the First Circuit, along with several others,[23] requires the plaintiff to establish that the defendant "affirmatively act[ed] to increase the threat to an individual of third-party private harm." *Irish*, 979

---

[23] *See, e.g.*, *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) ("As an initial matter, a showing of affirmative conduct and private violence are preconditions necessary to invoking the state-created danger theory."); *Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491–92 (6th Cir. 2019) ("[P]laintiffs can recover for private harms if they show . . . an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party" (citation omitted)); *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015) ("[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission."); *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009) ("[S]tate actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence.").

F.3d at 74 (quoting *Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004)). Plaintiffs offer no allegations of private violence. Without that, as Plaintiffs appeared to admit at oral argument, a traditional substantive due process claim and a state-created danger claim collapse into one with no clear distinctions between the two.

Moreover, Plaintiffs cannot meet the elements of the state-created danger claim the majority adopts. The second element requires Plaintiffs to identify "a danger *specific to the plaintiff[s]*." *Ante*, at 35. But where "the danger at issue . . . [is] a danger to the general public—not a danger that was in any meaningful sense specific to [Plaintiffs]," there can be no state-created danger claim. *Ramos-Pinero*, 453 F.3d at 54 (collecting cases). The danger alleged here was generalized to the City's entire water-drinking population, so it cannot meet the specific-individual requirement. And for all the reasons previously discussed, Plaintiffs cannot show that the City's conduct "shocks the conscience," as the majority's fourth element requires. *See ante*, at 35.

The majority appears unconcerned with the absence of historical support for this claim and unmoved by the Plaintiffs' inability to meet the very iteration of the state-created danger claim it adopts. Instead, the majority adopts the theory without regard to any of the Supreme Court's warnings or its applicability to this case, continuing its march to expand substantive due process far beyond anything this Circuit or the Supreme Court has ever recognized.

V

In a single opinion, the majority levels safeguards against the expansion of substantive due process and buries elected officials in tort claims dressed up as constitutional violations, creating a vast new vista of federal liability. Coercion by misrepresentation to induce citizens to use inadequate city services is a novel, if not implausible, theory of deliberate

indifference. We should not be surprised when a deluge of policy decisions previously thought to be safely in the province of executive discretion and tort law flow into our court for review as purported unconstitutional conscience-shocking misconduct. The sheer scope and impact of today's decision may be illustrated with a few examples.

## A

Perhaps a relatively banal example to begin: a mayor's half-hearted attempt to address potholes plaguing his city's streets. Despite city ordinances and regulations making clear that the city must maintain the roads, the potholes have gone unattended for generations. A new mayor decides to remediate the potholes (but ignores the major ones) and declares ("lies," as the majority states) repeatedly on a press tour that the streets are now "safe" and "drivable." In reliance on this claim, a new resident takes to the streets and, while driving the speed limit, hits a gigantic pothole obscured by standing water and the curve of the road. The impact of the car greeting the pothole causes whiplash and acute spinal injuries. Under the majority's theory, the city was statutorily required to maintain the streets, failed to do so, lied about their condition, and induced the unwitting citizen to drive into a life-threatening pothole. What was once a tort claim has suddenly transformed into a claim of constitutional proportions.

The majority's expansion of substantive due process claims is not limited to the local sphere. Take, for example, a pandemic accompanied by rapidly-developed vaccines. Authorized and qualified presidential advisers repeatedly claim without reservation that the vaccines are "safe and effective," and the administration implements vaccine mandates for most of the working population. The president maximizes the safety and efficacy claims with public statements that vaccinated individuals will not be able to contract or transmit the virus. And when vaccination rates slow, the

president threatens unvaccinated individuals with claims that they will endure severe illness, cause family members to die, and overwhelm hospitals. Following the mandates, threats of lost livelihoods and family members, and repeated claims of safety, 80% of the population takes the shot. Several years later, a Senate report suggests that the vaccine was not quite as safe or effective as reported—and officials knew it from the outset. The vaccine did not prevent infection or transmission. In some cases, it induced symptoms worse than the virus itself. And it carried with it cardiac risks, especially for young men, that federal officials covered up. Under the majority's approach, the non-custodial population was *coerced* by misrepresentations and nondisclosure into taking the vaccine. Those harmed now have a viable substantive due process claim.[24]

The opinion sweeps further, concluding that the time for adopting the state-created danger theory is now. Harm by private actors is now fair game and the deluge of substantive due process claims will proliferate. Consider the not-unusual city mayor who has become quite savvy at fudging crime statistics to make her city seem "safe." She downgrades every violent crime into something of a petty variant, including a few murders reclassified as "accidental" or "suicide" episodes. Her office releases the data, and she publicly calls the notoriously dangerous neighborhood "safe" and "good for

---

[24] The majority takes aim at this hypothetical with an inconsistency not supported by its own opinion. The majority suggests that administration of the vaccine through coercion could not shock the conscience because the vaccine had "demonstrable therapeutic benefits," even if it also had some "negative effects." *Ante*, at 31 n.8. But the majority declares in the same opinion that "[t]he Court has made clear that involuntary administration of even *therapeutic* substances can trigger the right to bodily integrity's protections—*particularly when those substances carry unwanted side effects*." *Ante*, at 14–15 (emphasis added) (citing *Washington v. Harper*, 494 U.S. 210, 221, 229 (1990)). The majority may resist the hypothetical, but under its interpretation of bodily integrity precedent, therapeutic benefit cannot vitiate a substantive due process claim. The vaccinated in the hypothetical above have a claim under the majority's approach.

tourists." As a result, a tourist visits the next day and is beaten, stabbed, and robbed. The tourist now has a state-created danger claim. Or perhaps a presidential administration opens the borders and declines to prosecute illegal crossings despite reports that Tren de Aragua gang members are arriving en masse and assaulting citizens. Despite knowing otherwise, administration officials repeatedly (and falsely) tell the public that the border is "secure" and there are no criminals migrating here. In reliance on these statements, a citizen travels to the border and is sexually assaulted by a Tren de Aragua member who crossed the border under the administration's non-enforcement policy. A state-created danger claim is born.

These examples alone suggest we have failed to heed the Supreme Court when it instructed us to "preserve the constitutional proportions of constitutional claims," arising from executive action. *Lewis*, 523 U.S. at 847 n.8. With the Supreme Court's limits gone, we are left with endless varietals of substantive due process claims and only our own subjective consciences to police whether the decisions of another branch pass constitutional muster.

## B

The majority demurs, assuring readers that these hypotheticals are mere abstractions because its holding is "narrow and fact specific." *Ante*, at 31. And, for avoidance of doubt, the opinion purportedly "does not recognize a generalized constitutional right to high-quality municipal services." *Id.* at 26–27. But these attempts at a levee will not hold. As the concurrence explains, at least one court has relied on *Guertin*'s reasoning to *extend* it to distinct contexts. *Ante*, at 45. The Fourth Circuit recently held that a plaintiff stated a viable § 1983 substantive due process claim against a city housing authority arising from its *failure* to maintain a gas-burning furnace and its *failure* to install a carbon monoxide detector following a tenant's death from carbon monoxide poisoning in a city-owned apartment. *See Washington v.*

*Hous. Auth. of the City of Columbia*, 58 F.4th 170, 175, 181 (4th Cir. 2023) (citing *Guertin*, 912 F.3d at 926). That sounds awfully close to recognizing a right to the competent administration of city services. Indeed, it bears an uncanny resemblance to some of the hypotheticals posed above.

The majority reshapes our Circuit's substantive due process jurisprudence in a single decision while assuring us it has done nothing of the sort. It embraces an all-encompassing right to bodily integrity whenever the state's action causes some harm, implies a right to competent city services, endorses the theory that elected officials can shock the conscience when they fail to give full disclosure of or misrepresent risks attending their decisions and failures, and adopts the state-created danger theory. The majority cannot make such sweeping changes and then characterize its holding as "narrow and fact specific" in the hopes that such a characterization will limit expansion. Expansion appears to be the point.

VI

Today's opinion opens Pandora's box of substantive due process claims and transforms this court—instead of the electorate—into the ultimate arbiters of good policy judgment. I have long been under the impression that substantive due process does not provide collateral review of every harmful decision made by elected officials in the process of balancing competing governmental priorities. *E.g.*, *Paul*, 424 U.S. at 701 (The Due Process Clause does not create "a right to be free of injury wherever the State may be characterized as the tortfeasor."). The majority takes a different view, but I am uncertain how long our constitutional and federalist order can sustain it. "The Judiciary . . . is the most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or even the design of the Constitution." *Michael H. v. Gerald D.*, 491 U.S. 110, 122 (1989) (citation omitted). We must

No. 24-60370

"be extremely reluctant to breathe . . . further substantive content into the Due Process Clause." *Id.* Today's opinion abandons reluctance to the threshing floor, inviting litigants to claim a violation of heretofore unrecognized "fundamental rights" and to recast every political misstep as conscience-shocking knavery.

Knavery or not, what "shocks my unelected conscience" should not determine the quality of governmental services administered by an official in whom voters have placed confidence. *Lewis*, 523 U.S. at 862 (Scalia, J., concurring). Whether that confidence was properly placed in the first instance is not a matter of *constitutional* proportions. Tort law, other statutes, and the ballot box provide a remedy that the Constitution does not. So, qualified immunity notwithstanding, I respectfully dissent.

# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

November 17, 2025

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:  Fifth Circuit Statement on Petitions for Rehearing
            or Rehearing En Banc

    No. 24-60370    Sterling v. City of Jackson
                    USDC No. 3:22-CV-531

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 39, 40, and 41
govern costs, rehearings, and mandates.  **Fed. R. App. P. 40 require
you to attach to your petition for panel rehearing or rehearing en
banc an unmarked copy of the court's opinion or order.**  Please
read carefully the Internal Operating Procedures (IOP's) following
Fed. R. App. P. 40 for a discussion of when a rehearing may be
appropriate, the legal standards applied and sanctions which may
be imposed if you make a nonmeritorious petition for rehearing en
banc.

Direct Criminal Appeals.  Fed. R. App. P. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

Pro Se Cases.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

Court Appointed Counsel.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for
rehearing and certiorari.**  Additionally, you MUST confirm that
this information was given to your client, within the body of your
motion to withdraw as counsel.

The judgment entered provides that each party bear its own costs on appeal.

Sincerely,

LYLE W. CAYCE, Clerk

By:_____
Roeshawn Johnson, Deputy Clerk

Enclosure(s)

Mr. Sheridan A. Carr
Mr. Mark P. Chalos
Mr. Dennis Jason Childress
Mr. Jeremy Daniels
Mr. Jack Robert Davis
Mr. Robert Lewis Gibbs
Mr. Terris Caton Harris
Mr. John Frederick Hawkins
Mr. Davide Macelloni
Mr. Drew McLemore Martin
Mr. Larry D. Moffett
Ms. Kaytie Michelle Pickett
Ms. Abbey Adcock Reeves
Mr. Dakota James Stephens
Mr. Adam Stone
Mr. Stuart Talley
Mr. Clarence Webster III
Mr. Tiseme G. Zegeye